**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04291-RLY-TAB |
| | ) | |
| RONCALLI HIGH SCHOOL, INC., | ) | |
| and the ROMAN CATHOLIC | ) | |
| ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

    A. Fitzgerald's role in the Archdiocese ............................................................. 3

    B. This dispute .................................................................................................... 5

STANDARD OF REVIEW ......................................................................................... 6

ARGUMENT ............................................................................................................... 6

    I.   Fitzgerald's federal claims are barred under Title VII and Title IX ................. 8

        A.  Title VII does not apply to decisions by religious employers based on an employee's religious observances and practices ............................ 8

        B.  Fitzgerald's material breach constituted a legitimate, nondiscriminatory reason for nonrenewal ................................................. 13

        C.  Fitzgerald has failed to allege that the challenged decision was motivated by sexual orientation, rather than Church teachings ............. 14

        D.  Fitzgerald's retaliation claims fail to allege but-for causation. ................ 16

        E.  Fitzgerald's Title IX claim is preempted by Title VII. .............................. 19

        F.  Fitzgerald's Title IX claim is barred by Title IX's religious-school exemption. ................................................................................................. 19

        G.  Neither Title VII nor Title IX applies to claims of discrimination based on sexual orientation .......................................................................... 20

    II.  All of Fitzgerald's claims are barred by the First Amendment ..................... 21

        A.  All of Fitzgerald's claims are barred by religious autonomy ..................... 21

            1.  Fitzgerald's federal claims are barred by religious autonomy .............. 21

            2.  Fitzgerald's state claims are barred by religious autonomy ................. 26

        B.  All of Fitzgerald's claims are barred because they would impermissibly entangle the Court in religious questions .......................... 28

        C.  All of Fitzgerald's claims are barred by freedom of association ............... 30

        D.  Constitutional avoidance requires dismissal of Fitzgerald's federal claims ....................................................................................................... 34

CONCLUSION .......................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. City of Indianapolis,*
    742 F.3d 720 (7th Cir. 2014) ...................................................................... 6

*Aparicio v. Christian Union, Inc.,*
    No. 18-CV-0592, 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019) ...................... 20, 25

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................. 6

*Bergholz v. John Marshall Law Sch.,*
    No. 18 C 3, 2020 WL 1066248 (N.D. Ill. Mar. 5, 2020) ........................................ 18

*Bouldin v. Alexander,*
    82 U.S. (15 Wall.) 131 (1872) ................................................................. 22

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) ......................................................... 30, 31, 32, 33

*Brasic v. Heinemann's Inc.,*
    121 F.3d 281 (7th Cir. 1997) .................................................................. 13

*Brazauskas v. Fort Wayne-South Bend Diocese, Inc.,*
    796 N.E.2d 286 (Ind. 2003) ............................................................. 27, 28

*Brown v. Ill. Dep't of Human Res.,*
    717 F. App'x 623 (7th Cir. 2018) ............................................................ 18

*Bryce v. Episcopal Church in the Diocese of Colo.,*
    289 F.3d 648 (10th Cir. 2002) ........................................................ 23, 25, 26

*Burton v. Bd. of Regents of Univ. of Wis. Sys.,*
    851 F.3d 690 (7th Cir. 2017) .................................................................. 16

*Byrd v. DeVeaux,*
    No. DKC 17-3251, 2019 WL 1017602 (D. Md. Mar. 4, 2019) ................................ 26

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ...........................................................*passim*

*Christian Legal Society v. Martinez,*
    561 U.S. 661 (2010) ............................................................................. 16

*Clark Cty. Sch. Dist. v. Breeden*,
    532 U.S. 268 (2001) ........................................................................ 17

*Cline v. Catholic Diocese of Toledo*,
    206 F.3d 651 (6th Cir. 2000) ........................................................ 12, 14

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*,
    483 U.S. 327 (1987) ................................................................*passim*

*Crotteau v. St. Coletta of Wis.*,
    200 F. Supp. 3d 804 (W.D. Wisc. 2016) ............................................. 9

*Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*,
    450 F.3d 130 (3d Cir. 2006) ...................................................*passim*

*Darbha v. Capgemini Am., Inc.*,
    No. 10-C-2581, 2012 WL 718826 (N.D. Ill. Mar. 6, 2012) ................... 17

*Darbha v. Capgemini America Inc.*,
    492 F. App'x 644 (7th Cir. 2012) ..................................................... 17

*Demkovich v. St. Andrew the Apostle Parish*,
    343 F. Supp. 3d 772 (N.D. Ill. 2018) .......................................... 24, 25

*Duquesne Univ. of the Holy Spirit v. NLRB*,
    947 F.3d 824 (D.C. Cir. 2020) ......................................................... 35

*Dwenger v. Geary*,
    14 N.E. 903 (Ind. 1888) ................................................................. 28

*EEOC v. Miss. Coll.*,
    626 F.2d 477 (5th Cir. 1980) ......................................................... 10

*El-Hajjami v. United Med. Ctrs.*,
    No. 13-cv-70, 2015 WL 11545025 (W.D. Tex. Apr. 1, 2015) ................... 3

*Eu v. S.F. Cty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989) ....................................................................... 30

*Fitzgerald v. Barnstable Sch. Comm.*,
    555 U.S. 246 (2009) ....................................................................... 18

*Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints*,
    No. 2:19-cv-554-RJS-DBP, 2020 WL 1536565
    (D. Utah Mar. 31, 2020) ................................................................. 26

*Garcia v. Salvation Army*,
   918 F.3d 997 (9th Cir. 2019) ............................................................... 9, 12

*Garrick v. Moody Bible Inst.*,
   412 F. Supp. 3d 859 (N.D. Ill. 2019) .................................... 19, 20, 24, 25

*Gonzalez v. Roman Catholic Archbishop*,
   280 U.S. 1 (1929) ..................................................................................... 22

*Gosche v. Calvert High Sch.*,
   997 F. Supp. 867 (N.D. Ohio 1998) ........................................................ 14

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*,
   882 F.3d 655 (7th Cir. 2018) ................................................................... 28

*Hall v. Baptist Mem'l Health Care Corp.*,
   215 F.3d 618 (6th Cir. 2000) ..................................................... 10, 29, 30

*Hall v. City of Chicago*,
   713 F.3d 325 (7th Cir. 2013) ................................................................... 14

*Hively v. Ivy Tech Cmty. Coll. of Ind.*,
   853 F.3d 339 (7th Cir. 2017) ................................................................... 20

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012) ............................................................. 6, 21, 23, 32

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
   515 U.S. 557 (1995) .......................................................................... 30, 34

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.*,
   665 F.3d 930 (7th Cir. 2012) ..................................................................... 6

*Johnson v. Advocate Health & Hosps. Corp.*,
   892 F.3d 887 (7th Cir. 2018) ................................................................... 14

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
   344 U.S. 94 (1952) ................................................................................... 22

*Kennedy v. St. Joseph's Ministries, Inc.*,
   657 F.3d 189 (4th Cir. 2011) ......................................................... 9, 10, 11

*Killinger v. Samford Univ.*
   113 F.3d 196 (11th Cir. 1997) ................................................................. 10

*Korte v. Sebelius*,
   735 F.3d 654 (7th. Cir. 2013) ............................................................. 8, 21

iv

*Leak v. Hous. Auth. of Winston-Salem,*
   No. 13-837, 2013 WL 5494085 (M.D.N.C. Oct. 2, 2013)......................................... 14

*Leitgen v. Franciscan Skemp Healthcare, Inc.,*
   630 F.3d 668 (7th Cir. 2011) ................................................................. 16

*Leonard v. E. Ill. Univ.,*
   606 F.3d 428 (7th Cir. 2010) ................................................................. 16

*Little v. Wuerl,*
   929 F.2d 944 (3d Cir. 1991)............................................................*passim*

*Maguire v. Marquette Univ.,*
   627 F. Supp. 1499 (E.D. Wisc. 1986) ...................................................... 11

*Maguire v. Marquette Univ.,*
   814 F.2d 1213 (7th Cir. 1987) ............................................................... 12

*Martinez v. City of New York,*
   338 F. App'x 71 (2d Cir. 2009)......................................................... 14, 16

*McCarthy v. Fuller,*
   714 F.3d 971 (7th Cir. 2013) ............................................................ 28, 29

*McEnroy v. St. Meinrad School of Theology,*
   713 N.E.2d 334 (Ind. Ct. App. 1999)................................................... 26, 27

*McMahon v. College,*
   No. 04-C-0384, 2005 WL 8162996 (E.D. Wis. Jan. 18, 2005) .............................. 18

*Montell v. Diversified Clinical Servs., Inc.,*
   757 F.3d 497 (6th Cir. 2014) ................................................................. 17

*Morgan Asset Holding Corp. v. CoBank, ACB,*
   736 N.E.2d 1268 (Ind. Ct. App. 2000).................................................... 27

*Myhre v. Seventh-day Adventist Church Reform Movement Am. Union*
   *Int'l Missionary Soc'y,*
   719 F. App'x 926 (11th Cir. 2018) ......................................................... 26

*N.Y. Times v. Sullivan,*
   376 U.S. 254 (1964) ........................................................................... 26

*NAACP v. Claiborne Hardware Co.,*
   458 U.S. 886 (1982) ........................................................................... 30

*Nader v. ABC Television, Inc.,*
  150 F. App'x 54 (2d Cir. 2005)..............................................................13

*Neely-Bey Tarik-El v. Conley,*
  912 F.3d 989 (7th Cir. 2019) ...............................................................31

*NLRB v. Catholic Bishop of Chi.,*
  440 U.S. 490 (1979) ..............................................................32, 34, 35

*Obergefell v. Hodges,*
  135 S. Ct. 2584 (2015) ......................................................................1, 16

*Oncale v. Sundowner Offshore Servs., Inc.,*
  523 U.S. 75 (1998) ................................................................................14

*Orgone Capital III, LLC v. Daubenspeck,*
  912 F.3d 1039 (7th Cir. 2019). ...............................................................3

*Our Lady's Inn v. City of St. Louis,*
  349 F. Supp. 3d 805 (E.D. Mo. 2018) ..................................................30

*Overall v. Ascension,*
  23 F. Supp. 3d 816 (E.D. Mich. 2014) ...................................................3

*Patterson v. Avery Dennison Corp.,*
  281 F.3d 676 (7th Cir. 2002) ................................................................30

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.,*
  819 F.2d 875 (9th Cir. 1987) ................................................................22

*Petruska v. Gannon Univ.,*
  No. 1:04-cv-80, 2008 WL 2789260 (W.D. Pa. Mar. 31, 2008)................19

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l
  Presbyterian Church,*
  393 U.S. 440 (1969) ..............................................................................28

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ..............................................................................31

*RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.,*
  672 F.3d 476 (7th Cir. 2012) ................................................................21

*Saud v. DePaul Univ.,*
  No. 19-cv-3945, 2019 WL 5577239 (N.D. Ill. Oct. 29, 2019) ................18

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976) ........................................................................... 6, 22

*Starkey v. Roncalli High Sch., Inc.*,
    No. 1:19-cv-03153-RLY-TAB (S.D. Ind. Mar. 24, 2020) ......................................... 1

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981) ............................................................................. 28

*Tomic v. Catholic Diocese of Peoria*,
    442 F.3d 1036 (7th Cir. 2006) .................................................................. 21

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S. Ct. 2012 (2017) .......................................................................... 16

*Univ. of Notre Dame v. Sebelius*,
    743 F.3d 547 (7th Cir. 2014) ................................................................... 28

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ........................................................................ 16, 17

*Vore v. Ind. Bell Telephone Co.*,
    32 F.3d 1161 (7th Cir. 1994) ................................................................... 14

*Washington v. Safer Found.*,
    274 F. App'x 484 (7th Cir. 2008) ............................................................... 14

*Watson v. Jones*,
    80 U.S. 679 (1871) .............................................................................. 22

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ............................................................................. 23

**Statutes**

20 U.S.C. § 1681 ............................................................................ 2, 19, 20

42 U.S.C. § 2000e .............................................................................. 2, 10

42 U.S.C. § 2000e-1 .................................................................... 9, 10, 11, 14

42 U.S.C. § 2000e-2 ............................................................................... 9

42 U.S.C. § 2000e-3 .............................................................................. 12

**Other Authorities**

Catechism of the Catholic Church ¶ 2357 ................................................. 15

Catechism of the Catholic Church ¶ 2358 ................................................. 15

Code of Canon Law, Canon 1055 .................................................... 5, 15

Code of Canon Law, Canon 795 ......................................................... 4

Code of Canon Law, Canon 803 ......................................................... 4

Carl H. Esbeck, Federal Contractors, Title VII, and LGBT
    Employment Discrimination: Can Religious Organizations
    Continue to Staff on a Religious Basis?, 4 Oxford J.L. & Relig. 368
    (2015) ............................................................................. 11

Stephanie N. Phillips, *A Text-Based Interpretation of Title VII's
    Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295 (2016)...................... 10

# INTRODUCTION

Both the Constitution and federal antidiscrimination laws have long recognized that religious organizations have a right to hire "only those committed to" their "religious mission." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). In the context of same-sex marriage, the Supreme Court has specifically emphasized that "religious organizations" must be given "proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths"—including when they "advocate" that "same-sex marriage should not be condoned." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2607 (2015).

The question in this case—as in the *Starkey* case, in which the Archdiocese has filed a similar motion for judgment on the pleadings, *see Starkey v. Roncalli High Sch., Inc.*, No. 1:19-cv-03153-RLY-TAB (S.D. Ind. Mar. 24, 2020), Dkt. 59 (brief)—is whether the Catholic Church will be able to continue conveying its millennia-old beliefs about marriage and sexuality in a comprehensive way throughout its religious institutions, or whether antidiscrimination laws will instead be distorted to punish the Church for asking its employees to be "committed to [its] mission." *Amos*, 483 U.S. at 342 (Brennan, J., concurring).

Plaintiff Michelle Fitzgerald led the guidance department at a Catholic high school, where she exercised significant influence over Catholic students. As a condition of working at the school, she signed a "Ministry Contract" agreeing to "convey and be supportive of the teachings of the Catholic Church" and acknowledging that she would be in violation of her contract if she engaged in "any personal conduct or lifestyle at variance with the policies of the Archdiocese or the moral or religious teachings of the Roman Catholic Church"—including any "[r]elationship[] … contrary to a valid marriage as seen through the eyes of the Catholic Church."

Ms. Fitzgerald knowingly violated her contract by entering a same-sex union in violation of Church teaching. Her complaint confirms her deep disagreement with that teaching, noting she has publicly opposed the Archdiocese's application of its teachings in the media, helps lead an organization that was formed to oppose the application of those teachings, and "is an active mentor for [her] students in their efforts" to do the same. When the Archdiocese declined to renew her contract, she brought this lawsuit, alleging that the Church's requirement that its representatives support Church teaching violates federal nondiscrimination and state tort law. Unsurprisingly, her claims are barred, not only by bedrock First Amendment principles but by the text of the statutes on which she bases her claims.

First, both Title VII and Title IX have religious exemptions that foreclose this action on the pleadings. Title VII permits a religious employer to make decisions based on an employee's "religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). And Title IX does not apply to religious schools where application would "not be consistent" with the school's "religious tenets." 20 U.S.C. § 1681(a)(3). The parties agree that the nonrenewal decision here was based on disagreement about Catholic religious practices on marriage. That is a legitimate, nondiscriminatory reason to not renew the contract of an educational leader in a Catholic school, and it is explicitly protected by statute.

The First Amendment also bars this action; indeed, multiple lines of doctrine limiting state interference with religious organizations converge in this case. First, religious-autonomy doctrine forbids the government from forcing a religious organization to retain a person, particularly in a leadership role, who rejects its teaching. Second, because Fitzgerald's discrimination claims turn on her view that the Church treated her same-sex union worse than other "violat[ions]" of "teachings of the Catholic Church," she can prevail only if the Court can weigh the gravity of different Church teachings—a quintessentially theological inquiry both Religion Clauses bar courts

from undertaking. Third, freedom of association protects the ability of religious and secular expressive organizations alike to exclude an employee or representative who would undermine the group's message. These interlocking constitutional problems bar all of Fitzgerald's claims; at a minimum, they raise grave constitutional-avoidance concerns that require giving Title VII and Title IX's limiting provisions full effect.

Nothing discovery could reveal would cure these fundamental flaws in Fitzgerald's case. Thus, all of her claims must be dismissed on the pleadings.

## FACTUAL BACKGROUND[1]

### A. Fitzgerald's role in the Archdiocese

Defendants are the Roman Catholic Archdiocese of Indianapolis and Roncalli Catholic High School. The Archdiocese is a constituent entity of the Roman Catholic Church that "derives its power to supervise" Catholic institutions "from the Catholic Church through the power invested in the Archdiocese by the Pope and the Vatican." Compl. ¶ 17, Dkt. 1.

Roncalli is a ministry "under the guidance and supervision" of the Archdiocese. Compl. ¶¶ 16-21; *see* Answer ¶¶ 16-21, Dkt. 29. Its purpose is to "support[] and … further[] the mission and purposes of" the Archdiocese, through "faith formation, education and instruction of its students." Ex. 3 ¶ 2.1.

---

[1] In evaluating a Rule 12(c) motion, the Court may consider, in addition to the pleadings themselves, (1) documents "incorporated by reference in the pleadings"; or (2) "public" information subject to "judicial notice." *Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019). As referenced here, Fitzgerald's employment contract (attached in part as Exhibits 1 and 2) is incorporated by reference in the pleadings. *See* Compl. ¶¶ 29, 49-50, Dkt. 1. Roncalli's Articles of Incorporation (attached as Exhibit 3) are on file with the Indiana Secretary of State's office and may be judicially noticed. *Overall v. Ascension*, 23 F. Supp. 3d 816, 825 (E.D. Mich. 2014). The Catholic Church's Code of Canon Law is a source of law, not fact, and in any event is publicly available on the Vatican's website (http://bit.ly/2WmgBTu) and may be judicially noticed. *See El-Hajjami v. United Med. Ctrs.*, No. 13-cv-70, 2015 WL 11545025, at *17 (W.D. Tex. Apr. 1, 2015).

Plaintiff Michelle Fitzgerald worked at Roncalli for over 14 years, "almost all of" that time "as a Guidance Counselor and/or Co-Director of Guidance[.]" Compl. ¶ 28; Answer ¶ 28. Each year, she was employed pursuant to a one-year employment contract that expired at the end of the school year. Compl. ¶ 29; *see* Answer ¶ 29. At the time this dispute arose, Fitzgerald was employed as Co-Director of Guidance. Compl. ¶ 126; *see* Ex. 1 (title indicated).

Catholic schools "strive for complete formation of the human person," focusing not just on academics but on developing students' faith and "moral ... talents" in a manner "grounded in the principles of Catholic doctrine." Code of Canon Law, Canons 795, 803 § 2. This objective was incorporated into Fitzgerald's written employment contract, which provided that school guidance counselors are "expected to be role models and are expressly charged with leading students toward Christian maturity and with teaching the Word of God." Ex. 2 ¶ V.A; *see* Ex. 1 ¶ 4. The contract thus specified that "the personal conduct of every school guidance counselor, ... both at school and away from school, must convey and be supportive of the teachings of the Catholic Church"—including "the belief that all persons are called to respect human sexuality and its expression in the Sacrament of Marriage." Ex. 2 ¶ V.A.

Consistent with these requirements, Fitzgerald agreed in the contract that she would be in default if she engaged in conduct inconsistent with Church teaching, including on marriage. Compl. ¶¶ 49, 54; *see* Answer ¶¶ 49, 54. The contract provided:

> 6. **Defaults.** The School Guidance Counselor shall be deemed to be in default under this contract in the event of any [of] the following:
>
> ...
>
> i.  Relationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church; and
>
> j.  ... any personal conduct or lifestyle at variance with the policies of the Archdiocese or the moral or religious teachings of the Roman Catholic Church.

Ex. 1. ¶ 6. The Catholic Church teaches that marriage is a "covenant" between "a man and a woman." Code of Canon Law, Canon 1055 § 1.

The contract also designated Fitzgerald as "a minister of the faith." Ex. 2 ¶ II. The first listed role in her "Ministry Description" was "facilitat[ing] faith formation." *Id.* ¶ III (capitalization altered). She was to do this by, among other things, "communicat[ing] the Catholic faith to students and families through implementation of the school's guidance curriculum" and "convey[ing] the Church's message and carr[ying] out its mission by modeling a Christ-centered life." *Id.* (capitalization altered).

### B.  This dispute

In August 2018, Roncalli leadership learned that Fitzgerald had obtained a marriage license with a same-sex partner and approached her about this matter. Compl. ¶ 52; Answer ¶ 52. Roncalli leadership indicated that this violated her contract as "contrary to teaching of the Catholic Church," and that she could not continue her employment while rejecting this Church teaching and remaining in this union. Compl. ¶¶ 53-54; *see* Answer ¶¶ 53-54. Fitzgerald stated that she would not resign, dissolve her marriage, or keep her rejection of Church teaching nonpublic. Compl. ¶ 55; Answer ¶ 55. She was then given "paid administrative leave" for the remainder of her one-year contract, which was not renewed. Compl. ¶¶ 56, 66; Answer ¶¶ 56, 66.

Fitzgerald alleges that since she was placed on paid administrative leave in August 2018, she has "taken an active role in opposing" the Archdiocese's policy requiring its educators to uphold Church teaching on the nature of marriage. Compl. ¶ 69. Her "activism" has "included her participation in numerous interviews with all forms of media across the world." Compl. ¶¶ 71. She has taken prominent roles in LGBT advocacy organizations such as the Pride Parade (where she acted as "Grand Marshall"). Compl. ¶ 72. And she "serves on the Board of Shelly's Voice"—an "advocacy

group" that was "formed to oppose" the Archdiocese's policies—and is an "active mentor for the [Roncalli] students in their efforts opposing" the Archdiocese's policies. Comp. ¶ 73-75.

On October 21, 2019, Fitzgerald sued the Archdiocese and Roncalli (hereinafter "the Archdiocese," except in Part II.A.2) asserting six claims: adverse employment action under Title VII (Count I); retaliation under Title VII (Count II); hostile work environment under Title VII (Count III); retaliation under Title IX (Count IV); a tort claim for interference with contract (Count V); and a tort claim for interference with an employment relationship (Count VI). Compl. ¶¶ 77-137.

## STANDARD OF REVIEW

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014). A claim should therefore be dismissed if the complaint fails to "state a 'plausible' claim for relief." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). For example, a claim fails if it "sets out all of the elements of an affirmative defense." *Id.* at 935.

## ARGUMENT

The Supreme Court has long recognized that disputes between a religious organization and its employees can raise significant First Amendment issues. *Amos*, 483 U.S. at 335-36; *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 715-20 (1976). Sometimes, the First Amendment issue is resolved based on the *function* the employee plays within the religious organization. For example, under the "ministerial exception," the Supreme Court has held that if an employee is a "minister"—a legal term of art that often includes educators in religious schools—the employee cannot sue to get her job back, even if there was no "religious reason" for the employment

decision. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194-95 (2012).

Other times, the First Amendment issue is resolved based on the "religious reason" for the employment decision. For example, federal employment laws like Title VII and Title IX expressly protect the right of religious organizations to make hiring decisions based on religious reasons. And several overlapping First Amendment doctrines likewise protect the ability of religious groups to "create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization[']s religious activities." *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 141 (3d Cir. 2006) (quoting *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991)).

This case involves *both* types of First Amendment issues. First, as the Archdiocese will show, if necessary, in a separate motion for summary judgment, Fitzgerald *was* a minister for ministerial-exception purposes; she played a crucial role in transmitting the Catholic faith to the next generation, held the title of a minister, was trained as a minister, and held herself out as a minister. However, for purposes of this motion, the court need not inquire into whether Fitzgerald was a minister, because the *reason* for Fitzgerald's nonrenewal is made clear on the face of the complaint and is undisputedly religious: The Archdiocese declined to renew her contract because she defied its teachings on marriage and sexuality. That employment decision is protected by multiple, overlapping statutory and constitutional provisions, which can be resolved based solely on the pleadings.

First, both Title VII and Title IX expressly protect the right of religious organizations to limit employment to individuals who adhere to their religious tenets. Second, the religious-autonomy doctrine, which is rooted in the Religion Clauses, prohibits civil courts from interfering in a religious organization's decision about who meets religious qualifications for membership or employment. Third, the Religion Clauses'

rule against judicial entanglement in religious questions forecloses Fitzgerald's invitation to have this Court weigh the significance of different violations of Church teaching. Finally, the freedom of association protects the ability of an expressive association like the Archdiocese here to disaffiliate with a person whose presence in the group would undermine the group's message.

Any one of these doctrines would suffice to require dismissal of Fitzgerald's claims; all foreclose them here. Because Fitzgerald's claims on their face would trample on the "boundary between two separate polities, the secular and the religious," *Korte v. Sebelius*, 735 F.3d 654, 677 (7th. Cir. 2013), they fail on the pleadings.

## I. Fitzgerald's federal claims are barred under Title VII and Title IX.

Fitzgerald's Title VII and Title IX claims (Counts I-IV) are barred on their face by the statutes themselves. Title VII's religious exemptions permit religious organizations to set and enforce employment standards based on an employee's religious beliefs and conduct. In any event, Fitzgerald's knowing breach of the contract's morals clause was a legitimate, nondiscriminatory reason for nonrenewal. And her retaliation claims fail the but-for causation test.

Fitzgerald's Title IX claim is preempted by Title VII. Even if it were not, Title IX also contains a religious exemption allowing religious schools to conduct their affairs consistent with their beliefs. Finally, neither statute prohibits the "sexual orientation" discrimination that is the basis of Fitzgerald's claims.

### A. Title VII does not apply to decisions by religious employers based on an employee's religious observances and practices.

Title VII exempts religious organizations like the Archdiocese from claims based on the application of religious employment standards. The relevant exemptions appear in two sections of the statute. First, § 702(a) of Title VII provides an exemption applicable to all religious employers:

> This subchapter shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a). Second, § 703(e)(2) provides that even schools that aren't "owned, supported, controlled, or managed by a particular religion or … religious corporation" may "hire and employ employees of a particular religion" if their "curriculum … is directed toward the propagation of a particular religion." 42 U.S.C. § 2000e-2(e)(2). Defendants here are themselves a religious corporation and a religious educational institution. Compl. ¶¶ 14-15, 17; Answer ¶¶ 14-15, 17; *see* Ex. 3 ¶ 2.1. So, while both exemptions apply, this brief focuses on § 702(a).

The exemption provided by § 702(a) bars all of Fitzgerald's Title VII claims. Congress enacted § 702(a) to protect "the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 339. It therefore "painted with a broad[] brush," *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011), in three ways important here.

First, the exemption applies to all Title VII claims—not just claims of discriminatory hiring and firing. *Id.* at 193-94; *see also, e.g.*, *Garcia v. Salvation Army*, 918 F.3d 997, 1006 (9th Cir. 2019). The "subchapter" the exemption covers is Title VII itself. *Kennedy*, 657 F.3d at 194. Thus, Fitzgerald's "three [Title VII] claims—discharge, harassment, and retaliation"—are "all" barred if the exemption applies. *Id.* at 193-94; *see Garcia*, 918 F.3d at 1006 ("The 'entire subchapter' of Title VII includes protections against retaliation and discriminatory harassment amounting to a hostile work environment."); *accord Crotteau v. St. Coletta of Wis.*, 200 F. Supp. 3d 804, 811 (W.D. Wisc. 2016) (exemption "likely also applies to claims for hostile work environment based on religion" (citing *Kennedy*)).

Second, the exemption applies to "all employees"—not just those "engaged in 'religious activities.'" *Little*, 929 F.2d at 950; *see also Amos*, 483 U.S. at 330 (case involving a building engineer). Thus, while the evidence in this case would ultimately show that Fitzgerald *did* have religious duties, that is irrelevant for purposes of § 702(a).

Third, the exemption protects an employer's ability to make employment decisions based on an employee's "*conduct*," not just her beliefs or formal religious affiliation. *Kennedy*, 657 F.3d at 194 (quoting *Little*, 929 F.2d at 951). The exemption allows religious employers to limit hiring to individuals of a "particular religion." 42 U.S.C. § 2000e-1(a). And Title VII defines "religion" not in the colloquial sense of mere affiliation, but broadly to "include[] *all aspects of religious observance and practice*, as well as belief." *Little*, 929 F.2d at 950 (quoting 42 U.S.C. § 2000e(j)) (emphasis added). "[D]ecision[s] to employ individuals 'of a particular religion'" under § 702(a), then, "include the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer." *Kennedy*, 657 F.3d at 192 (quoting *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000)); *see also Killinger v. Samford Univ.* 113 F.3d 196, 200 (11th Cir. 1997) ("[Section 702(a)] allows religious institutions to employ only persons whose beliefs are consistent with the employer's…."). So when a religious employer decides, based on its religious beliefs, that it will employ only individuals whose "religious observance and practice" align with its own, Title VII does not apply. *See EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) (also finding First Amendment barred inquiry into whether plausible religious reason was a "pretext"); Stephanie N. Phillips, *A Text-Based Interpretation of Title VII's Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295, 312 (2016).

The Third Circuit's decision in *Curay-Cramer* is illustrative. There, a Catholic school dismissed a teacher for engaging in pro-choice advocacy in violation of Catholic teaching. 450 F.3d at 132. The teacher then sued the school under Title VII for sex discrimination, alleging that the school had treated her more harshly than "similarly

situated male employees" who had engaged in "substantially similar conduct" relating to other Catholic teachings. *Id.* The court, however, held that her claim must be dismissed at the pleadings stage based on Title VII's religious-school exemption. As the Third Circuit explained, "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Id.* at 141 (quoting *Little*, 929 F.2d at 951). Because the school had "offer[ed] a religious justification" for its decision— that the teacher had violated Church doctrine by promoting abortion—the teacher's claim was barred, even though the claim complained of sex (rather than religious) discrimination. *Id.*; *see also Maguire v. Marquette Univ.*, 627 F. Supp. 1499, 1502-04 (E.D. Wisc. 1986) (applying exemption to sex-discrimination claim; "There is no question but that the government has a significant interest in eradicating sex discrimination. But as Title VII and the First Amendment recognize, the right to exercise religious faith free of governmental interference is fundamental."), *aff'd in part and vacated in part*, 814 F.2d 1213 (7th Cir. 1987).

Applied here, § 702(a) bars all of Fitzgerald's Title VII claims. It's undisputed that the Archdiocese had a religious justification for putting Fitzgerald on paid administrative leave and declining to renew her contract: it did so because her same-sex union was "contrary to [the] teaching of the Catholic Church." Compl. ¶ 54; Answer ¶ 54. Fitzgerald attacks the Church's teaching on marriage as itself discriminatory. But she does not (and cannot) dispute the facts that trigger § 702(a): Her contract wasn't renewed because her "particular religion," 42 U.S.C. § 2000e-1(a) (observance, practice, and belief)—as manifested in her entering a same-sex union and rejecting Church teaching—was "inconsistent with" the Archdiocese's. *Kennedy*, 657 F.3d at 192; *see also* Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment Discrimination: Can Religious Organizations Continue to Staff on a Religious Basis?*, 4 Oxford J.L. & Relig. 368, 376 (2015) ("[T]here is no limitation that turns on the

11

mere chance that the employee-plaintiff complains of religious discrimination as opposed to claiming under some other protected class such as sex.").

Fitzgerald's hostile-work-environment and retaliation claims are also foreclosed by § 702(a). The Archdiocese's only actions that are alleged to have created the hostile work environment are its articulation and application of its beliefs on marriage—the same protected conduct underlying Fitzgerald's adverse-action claim. Compl. ¶¶ 52-68; *see* Compl. ¶ 114 (alleging hostile work environment beginning at the time of her paid administrative leave). As for retaliation, Fitzgerald alleges that the Archdiocese declined to renew her contract (and asked her father, who supported her, not to act as a speaker at the Senior Retreat dedicated to "spiritual growth") because she and her father "oppos[ed the Archdiocese's] practices" of placing her on administrative leave based on her same-sex union. Compl. ¶ 94; *see also id.* ¶¶ 52-76, 98. But even if Fitzgerald could bring a retaliation claim for decisions made before her opposition— and she cannot, *see* Part I.D—that's just another way of saying that the Archdiocese took action against Fitzgerald because she "oppos[ed]" its views on same-sex unions. Again, this is precisely what § 702(a) allows. "Because [§ 702(a)] permits religious organizations" to dismiss employees whose beliefs or conduct are inconsistent with the organization's religion, retaliation claims based on opposition to such actions fail "because the practice 'opposed' is not 'unlawful.'" *Garcia*, 918 F.3d at 1006 (quoting 42 U.S.C. § 2000e-3(a)).

"Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Little*, 929 F.2d at 951. The pleadings demonstrate that this is precisely what the Archdiocese has done in declining to renew Fitzgerald's contract here. Her Title VII claims (Counts I-III) must be dismissed.

## B. Fitzgerald's material breach constituted a legitimate, nondiscriminatory reason for nonrenewal.

Exemption aside, Fitzgerald's Title VII claims also fail because her breach of her ministry contract's "morals clause[]," Compl. ¶ 49, constitutes a "legitimate, nondiscriminatory reason" for the Archdiocese's nonrenewal decision. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 666 (6th Cir. 2000) (citation omitted); *see Maguire v. Marquette Univ.*, 814 F.2d 1213, 1216-17 (7th Cir. 1987) (explaining that "Title VII does not grant relief to individuals who were refused employment for any reason other than discrimination on account of race, color, religion, sex, or national origin" and rejecting a claim where a decision was based on theological disagreement (internal quotation marks and citation omitted)).

When this dispute arose, Fitzgerald was employed pursuant to a "School Guidance Counselor Ministry Contract." Compl. ¶ 50; *see* Ex. 1 (contract). Under what Fitzgerald refers to as the contract's "morals clause[]," Compl. ¶ 49, she was required to "convey and be supportive of the teachings of the Catholic Church"—including, specifically, "the belief that all persons are called to respect human sexuality and its expression in the Sacrament of Marriage." Ex. 2 ¶ V.A. The contract further specified that she would be in default if she entered a "[r]elationship[ ] … contrary to a valid marriage as seen through the eyes of the Catholic Church" or engaged in "any personal conduct or lifestyle at variance with the policies of the Archdiocese or the moral or religious teachings of the Roman Catholic Church." Ex. 1 ¶ 6(i), (j).

The parties agree that Fitzgerald engaged in conduct prohibited by these provisions. Compl. ¶ 51; Answer ¶ 51. And the parties further agree that this breach formed the basis of the Archdiocese's actions: Fitzgerald was placed on paid leave and not renewed because "her marriage to a female spouse" violated her ministry contract

13

and was "contrary to the teaching of the Catholic Church." Compl. ¶¶ 52-56 (emphasizing that Fitzgerald would not "keep quiet" about her disagreement with Church teaching); *see* Answer ¶¶ 52-56.

Material breach of contract is of course a legitimate, nondiscriminatory reason for an adverse employment action. *E.g.*, *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284-85 (7th Cir. 1997). And morals clauses are no different; even for secular employers, "[m]orals clauses have long been held valid and enforceable" despite Title VII claims. *Nader v. ABC Television, Inc.*, 150 F. App'x 54, 56 (2d Cir. 2005). That is "particularly" true for religious employers like the Archdiocese, whose contractual morals clauses are often connected to their statutorily and constitutionally protected efforts to hire and retain only employees "of a particular religion." *Gosche v. Calvert High Sch.*, 997 F. Supp. 867, 872 (N.D. Ohio 1998) (quoting 42 U.S.C. § 2000e-1); *see also, e.g.*, *Cline*, 206 F.3d at 666 (diocesan school's policy against premarital sex); *cf. Christian Legal Soc'y v. Walker*, 453 F.3d 853, 857-58 (7th Cir. 2006) (student group's policy prohibiting "sexual activity outside of a traditional (one man, one woman) marriage"). Because this legitimate, nondiscriminatory reason for the Archdiocese's decision is admitted on the face of Fitzgerald's complaint, her Title VII claims must be dismissed on the pleadings. *See, e.g.*, *Martinez v. City of New York*, 338 F. App'x 71, 73 (2d Cir. 2009); *Leak v. Hous. Auth. of Winston-Salem*, No. 13-837, 2013 WL 5494085, at *3 (M.D.N.C. Oct. 2, 2013); *cf. Washington v. Safer Found.*, 274 F. App'x 484, 485 (7th Cir. 2008) ("[P]laintiff does not dispute that he was aware of [the employer's] absence policy and violated it. That is enough to doom his *prima facie* case.").

### C. Fitzgerald has failed to allege that the challenged decision was motivated by sexual orientation, rather than Church teachings.

Fitzgerald's Title VII claims also fail because she does not (and cannot) allege that the challenged actions were based on her sexual orientation rather than her conduct in entering a same-sex union and rejecting Church teaching.

Title VII is "only concerned with animus motivated by certain protected characteristics." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). If an employment decision is based on "any reason other than" a protected characteristic, "no federal claim is implicated." *Vore v. Ind. Bell Telephone Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994); *see Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) ("[T]he singular question that matters in a discrimination case [is] whether … [a] proscribed factor caused the discharge or other adverse employment action." (cleaned up)).

Here, Fitzgerald purports to assert "sexual orientation" discrimination. Compl. ¶¶ 79, 113. But even assuming "sexual orientation" is a characteristic protected by Title VII, *but see infra* Part I.G, the parties agree that the Archdiocese placed Fitzgerald on paid leave and declined to renew her contract not because of her "sexual *orientation*" but because of her "*conduct*" in entering into a same-sex union and rejecting Church teaching. *Walker*, 453 F.3d at 860-61 (emphasis original). In *Walker*, the Seventh Circuit held that a university policy prohibiting "sexual orientation" discrimination likely did not prohibit a religious group from requiring members "to adhere to and conduct themselves in accordance with" its religiously motivated opposition to homosexual conduct. *Id.* at 860. The Seventh Circuit explained that this requirement was "based on belief and behavior rather than status, and no language in" the university policy "prohibits this." *Id.*

So too here: The pleadings and incorporated documents show that the Archdiocese's actions were not because of Fitzgerald's "sexual orientation" but because she entered a same-sex union contrary to Church teaching. The Archdiocese believes that people with same-sex attraction "must be accepted with respect, compassion, and sensitivity." Catechism of the Catholic Church ¶ 2358, *available at* http://www.vatican.va/archive/ccc_css/archive/catechism/ccc_toc.htm. At the same time, the Church teaches that "homosexual acts" "do not proceed from a genuine affective and sexual

15

complementarity" and are "[u]nder no circumstances" permitted, *id.* ¶ 2357, and that marriage is a covenant between "a man and a woman" as established and revealed by God. Code of Canon Law, Canon 1055 § 1. Consistent with these beliefs, Fitzgerald's contract required her to "*convey* and *be supportive of* the teachings of the Catholic Church," rendering her in default if she entered a "[r]elationship[ ] … contrary to a valid marriage as seen through the eyes of the Catholic Church" or engaged in "any personal conduct or lifestyle at variance with the" Church's "moral or religious teachings." Ex. 2 ¶ V.A (emphasis added); Ex. 1 ¶ 6(i), (j). And consistent with the contract, the Archdiocese declined to renew Fitzgerald's employment not because of her *status* but because of her conduct: she had entered into a "marriage [that] violated the contract between her and Roncalli" and was "contrary to teaching of the Catholic Church." Compl. ¶ 54. Fitzgerald therefore does not plausibly allege discrimination based on any protected "status" separate from "belief and behavior." *Walker*, 453 F.3d at 860. The Archdiocese's opposition to same-sex unions—the Church's millennia-old view that marriage is "by its nature a gender-differentiated union of man and woman"—is not invidious discrimination but a belief "held in good faith by" millions of "reasonable and sincere people here and throughout the world" and entitled to "protection." *Obergefell*, 135 S. Ct. at 2594, 2602, 2607.[2]

### D. Fitzgerald's retaliation claims fail to allege but-for causation.

Fitzgerald's Title VII and Title IX retaliation claims (Counts II & IV) also fail to allege but-for causation, where the alleged retaliation was decided upon *before* the

---

[2] *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010), does not overrule the Seventh Circuit's decision in *Walker* or contradict *Obergefell* on this point. Although *Martinez* said some decisions "have declined to distinguish between status and conduct," that was dictum in the context of explaining why a university might want to adopt a policy requiring all student groups to accept "all-comers." *Id.* at 689. More recent decisions have expressly relied on the distinction between status and conduct. *See, e.g.*, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2023 (2017) (distinguishing prior precedent on the ground that the plaintiff "was not denied a scholarship because of who he *was*" but "because of what he proposed *to do*," and forbidding discrimination based on "status").

alleged protected activity took place. Compl. ¶¶ 52-58, 65-75. "[R]etaliation claims require proof that the desire to retaliate" against protected opposition activity "was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013) (Title VII); *see Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690 (7th Cir. 2017) (same for Title IX). A retaliation "theory doesn't work" if the allegedly retaliatory decision "precedes the protected activity." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011) (quoting *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010)). Put differently, it is "impossible" for protected activity to be the but-for cause of an adverse employment decision when the decision came first. *Darbha v. Capgemini America Inc.*, 492 F. App'x 644, 647-68 (7th Cir. 2012). And this is true even if a decision "*reached*" before the protected opposition activity is actually "carr[ied] out" after it; either way, the required causal link cannot be shown. *Curay-Cramer*, 450 F.3d at 137 (emphasis added) (dismissing claim where complaint "makes it clear that [Defendant] contemplated firing her" from before alleged protected activity); *see Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("[e]mployers need not suspend previously planned" actions due to protected activity); *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) (same for "adverse employment actions that were previously contemplated" (citing *Nassar*, 133 S. Ct. at 2532)).

Here, Fitzgerald's retaliation claims rely on adverse employment decisions that were reached *before* her alleged protected activities. According to Fitzgerald herself, the complained-of adverse employment actions—paid leave, conditions on returning to campus, and nonrenewal—were simply the carrying-out of the Archdiocese's "statement of intent in the meeting with Fitzgerald on August 10, 2018" that she could not continue her employment in violation of her contract and standing in opposition to Church teaching. Compl. ¶¶ 54, 67. And the allegedly protected opposition activities undertaken by "Fitzgerald and her family" have occurred "[s]*ince* August

10, 2018." *Id.* ¶¶ 69-76 (emphasis added). Fitzgerald "cannot create an issue of retaliation" by opposing a "decision to terminate h[er] employment" made "earlier." *Darbha v. Capgemini Am., Inc.*, No. 10-C-2581, 2012 WL 718826, at *9 (N.D. Ill. Mar. 6, 2012), *aff'd*, 492 F. App'x 644 (7th Cir. 2012).

Because her allegations negate the but-for causal link between her alleged opposition activities and the adverse employment actions she challenges, these retaliation claims must be dismissed.

### E. Fitzgerald's Title IX claim is preempted by Title VII.

Before even reaching the relevant exemption, Fitzgerald's Title IX claim cannot proceed because it is preempted by Title VII. That claim is based on the same alleged conduct as her Title VII claims—paid leave and the nonrenewal of her employment contract. Compl. Count IV. But it is settled Seventh Circuit "precedent that *all* employment-discrimination claims must be brought under Title VII," even if the employer is an institution also covered by Title IX. *Brown v. Ill. Dep't of Human Res.*, 717 F. App'x 623, 625-26 (7th Cir. 2018) (Mem.) (emphasis added; citing *Waid v. Merrill Area Pub. Schs.*, 91 F.3d 857 (7th Cir. 1996), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009)). "Title VII provides a comprehensive statutory scheme for protecting rights against discrimination in employment," and it is "well-established that Title VII's own remedial mechanisms are the only ones available to protect the rights created by Title VII." *Waid*, 91 F.3d at 861-62. "It follows," then—as district courts within this Circuit routinely recognize—that Title IX claims for employment discrimination are "precluded by Title VII." *Bergholz v. John Marshall Law Sch.*, No. 18 C 3, 2020 WL 1066248, at *8 (N.D. Ill. Mar. 5, 2020); *see also, e.g., Saud v. DePaul Univ.*, No. 19-cv-3945, 2019 WL 5577239, at *4 (N.D. Ill. Oct. 29, 2019) ("Defendants respond that Plaintiff's Title IX claim is employment-related and therefore preempted by Title VII. Defendants are correct. The relevant Seventh Circuit precedent is *Waid* …." (collecting cases)); *McMahon v. College*,

No. 04-C-0384, 2005 WL 8162996, at *4 (E.D. Wis. Jan. 18, 2005) ("[C]ourts that have considered the issue have concluded that Title VII preempts Title IX claims for employment discrimination." (collecting cases)).

### F.  Fitzgerald's Title IX claim is barred by Title IX's religious-school exemption.

Even if it were not preempted by Title VII, Fitzgerald's Title IX claim would fail under Title IX itself. Like Title VII, Title IX includes an explicit exemption for religious organizations like the Archdiocese: Title IX "shall not apply to an educational institution which is controlled by a religious organization" if application would "not be consistent" with the organization's "religious tenets." 20 U.S.C. § 1681(a)(3). That exemption controls here, barring Fitzgerald's Title IX claim.

First, Roncalli is an "educational institution," and it is "controlled by a religious organization," the Archdiocese. *Id.* Roncalli is an archdiocesan high school of which the Archbishop of the Archdiocese of Indianapolis is the sole corporate member. Compl. ¶ 26; *see* Ex. 3 ¶ 1.1. And Fitzgerald's complaint states that "the Archdiocese is able to both control and influence Roncalli[]" by "controll[ing]" its "affiliation with the Catholic Church, and its designation as a Catholic Institution." Compl. ¶¶ 16-21. Thus, the exemption's religious-control requirement is met.

Second, applying Title IX here would "not be consistent" with the Archdiocese's "religious tenets." 20 U.S.C. § 1681(a)(3). This element is met where the religious organization "offers a religious justification for the adverse action or where the claim will otherwise pose too much intrusion into the religious [organization's] Free Exercise and Establishment Clause rights." *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871 & n.5 (N.D. Ill. 2019) (internal quotation marks and citation omitted); *Petruska v. Gannon Univ.*, No. 1:04-cv-80, 2008 WL 2789260, at *4 (W.D. Pa. Mar. 31, 2008) (applies "where the organization's challenged conduct is religiously motivated"). For example, a claim of sexual-orientation discrimination "could not proceed"

if the challenged action "was rooted in the Catholic church's doctrinal opposition to same-sex marriage." *Moody Bible*, 412 F. Supp. 3d at 871 & n.5.

That is this case. Fitzgerald alleges that the Archdiocese violated Title IX by declining to renew her contract following her "opposi[tion]" to its already-expressed intent to conclude her employment. Compl. ¶¶ 120-21; *see* Compl. ¶ 67. But the Archdiocese's actions were "rooted firmly in its religious beliefs" opposing same-sex unions. *Moody Bible*, 412 F. Supp. 3d at 872. The Archdiocese placed Fitzgerald on paid leave and declined to renew her contract because she rejected Church teaching and entered a same-sex union. Compl. ¶ 54. Title IX's religious exemption protects these decisions. And that is true whether the decisions are cast as discrimination or retaliation: the exemption permits religious schools to take actions based on their "religious tenets," and "where a retaliation claim is based on complaints directed toward that permissible discrimination, [Title IX]'s anti-retaliation provision does not apply." *Aparicio v. Christian Union, Inc.*, No. 18-CV-0592, 2019 WL 1437618, at *9 (S.D.N.Y. Mar. 29, 2019) (internal quotation marks and citation omitted; discussing Title VII); *see Moody Bible*, 412 F. Supp. 3d at 872 (same reasoning for Title IX claim based "entirely upon the alleged retaliation [plaintiff] faced for her advocacy" against religiously motivated conduct alleged to be sex discrimination).

Because Fitzgerald's Title IX claim would punish the Archdiocese for acting on its religious beliefs, application of Title IX "would not be consistent with [the Archdiocese's] religious tenets," 20 U.S.C. § 1681(a)(3), and the Title IX claim must be dismissed. *Moody Bible*, 412 F. Supp. 3d. at 871.

### G. Neither Title VII nor Title IX applies to claims of discrimination based on sexual orientation.

To preserve its argument pending the Supreme Court's decision in *Bostock v. Clayton County,* No. 17-1618 (argued October 8, 2019), the Archdiocese notes that neither Title VII nor Title IX, rightly understood, "cover[s]" "employment decisions based on

a person's sexual orientation." *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 360-61 (7th Cir. 2017) (Sykes, J., dissenting). If the Court issues its *Bostock* opinion during the pendency of this motion, the Archdiocese anticipates that the parties will file supplemental briefing addressing how that decision affects Fitzgerald's claims.

## II. All of Fitzgerald's claims are barred by the First Amendment.

Fitzgerald's claims are not only foreclosed by the text of Title VII and Title IX, but also barred by multiple, overlapping First Amendment doctrines: the right of religious autonomy, the prohibition on government entanglement in religious questions, and the freedom of association.[3]

### A. All of Fitzgerald's claims are barred by religious autonomy.

The constitutional principle of religious autonomy gives "'special solicitude to the rights of religious organizations' *as* religious organizations, respecting their autonomy to shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines as religious institutions." *Korte*, 735 F.3d at 677-79 (7th Cir. 2013) (quoting *Hosanna-Tabor*, 565 U.S. at 189).[4] One way in which it does so is by barring lawsuits, like this one, implicating a religious organization's "internal affairs." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1037 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor*, 565 U.S. at 195 n.4. And because religious autonomy is rooted in the First Amendment, it bars Fitzgerald's federal and state claims alike.

---

[3] If Fitzgerald's federal claims are dismissed, the Court should dismiss the state claims, too, under the well-settled "presumption" that "when all federal claims in a suit in federal court are dismissed … the court will relinquish jurisdiction over any supplemental state-law claims." *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (cleaned up). As discussed in this Part, however, the First Amendment bars Fitzgerald's federal and state claims alike.

[4] Courts have variously used the terms "religious autonomy" and "church autonomy" to denote this concept. *See, e.g., Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring) (describing "religious autonomy"). We use "religious autonomy" here to clarify that the concept extends beyond Christian houses of worship.

### 1.  Fitzgerald's federal claims are barred by religious autonomy.

Under the religious-autonomy doctrine, churches have a constitutional right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This doctrine has been held to bar civil authorities from intervening in a broad range of internal church matters. For example, in *Kedroff*, the Supreme Court struck down a New York law that would have transferred control over a cathedral from one church authority to another. 344 U.S. at 119. And in *Milivojevich*, it barred civil courts from interfering in a church's decision to reorganize itself and remove a bishop. 426 U.S. at 713.

Most relevant here, religious autonomy also bars civil courts from intervening in disputes over whether a person meets a religious organization's doctrinal qualifications for membership or employment. As the Court recognized over a century ago, when a religious association organizes itself and provides for its governance, all who later "unite themselves to [it] do so with an implied consent to this government, and are bound to submit to it," "in all cases of ecclesiastical cognizance." *Watson v. Jones*, 80 U.S. 679, 728-29 (1871). It is therefore well-recognized that suits challenging a church's disciplining or expulsion of a member on religious grounds are off-limits: Civil courts "have no power to revise or question ordinary acts of church discipline, or of excision from membership." *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139 (1872); *see also, e.g.*, *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987) ("The members of the Church Paul decided to abandon have concluded that they no longer want to associate with her.... [T]hey are free to make that choice.").

The same principle applies even more forcefully when the person disciplined or expelled is not just a member but a representative or employee—and especially (as here) a school's "Director." *See Gonzalez v. Roman Catholic Archbishop*, 280 U.S. 1,

16 (1929) ("[I]t is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them."). The ministerial exception prevents courts from intervening in disputes between a religious organization and its "ministers," whether the dispute is based on a question of religious doctrine or not. *Hosanna-Tabor*, 565 U.S. at 194-95. But religious autonomy protects other "personnel decision[s]," too—including for non-ministers—when they are "based on religious doctrine." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002). Determining that "only those committed to [the church's] mission should conduct" its activities is a "means by which a religious community defines itself." *Amos*, 483 U.S. at 342 (Brennan, J., concurring). Thus, to forbid a religious institution from requiring its employees and representatives to be committed to its mission is to "cause the group as it currently identifies itself to cease to exist." *Walker*, 453 F.3d at 863.

*Bryce* is instructive. There a church's youth minister sued under Title VII after she was allegedly harassed following her entrance into a civil commitment ceremony with another woman; she alleged that church officials' statements about homosexuality and her activities constituted sex discrimination. 289 F.3d at 651-53. But the Tenth Circuit affirmed judgment for the church on grounds of religious autonomy. The court expressly declined to decide whether the plaintiff was a "minister" for ministerial-exception purposes. *Id.* at 658 n.2. Instead, the court explained that even where the plaintiff is *not* a minister, claims challenging religious organizations' "personnel decision[s]" are precluded where "the alleged misconduct is 'rooted in religious belief.'" *Id.* at 657-58 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). Thus, because the plaintiff had suffered adverse action for "violating Episcopal doctrine"—specifically, entering a same-sex union—and the challenged conduct consisted of "meetings to discuss that decision and the ecclesiastical doctrine underlying it, the courts [could] not intervene." *Id.* at 652, 660.

23

Courts in this Circuit have repeatedly applied a similar analysis, holding that the "overarching principle of religious autonomy" barred employment-discrimination claims arising from a religious organization's interpretation and application of religious doctrine, regardless of whether the plaintiff is a minister or not. *See Moody Bible*, 412 F. Supp. 3d at 871 (citing *Demkovich v. St. Andrew the Apostle Parish*, 343 F. Supp. 3d 772, 782, 785 (N.D. Ill. 2018)).

In *Demkovich*, for example, the court held that religious autonomy, rather than the ministerial exception, barred a Catholic church employee's hostile-work-environment claim based on the pastor's alleged "abusive and harassing behavior" in response to the employee's sexual orientation and same-sex wedding. 343 F. Supp. 3d at 776-77. These alleged comments went far beyond anything alleged in support of the hostile-work-environment or retaliation claims here. *See id*. Yet the court nonetheless dismissed the claim on the pleadings, because "the Archdiocese offer[ed] a religious justification for the alleged derogatory remarks and other harassment": "the pastor's opposition, in accordance with Catholic doctrine, to same sex marriage." *Id*. at 786-87 (internal quotation marks omitted). Because the employee's claim implicated that "official opposition," entertaining it "would pose too much of an intrusion into the" Archdiocese's "religious employer's Free Exercise and Establishment Clause rights." *Id*. at 785-86.

Likewise, in *Moody Bible*, the court dismissed at the pleading stage employment-discrimination claims involving a religious employer's application of its religious standards. There, a Christian college dismissed a teacher because her beliefs and advocacy in favor of "women in the ministry" were "contrary to [the college's] doctrinal views" on "gender roles." 412 F. Supp. 3d at 865, 872. The teacher then sued, alleging sex discrimination and retaliation in violation of Title VII and Title IX. *Id*. at 871-72. The court could not "conclusively" determine whether plaintiff was a minister based

solely on the complaint. *Id.* at 871. But it nonetheless dismissed her claims as violating religious autonomy, reasoning that when a religious employer's reasons for taking adverse action are "rooted firmly in its religious beliefs," entertaining discrimination claims "would impermissibly inject the auspices of government into religious doctrine and governance." *Id.* at 871-72 (citing *Bryce*, 289 F.3d at 657-59); *see also Aparicio*, 2019 WL 1437618, at *8-10 (barring non-minister plaintiff's Title VII discrimination and retaliation claims as violating religious autonomy where terminated for opposing the religious organization's beliefs excluding women from ministry).

As in *Bryce*, *Demkovich*, and *Moody Bible*, Fitzgerald's claims are barred by religious autonomy. She acknowledges that her paid leave and non-renewal occurred because she "violated … teaching[s] of the Catholic Church" that have been taught for millennia and were expressly incorporated into her contract. *Bryce*, 289 F.3d at 652; *see* Compl. ¶ 54; Ex. 1 ¶ 6(i); Ex. 2 ¶ V.A. Thus, allowing her claims to proceed "would impermissibly inject the auspices of government into religious doctrine and governance." *Moody Bible*, 412 F. Supp. 3d at 871-72 (citing *Bryce*, 289 F.3d at 657-59).

Moreover, although Fitzgerald attempts to repackage her single, doctrine-motivated nonrenewal into various Title VII and Title IX boxes, for all these claims, "the alleged misconduct" remains "rooted in religious belief." *Bryce*, 289 F.3d at 657 (internal quotation marks and citation omitted). Whether the Archdiocese's actions were based solely on the violation of Church teaching itself (Compl. Count I), or also her "activism" (Compl. ¶ 94) against Church teaching and her father's support thereof (Compl. Counts II, IV), "[e]ither way, [the Archdiocese's] alleged reasons for firing [her] were rooted firmly in its religious beliefs." *Moody Bible*, 412 F. Supp. 3d at 872. And "her hostile-work-environment claim" (Compl. Count III) likewise "implicates [the Archdiocese's] doctrine, given that" the alleged hostility arose from her rejection of Church teaching. *Id.*; s*ee* Compl. ¶¶ 29-45. Just as the First Amendment bars the Court from "outright punishing the Church for holding that position," it also "give[s]

25

the [C]hurch the right 'to engage freely in ecclesiastical discussions'" applying its views to individual cases. *Demkovich*, 343 F. Supp. 3d at 786 (quoting *Bryce*, 289 F.3d at 653, 659).

In short, when a religious organization "makes a personnel decision based on religious doctrine, and holds meetings to discuss that decision and the ecclesiastical doctrine underlying it, the courts will not intervene." *Bryce*, 289 F.3d at 660. Fitzgerald's discrimination claims are barred by religious autonomy.

### 2. Fitzgerald's state claims are barred by religious autonomy.

For similar reasons, religious autonomy also bars Fitzgerald's state-law claims (Counts V-VI). Specifically, Fitzgerald claims the Archdiocese is liable for intentional interference with contract and intentional interference with an employment relationship for "directing Roncalli to implement a 'morals clause' in Fitzgerald's contract" and requiring Roncalli to place Fitzgerald on leave and decline to renew her contract after Fitzgerald violated the morals clause. Compl. ¶¶ 128-29, ¶¶ 134-35. This is at bottom a challenge to the same religiously motivated employment decision as her discrimination claims, and it violates religious autonomy for the same reasons. *See Myhre v. Seventh-day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 F. App'x 926, 928-30 (11th Cir. 2018) (dismissing state tort claims premised on employee's defrocking and termination of benefits "due to a 'theological disagreement'"); *N.Y. Times v. Sullivan*, 376 U.S. 254, 265 (1964) (First Amendment applies to state claims, and it "matters not that that law has been applied in a civil action and that it is common law only…."); *accord Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, No. 2:19-cv-554-RJS-DBP, 2020 WL 1536565, at *5-10 (D. Utah Mar. 31, 2020) (dismissing both state and federal claims on religious-autonomy grounds).

Indiana courts have repeatedly applied the religious autonomy doctrine to dismiss tort claims like Fitzgerald's in circumstances like those here. *See Byrd v. DeVeaux*,

No. DKC 17-3251, 2019 WL 1017602, at *5-8 (D. Md. Mar. 4, 2019) (looking to state cases to determine that state tort claims implicated religious autonomy and granting motion to dismiss). In *McEnroy v. St. Meinrad School of Theology*, 713 N.E.2d 334 (Ind. Ct. App. 1999), for example, a Catholic seminary professor signed an open letter opposing the Pope's teaching on ordination of women. The Archabbot decided that this rendered the professor "seriously deficient" as a teacher under "the Church's canon law," and he directed the seminary's President to remove the professor. *Id.* at 336. The professor then sued the Archabbot for intentional interference with contractual relations. But the Court of Appeals dismissed the claim for lack of jurisdiction, because determining whether the professor's conduct caused her to be "seriously deficient" as a teacher, and whether the Archabbot "properly exercised his jurisdiction over [the seminary]," would "clearly and excessively entangle[]" the court "in religious affairs in violation of the First Amendment." *Id.* at 337.

The same is true here. Under Indiana law, both of Fitzgerald's tort claims would require the Court to determine whether the Archdiocese had a "legitimate reason" for the alleged "interference," *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000)—that is, for requiring Roncalli to implement a "morals clause" in Fitzgerald's contract and then to enforce it in light of her violation. *See* Compl. ¶ 129, ¶ 135. And that is ultimately a religious question—turning on whether violating the teachings of the Catholic Church renders a Catholic-school guidance counselor "deficient" under "canon law," and whether the Archbishop "properly exercised his jurisdiction over [Roncalli]." *McEnroy*, 713 N.E.2d at 337. As in *McEnroy*, resolving these questions would make this Court "clearly and excessively entangled in religious affairs in violation of the First Amendment." *Id.*

The Indiana Supreme Court reached a similar result in *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286 (Ind. 2003). There, the plaintiff sued a Catholic diocese for tortious interference with a business relationship, alleging that the

diocese prevented her from getting a job at Notre Dame by informing Notre Dame of her past accusations against the diocese. But the court held that her claims were barred, because applying "tort law to penalize communication and coordination among church officials … on a matter of internal church policy and administration that did not culminate in any illegal act … would violate the church autonomy doctrine." *Id.* at 294. So too here: As in *Brazauskas*, Fitzgerald invokes tort law to penalize the Archdiocese for its "communication and coordination" with Roncalli "on a matter of internal church policy and administration." *Id.* Fitzgerald's state-law claims, like those under Title VII and Title IX, must be dismissed. *See also Dwenger v. Geary*, 14 N.E. 903, 908, 909 (Ind. 1888) (rejecting claim of a contractual right to burial in a Catholic cemetery, because the Constitution gives the church authority to establish "rules for the government of [its] cemetery," and "[t]he court, having no ecclesiastical jurisdiction, cannot review or question ordinary acts of church discipline").

### B. All of Fitzgerald's claims are barred because they would impermissibly entangle the Court in religious questions.

Relatedly, all of Fitzgerald's claims are also barred because they invite the Court to engage in "religious line-drawing" that would "impermissibly entangle[]" the Court in religious questions. *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 660 (7th Cir. 2018) (quoting *Amos*, 483 U.S. at 343). "[F]ederal courts are not empowered to decide (or to allow juries to decide) religious questions." *McCarthy v. Fuller*, 714 F.3d 971, 980 (7th Cir. 2013). To do so would be "wholly inconsistent with the American concept of the relationship between church and state." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 445-46 (1969). "Courts are not arbiters of scriptural interpretation." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981); *see also Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 566 (7th Cir. 2014) (Flaum, J., dissenting) ("[W]e are judges, not moral philosophers or theologians[.]"), *vacated and remanded* 575 U.S. 901 (2015).

28

Rather, "[r]eligious questions are to be answered by religious bodies." *McCarthy*, 714 F.3d at 976.

Here, Fitzgerald's claims on their face would require impermissible judicial decisions on quintessentially theological disputes. *See id.* at 975-76. Specifically, her complaint acknowledges that although she was fired for a sex- (and sexual-orientation)-neutral reason—her violation of Church teachings on sex and marriage—she hopes to show differential treatment by finding evidence that the Archdiocese employs people who violate other "teachings of the Catholic Church," including by being in "opposite sex marriages that allegedly violate [that] teaching." Compl. ¶¶ 81-82, 87. But that comparison is probative only if being in an opposite-sex marriage inconsistent with Church teaching is, as a moral and theological matter, an equally weighty violation as being in a same-sex union—a theological question not amenable to resolution by civil courts.

Multiple cases demonstrate the point. For example, in *Curay-Cramer*, a Catholic school teacher fired for publicly supporting abortion attempted to prove sex discrimination by showing that her conduct was "less egregious under Catholic doctrine than conduct of male employees who were treated less harshly." 450 F.3d at 132. The Third Circuit rejected the claim, because "measur[ing] the degree of severity of various violations of Church doctrine" "would violate the First Amendment." *Id.* at 137, 139.

Likewise, in *Hall*, a Baptist college employee was fired for becoming a lay minister in a church that affirmed homosexual conduct; she tried to prove discrimination by pointing to other employees who had not been fired for violating Baptist teachings—such as becoming ordained in a church that permitted women's ordination, or "having an adulterous relationship." 215 F.3d at 626-27. But the Sixth Circuit declined to entertain this comparison and affirmed judgment for the college. "In essence," the court explained, the plaintiff was "requesting this court to tell the College that it must

be opposed to the ordination of women with the same degree of conviction and intensity" as it opposed homosexuality or else "suffer liability under Title VII." *Id.* at 626 (internal quotation marks and brackets omitted). Accepting that invitation would violate the First Amendment. *Id.*

Fitzgerald's discrimination claims fail for the same reason. Fitzgerald does not dispute that her "legally valid same sex marriage" violates Church teaching, Compl. ¶ 80; she alleges only that she's been treated worse than other employees whose opposite-sex marriages do, too (or other employees who have engaged in other, unspecified violations). But even if these allegations were true, they would be relevant only if the two types of violations are morally and theologically equivalent. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (comparators must be "directly comparable … in all material respects"). And *that* is a religious question the First Amendment bars this Court from deciding. If the Archdiocese "wishes to differentiate between the severity of violating two tenets of its faith, it is not the province of the federal courts to say that such differentiation is discriminatory and therefore warrants Title VII liability." *Hall*, 215 F.3d at 626-27.

### C. All of Fitzgerald's claims are barred by freedom of association.

Even setting aside the Religion Clauses, the First Amendment would still bar all of Fitzgerald's claims. Freedom of association protects expressive associations' right to disaffiliate with those who undermine their message, even if doing so would otherwise violate an antidiscrimination law, *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000), or state tort law, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). This right protects organizations both secular and religious, including the Boy Scouts, *Dale*, 530 U.S. at 642-43; political parties, *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 229 (1989); parade organizers, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 581 (1995), student groups, *Walker*, 453 F.3d at 861-64—and Catholic schools like the Archdiocese, *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805,

822 (E.D. Mo. 2018). And it requires here that Fitzgerald's claims be dismissed.

*Dale* is the leading case. There, a former scoutmaster sued the Boy Scouts, claiming that his dismissal for being "an avowed homosexual and gay rights activist" violated state antidiscrimination law. 530 U.S. at 643-45. But the Supreme Court held that the First Amendment foreclosed this claim. Freedom to associate, the Court explained, "presupposes a freedom not to associate," where forced association would undermine the group's ability to express its views. *Id.* at 647-48 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). Applying this rule, the Court found that the Boy Scouts taught that "homosexual conduct is not morally straight"—yet "Dale's presence in the" group would suggest that it "accepts homosexual conduct as a legitimate form of behavior." *Id.* at 651-53. To apply antidiscrimination law to override the Boy Scouts' disaffiliation decision, then, would unconstitutionally impair its ability "to express those views, and only those views, that it intends to express." *Id.* at 648.

Following *Dale*, the Seventh Circuit, too, has recognized that the freedom of association protects a group's ability to disaffiliate with those who reject its tenets—including, as in *Dale* and here, tenets on human sexuality. In *Walker*, a university revoked a Christian student group's official status because the group did not accept members "who engage in or affirm homosexual conduct." 453 F.3d at 858. The district court declined to enjoin the university's actions, *id.*, but the Seventh Circuit reversed. Forcing the group to include those members "significantly affect[ed]" its "ability to express its disapproval of homosexual activity," the court explained, and the university's interest in prohibiting sexual-orientation discrimination could not outweigh the First Amendment. *Id.* at 862-64.

As *Walker* and other cases show, freedom of association does not just protect a group's right to determine its "leaders" but applies to any forced association that would "significantly affect [the group's] ability to preserve and pass on its message."

*Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1000 (7th Cir. 2019) (prohibition of "participat[ion] as a member" including "speak[ing]" to group members). The key questions are whether the organization "engage[s] in some form of expression"; and, if so, whether the forced association would "significantly affect [its] ability to advocate" its viewpoints. *Dale*, 530 U.S. at 648, 650.

Applying this analysis here, punishing the Archdiocese for placing Fitzgerald on leave and declining to renew her contract would violate freedom of association. First, the Archdiocese is an expressive association. Indeed, "[r]eligious groups are the archetype of associations formed for expressive purposes." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring, joined by Kagan, J.). The Archdiocese exists to express, preserve, and convey the Catholic faith—including its teachings on sex and marriage. *See* Ex. 2 ¶ V.A; *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 503 (1979) ("obvious … that the *raison d'être* of parochial schools is the propagation of a religious faith" (internal quotation marks omitted)). And those teachings are clear, widely understood, and have been articulated for millennia. *Cf. Dale*, 530 U.S. at 668 (Stevens, J., dissenting) (arguing that the Boy Scouts' requirements that scouts be "morally straight" and "clean" didn't "say[ ] the slightest thing about homosexuality").

Second, punishing the Archdiocese for declining to retain Fitzgerald as a guidance counselor, despite her open defiance of the Church's teachings on sexuality, would "significantly affect" the Archdiocese's "ability to advocate" its viewpoint. *Dale*, 530 U.S. at 650. Courts must "give deference to an association's view of what would impair its expression." *Id.* at 653. Yet little deference is required to see that forcing the Archdiocese to retain Fitzgerald would undermine its ability to express its message on homosexual conduct. "It would be difficult for [the Archdiocese] to sincerely and effectively convey a message of disapproval of [homosexual conduct] if, at the same time, it must" employ representatives who reject the message and "engage in that conduct," *Walker*, 453 F.3d at 863—particularly when, like Fitzgerald, they are

charged with counseling students who may be struggling with the same Church teachings.

Beyond that, Fitzgerald's complaint indicates she not only engaged in conduct prohibited by the Church's teachings on sexuality, but openly advocated against the teachings (and the Archdiocese's application of those teachings) themselves. *See Dale*, 530 U.S. at 643-45 (plaintiff was "an avowed homosexual and gay rights activist"). The complaint alleges that Fitzgerald is an "activis[t]" who has participated in "numerous interviews with all forms of media across the world" opposing the Archdiocese's application of its teachings about marriage and sexuality; that she was the "Grand Marshall" of a "Pride Parade"; and that she serves on the board of an organization formed "to promote acceptance" of same-sex sexual conduct "within the Catholic Church." Compl. ¶¶ 70-75 (cataloguing these and other examples). She also serves as an "active mentor for the [Roncalli] students in their efforts opposing" the Archdiocese's application of its teachings, too. Compl. ¶ 74. Forcing the Archdiocese to retain a "gay rights activist" as a guidance counselor "would, at the very least, force [it] to send a message, both to [its students] and the world, that the [Archdiocese] accepts homosexual conduct as a legitimate form of behavior." *Dale*, 530 U.S. at 653. The Archdiocese has a First Amendment right not to send that message. *Id.* at 656.

Freedom of association likewise bars Fitzgerald's alternative theory that the Court can hold the Archdiocese liable for disaffiliating with *her father*, by declining to have him serve as a "guest speaker on the Roncalli Senior Retreat" after his participation in a "rally" against the Archdiocese's policies. Compl. ¶¶ 96-109. As Fitzgerald acknowledges, the Senior Retreat is organized for an expressive purpose— "guid[ing] … students on a journey of reflection and understanding"—tied to the Archdiocese's "spiritual" mission. Compl. ¶¶ 98-99. The Archdiocese is therefore entitled to control the message sent at the retreat, including by declining to elevate someone as a speaker who has publicly opposed its application of Church teachings

on sex and marriage. If freedom of association forbids applications of antidiscrimination law that would require parade organizers to include marchers who would "alter[] the expressive content of their parade," *Hurley*, 515 U.S. at 572-73, it must also protect the organizers of a spiritual retreat from being forced to invite *speakers*—who by definition "alter[] the expressive content" of an event—where the speakers publicly disagree with the organizers' message.

Fitzgerald's claims—whether articulated as challenges to the Archdiocese's decision to disaffiliate from her as Co-Director of Guidance at Roncalli, or as challenges to the Archdiocese's decision to disaffiliate from her father in the context of the Roncalli Senior Retreat—are precluded by freedom of association.

### D. Constitutional avoidance requires dismissal of Fitzgerald's federal claims.

Even if it were unclear whether entertaining Fitzgerald's claims would violate the First Amendment (and it is not), those claims at least present "serious constitutional questions"—so constitutional avoidance requires the Court to interpret Title VII and Title IX narrowly to avoid having to reach them. *Catholic Bishop*, 440 U.S. at 501.

In *Catholic Bishop*, the Court considered whether the National Labor Relations Act gave the NLRB jurisdiction over lay faculty members at Catholic schools. 440 U.S. at 491. Noting that the Religion Clauses could be violated by "the very process of inquiry" necessary to resolve labor charges against religious schools, the Court concluded that "serious First Amendment questions" would follow from finding jurisdiction. *Id.* at 502, 504. Thus, the Court held that the statute should be interpreted narrowly to avoid that result unless there was "clear expression of an affirmative intention of Congress" to require it. *Id.* at 504; *see also id.* at 504-07 (finding none); *Curay-Cramer*, 450 F.3d at 137-42 (applying *Catholic Bishop* in interpreting federal nondiscrimination law not to require courts "to measure the degree of severity of various violations of Church doctrine"); *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d

824, 829 (D.C. Cir. 2020) ("Given this vital role played by teachers, exercising juris-diction over disputes involving teachers at *any* church-operated school presented a 'significant risk that the First Amendment will be infringed.'" (quoting *Catholic Bishop*, 440 U.S. at 502)).

Here, applying Title VII and Title IX to require a Catholic school to retain a guid-ance counselor who "repudiat[es] Catholic doctrine" on human sexuality would, at minimum, give rise to serious constitutional questions under the First Amendment's protection of religious autonomy, the prohibition on government entanglement in re-ligious questions, and freedom of association. *Curay-Cramer*, 450 F.3d at 140. So those statutes must be read narrowly to avoid that result absent a clearly expressed, affirmative intention of Congress to the contrary. *Catholic Bishop*, 440 U.S. at 501. There is no such intention; rather, as explained above, the statutes exempt employers like the Archdiocese from claims like these. Thus, constitutional avoidance, as well as the plain text, structure, and history of Title VII, Title IX, and the Religion Clauses, require Fitzgerald's claims to be dismissed on the pleadings.

## CONCLUSION

Judgment should be rendered for the Archdiocese.


Respectfully submitted,


By: /s/  Luke W. Goodrich
Luke W. Goodrich (DC # 977736)
Daniel H. Blomberg (DC # 1032624)
Christopher C. Pagliarella (DC # 273493)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave NW
Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090 fax

John S. (Jay) Mercer, #11260-49
Paul J. Carroll, #26296-49
MERCER BELANGER
One Indiana Square, Suite 1500
Indianapolis, IN 46204
(317) 636-3551
(317) 636-6680 fax

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing has been served upon the following on April

1, 2020 by this Court's electronic filing system:

David T. Page
1634 W. Smith Valley Rd.
Suite B
Greenwood, IN 46142

Mark W. Sniderman
Findling Park Conyers Woody & Sniderman, P.C.
151 N. Delaware St.
Indianapolis, IN 46204

<div style="margin-left:40%;">

By: /s/  Luke W. Goodrich
Luke W. Goodrich (DC # 977736)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave NW
Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090 fax

</div>