UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04291-RLY-DLP |
| | ) | |
| RONCALLI HIGH SCHOOL, INC., and | ) | |
| the ROMAN CATHOLIC ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff, Michelle Fitzgerald, by counsel, hereby files her response to Defendants' Motion for Judgment on the Pleadings [ECF 41], pursuant to this Court's order. [ECF 52.]

## I.   INTRODUCTION

Fitzgerald, a female, was a beloved guidance counselor at Roncalli High School, Inc. ("Roncalli); and was dedicated to her students, school, and her spouse, who is also female. The Defendants subjected her to wrongful discrimination, hostile work environment, and retaliation for speaking out, because, the Defendants claim, her marriage was allegedly contrary to Church teaching. Fitzgerald alleges the reason the Defendants proffer is merely a pretext: she points out Defendants took and take no similar actions against male and/or heterosexual employees whose actions and marriages allegedly contradict the teaching of the Catholic Church. Instead, Fitzgerald argues that Defendants discriminated against her on the basis of sex or her sexual orientation.

Now, Defendants seek to dismiss this action. They essentially claim that as a religious employer, they are protected from the secular claims brought by the plaintiff. Defendants claim

that reaching the merits on this case will necessitate this Court delving into religious law. But this Court can resolve this dispute by relying on neutral principles of general applicability that govern all types of matters involving employment discrimination. A finder of fact should and may be permitted to decide whether Defendants treat women and men equally, and whether they treat people in same-sex marriages and opposite-sex marriages equally, when their similar actions are alleged to have violated Church teaching.

Courts may apply neutral principles of law to Churches without violating the First Amendment. Because Fitzgerald's claims can be resolved by using neutral principles of general applicability and without delving into religious law, Defendants' Motion should be denied.

## II.     FACTS AND PROCEDURAL BACKGROUND

Fitzgerald, a guidance counselor at Roncalli from 2004-2019, was placed on administrative leave, banned from campus, and fired from her job because she married a woman. [ECF 1 at 1, ¶ 1.] She alleges Roncalli and the Roman Catholic Archdiocese of Indianapolis, Inc. ("Archdiocese"), discriminated against her because of sex: hers and/or her spouse's; and/or her sexual orientation. [*Id.*, and p. 9, ¶ 78.] Although Defendants publicly claimed they took adverse actions against Fitzgerald because her actions allegedly contradicted the teaching of the Catholic Church, Fitzgerald counters that such defenses are merely pretextual: Defendants took and take no similar actions against male and/or heterosexual employees whose actions and marriages contradict the teaching of the Catholic Church. [*Id.* at 1, 10-11, ¶ 1, 87.] Fitzgerald also asserts she is not a minister: her position had no ministerial or teaching duties, she never was a minister, and never held herself out to be a minister. [*Id.* at 5, ¶¶ 33-34, 36, 37.] (For the purposes of their Motion for Judgment on the Pleadings, however, Defendants do not invoke the "ministerial exception," or claim they are entitled to judgment due to their view that she was a minister.)

Fitzgerald had been employed pursuant to a contract, which was renewed annually until 2019. [*Id.* at 4, ¶ 29.] As Guidance Counselor and Co-Director of Guidance, Fitzgerald was responsible for assisting and advising students regarding academic, professional and vocational options available to students. [*Id.* at 5, ¶ 30.] Approximately two or three years ago, the Archdiocese directed Roncalli to implement uniform "morals clauses" in its employee contracts. [*Id.* at 4, ¶ 49.] Defendants claim Fitzgerald was employed pursuant to a "School Guidance Counselor Ministry Contract," (hereinafter referred to as the "Contract"). [ECF 42 at 22, citing ECF 42-2.] Defendants also claim that a morals clause, purportedly attached to the Contract, required Fitzgerald to ""convey and be supportive of the teachings of the Catholic Church"— including, specifically, "the belief that all persons are called to respect human sexuality and its expression in the Sacrament of Marriage."" [ECF 42 at 22.][1]

Fitzgerald has a female spouse, to whom she has been legally married since 2014. [ECF 1 at 6, ¶ 51.] On August 10, 2018, Roncalli President Joseph Hollowell and Principal Chuck Weisenbach met with Fitzgerald and informed her they knew of her marriage to a female. [*Id.*, ¶ 52.] They presented Fitzgerald with the options of resigning; dissolving what they termed her "civil union" (referring to her marriage); "keeping quiet" until her contract was up (at which time it would not be renewed); or being fired. [*Id.* at 7, ¶ 53.] Hollowell and Weisenbach represented to Plaintiff that they gave her the foregoing options because they believed her marriage violated the Contract. [*Id.*, ¶ 54.] Fitzgerald refused to resign, dissolve her marriage, or keep quiet about it; and on August 10, 2018, Defendants placed Fitzgerald on paid administrative leave. [*Id.*, ¶¶

---

[1] The above language to which Defendants cite, and which they characterize as the morals clause, does not appear in the Contract. Instead, that clause and language appear on a document filed by Defendants that is titled "Archdiocese of Indianapolis, Ministry Description, School Guidance Counselor," (hereinafter referred to as the "Position Description"). [ECF 42-3 at 2-5.] Indeed, when Defendants refer to the morals clause, they do not cite to the Contract (at ECF 42-2), but cite to the Position Description (at ECF 42-3). [ECF 42 at 22.]

55, 56.] Two days later, she was banned from the school campus until further notice. [*Id.*, ¶ 57.] Around January 31, 2019, Fitzgerald received from Roncalli an "Intent to Return" form, upon which she designated her intent to return to her employment during the next contract year of 2019-20, and which she promptly returned. [*Id.* at 8, ¶ 65.]

On May 2, 2019, Roncalli informed Fitzgerald that her employment contract, which expired on July 31, 2019, was not going to be renewed, and it was not renewed. [*Id.*, ¶ 66.] Since August 10, 2018, Fitzgerald and her family have taken an active role in opposing the discriminatory actions taken by the Defendants against her. [*Id.*, ¶ 69.] In mid-January of 2019, Plaintiffs' father, Pat Fitzgerald, who had volunteered for 26 years at Roncalli High School Senior Retreats, was advised by a representative of the Defendants that he could no longer do so. [*Id.* at 12-13.] Pat Fitzgerald was emotionally crushed when he was told he would no longer be allowed to participate in the Senior Retreats. [*Id.* at 13, ¶ 104.] When Pat Fitzgerald inquired as to why such action was being taken against him, he was advised that the decision was being made by the Defendants because he had appeared on the news in a rally to support his daughter wherein he had held up a sign that read "Please treat my daughter Shelly kindly." [*Id.*, ¶ 105.] Defendants' actions against Pat Fitzgerald were intended to punish and deter Fitzgerald for and from her social activism and her efforts to oppose the Defendants' unlawful acts. [*Id.*, ¶¶ 107-08.]

Plaintiff filed her Complaint on October 21, 2019, asserting four federal claims against both Defendants, and two state-law claims against the Archdiocese only. Three of the federal claims are brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq. ("Title VII") (wrongful discrimination, retaliation and hostile work environment), and one federal claim is brought under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX") (retaliation). [ECF 1, pp. 9-15.] The state-law claims against the Archdiocese allege tortious interference with a contractual relationship and tortious

interference with a business relationship. [*Id.* at 15-17.] The federal claims allege, inter alia, that Title VII bans discrimination on the basis of sexual orientation, or gender or sex stereotypes (*see,* e.g., *Hively v. Ivy Tech Community College of Indiana*, 853 F.3d 339, 341 (7th Cir. 2017)).

Fitzgerald alleged that the Defendants discriminated against her by treating her differently from and less preferably than similarly situated employees who are married to women, and/or who are heterosexual, by wrongfully discharging her, in substantial part due to her sex, sexual orientation, and/or marriage to a woman. She pled that the Defendants violated Title VII by:

(1) treating her less favorably because of her sex;

(2) taking her sex into account by treating her differently from similarly-situated men who married a woman;

(3) taking into account the sex of her spouse;

(4) discriminating against her based on gender and sex stereotypes, including heterosexually-defined gender norms;

(5) taking her sex into account by treating her differently from men who are in marriages that allegedly violate the teaching of the Catholic Church;

(6) taking her sexual orientation into account by treating her differently from heterosexuals who are in legally valid, opposite sex marriages that allegedly violate the teaching of the Catholic Church; and/or

(7) taking her sex and/or sexual orientation into account by treating her differently from men and/or heterosexuals whose behavior allegedly violates the teaching of the Catholic Church.

[ECF 1 at 10-11, ¶ 87.]

She also pled that there was a causal connection between her sex, sexual orientation, and marital status, and the adverse employment actions Defendants took towards her. [*Id.* at 11, ¶¶ 88-89.]

Defendants previously moved to stay this case in its entirety until the Supreme Court of the United States decides both *Altitude Express, Inc. v. Zarda,* No. 17-1623, cert. granted 139 S. Ct.

1599 (U.S. Apr. 22, 2019) and *Bostock v. Clayton County*, No. 17-1618, cert. granted 139 S. Ct. 1599 (U.S. Apr. 22, 2019). [ECF 17 at 1.] At issue in both *Altitude Express* and *Bostock* is whether Title VII prohibits discrimination on the basis of sexual orientation, and both cases were argued on October 8, 2019. Defendants claim the opinion by the Supreme Court in those actions may resolve material issues in this matter and have a direct effect upon this action. [ECF 20 at 3-4.] If the Supreme Court determines that discrimination on the basis of sexual orientation is not banned by Title VII, Defendants claim that Plaintiff's federal claims will be foreclosed. [*Id.*] This Court denied the motion to stay. [ECF 31.]

A related action, *Lynn Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc., and Roncalli High School, Inc*., Case No. 1:19-cv-3153-RLY-TAB, is also pending in this Court. *Starkey* arises out of many of the same or similar facts as the instant case, and that plaintiff has alleged the same six legal claims against the same corporate Defendants. Defendants also sought a stay in *Starkey* for the same reasons discussed above, and that motion was also denied.

Defendants have now filed motions for judgment on the pleadings in both *Starkey* and this action. These motions are based upon the same theories. Many of the facts underlying and giving rise to *Starkey* are the same or similar as those that give rise to the instant action. The complaints in *Starkey* and the instant action are similar, and the legal claims are essentially based upon the same legal theories.

## III.  <u>LEGAL STANDARD</u>

Courts review motions made pursuant to Rule 12(c) of the Federal Rules of Civil procedure under the same standard as motion to dismiss under Rule 12(b). *Northern Indiana Gun & Outdoor Shows v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). Accordingly, courts grant a Rule 12(c) motion only if "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Id.* (citing *Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686,

6

688 (7th Cir. 1993) (quoting *Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989)). In order

to succeed, a Rule 12(c) movant must demonstrate that there are no material issues of fact to be

resolved. *Id.* Courts "will view the facts in the complaint in the light most favorable to the

nonmoving party," but need not ignore facts set forth in the complaint that undermine the

plaintiff's claim or give weight to unsupported conclusions of law. *Id.* (internal citations omitted.)

## IV.   <u>ARGUMENT</u>

Fitzgerald's Complaint states six claims that are plausible on their face. When the facts

and their inferences are viewed in the light most favorable to Fitzgerald, they demonstrate that

the Defendants could be held liable for discriminating against her on, e.g., the basis of sex, or

sexual orientation, instead of their proffered pretextual reasons. Defendants seem to recognize

this, so they instead argue various doctrines and exemptions bar Plaintiff's claims. But they are

not entitled to the statutory exemptions of Title VII or Title IX, and they had had no legitimate

nondiscriminatory reason for nonrenewal of the Contract. Fitzgerald appropriately pled her

claims, and Title VII does not preempt her Title IX claim. Finally, Fitzgerald's claims are not

barred by the First Amendment.

### A.   <u>Fitzgerald's federal claims are cognizable under Title VII and Title IX.</u>

#### 1.   **Title VII and Title IX apply to claims of discrimination based upon sexual orientation.**

Defendants claim that neither Title VII nor Title IX "rightly understood" apply to

employment decisions based on a person's sexual orientation. [ECF 42 at 20-21.] This assertion

flatly misstates the law of this circuit with respect to Title VII claims. The Seventh Circuit has

held that for the purposes of Title VII, "discrimination on the basis of sexual orientation is a form

of sex discrimination." *Hively*, 853 F.3d at 341 (and courts in this circuit look to Title VII when

construing Title IX (*Whitaker v. Kenosha Unified School District*, 858 F.3d 1034, 1047 (7th Cir.

2017))). Defendants do cite to *Hively*, but only to the dissent, and do not concede *Hively's* central

holding. [ECF 42 at 20-21.] While they may hope to preserve this issue pending the Supreme

Court's opinion in *Bostock* (argued October 8, 2019), they do not state controlling law in this

circuit. Under *Hively*, a plaintiff may state a claim for sex-based discrimination under Title VII

pursuant to a sex stereotyping theory or the associational theory. *Whitaker*, 858 F.3d at 1048;

*Hively*, 853 F.3d at 351-2 ("a person who alleges that she experienced employment discrimination

on the basis of her sexual orientation has put forth a case of sex discrimination for Title VII

purposes."). Here, Fitzgerald properly pled she had been discriminated against in violation of

Title VII both under the sex stereotyping and associational theories. [ECF 1, p. 1, ¶ 1; pp. 10-11,

¶ 87.]

> **2.    Title VII's statutory exemptions do not bar Fitzgerald's Title VII claims.**

Defendants claim Title VII's statutory exemptions, § 702(a) and 703(e)(2), bar Fitzgerald's

Title VII claims. [ECF 42, pp. 8-12.] These exemptions read:

> This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a).

> [I]t shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. §§ 2000e-2(e)(2).

Neither exemption applies here however. Both operate instead to bar claims of religious discrimination made by a religious employee against a religious employer. But neither gives "religious organizations freedom to make discriminatory decisions based on race, sex, or national origin." *Herx v. Diocese of Ft. Wayne-South Bend, Inc.*, 48 F.Supp.3d 1168, 1175 (N.D. Ind. 2014) (citing, inter alia, *Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985)). The plaintiff in *Herx* was employed as a teacher by a Catholic school and Archdiocese, and underwent in vitro fertilization. *Herx*, 48 F.Supp.3d at 1170. When those defendants learned about the procedure, they declined to renew her contract, because they thought her actions immoral. *Id.* The plaintiff brought claims of sex and disability discrimination under Title VII and the Americans with Disabilities Act. *Id.* at 1173. Defendants argued, as they do here, that the religious employer exemption applied, but the Court denied their motion, citing *Rayburn*, holding that "Title VII's exemptions are limited specifically to claims of discrimination premised upon religious preferences, and Mrs. Herx isn't complaining about religious preference." *Id.* at 1175.

So it is here. Fitzgerald makes no complaint or allegation of religious discrimination, or religious preference. [ECF 1.] If she had, such a claim may have been barred by the foregoing exemptions. But they do not apply, on their own terms, to the discrimination on the basis of sex and sexual orientation alleged by Fitzgerald.

In support of their motion, Defendants cite to other cases that involve religious discrimination claims, and some that involved sex discrimination claims. The former are distinguishable, and so are the latter. In *Curay-Cramer v. The Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130 (3rd Cir. 2006), the court determined that Title VII did not apply, *not* because of the statutory exemption, but instead on the grounds of constitutional avoidance: it found Congress did not demonstrate a clear expression of an affirmative intention that courts Title VII in situations where serious constitutional questions are implicated. *Curay-Cramer*, 450

F.3d at 141 (but see Plaintiff's discussion of the constitutional avoidance doctrine, and why it does not apply here, in Sec. IV(B)(4), *infra*).

In *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980), the EEOC sought enforcement of a subpoena issued to investigate a charge of sex and race discrimination. *EEOC*, 626 F.2d at 478-79. The Fifth Circuit held that when a religious institution "presents convincing evidence that the challenged employment practice resulted from discrimination on the basis of religion, § 702 deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination." *Id.* at 485. Here, Defendants have presented no evidence, let alone convincing evidence, that their challenged actions resulted from the discrimination on the basis of religion. Accordingly, they may not avail themselves of EEOC's holding.

And finally, in *Maguire v. Marquette University*, 814 F.2d 1213 (7th Cir. 1987), while the district court "construed the exemption to cover the hiring decisions made in the theology department of a Catholic university," the Seventh Circuit specifically refrained from reaching the same conclusion, holding instead that it did not have to "determine whether Marquette qualifies as a religious employer under the terms of the exemption and if so whether the exemption covers the type of hiring decision involved here, for this case can be resolved on a much narrower ground," concluding the plaintiff failed to make out a claim of Title VII sex discrimination. *Maguire*, 814 F.2d at 1216.

For the foregoing reasons, Title VII's statutory exemptions do not bar Fitzgerald's three Title VII claims, which are based upon sex and/or sexual orientation discrimination.

### 3.  Fitzgerald's Title IX claim is not preempted by her Title VII claims.

Defendants claim that Fitzgerald's Title IX retaliation claim is preempted by her Title VII claims because Seventh Circuit precedent requires all employment-discrimination claims to be brought under Title VII. [ECF 42 at 27, citing *Brown v. Ill. Dep't of Human Res.*, 717 F. App'x 623, 625-26 (7th Cir. 2018) (Mem.).] While Title IX *discrimination* claims may be preempted by Title VII claims, Fitzgerald's Title IX retaliation claim is not.

Defendants rely upon *Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1997), in support of their position. There, the plaintiff had brought a Title IX discrimination claim, as opposed to a Title IX retaliation claim. *Waid*, 91 F.3d at 860. The Seventh Circuit held the plaintiff's Title IX discrimination claim was preempted by Title VII because the latter was a "comprehensive statutory scheme for protecting rights against discrimination in employment," which thus precluded the equitable relief sought by the plaintiff under Title IX. *Id.* at 862. (With respect to the damages sought (before amendments to Title VII allowed them), the plaintiffs' Title IX claim was *not* preempted by Title VII, because the latter's legislative history showed Congress did not intend for such preemption, though it was preempted by 42 U.S.C. § 1983. *Id.*)

*Waid*, however, was decided before the Supreme Court held that retaliation claims could be brought under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005). Since then, a district court in this circuit, citing *Jackson*, held a Title IX retaliation claim was not preempted by Title VII. *Burton v. Board of Regents of the Univ. of Wisconsin*, 171 F.Supp.3d 830, 840 (W.D. Wisc. 2016) (citing *Jackson*, 544 U.S. at 171 ("Defendants' expansive reading of the preemption rule would run headlong into the Supreme Court's decision in *Jackson*, which allowed a teacher to bring a retaliation claim under Title IX…")). On appeal, the Seventh Circuit did not discuss the issue of preemption, but analyzed the Title IX retaliation claim, and affirmed the

dismissal below because the adverse actions "did not rise to level of materiality necessary to form the basis of a Title IX retaliation claim." *Burton v. Board of Regents of the Univ. of Wisconsin*, 851 F.3d 690, 696 (7th Cir. 2017). And the Third Circuit has held explicitly that a "private retaliation claim exists for employees of federally-funded education programs under Title IX notwithstanding Title VII's concurrent applicability," because, inter alia, Congress provided multiple, overlapping remedies in order to "eradicate [ ] private-sector employment discrimination." *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 563-64 (7th Cir. 2017) (quoting *Jackson*, 544 U.S. at 174.)

Defendants also cite a recent district court case, *Bergholz v. John Marshall Law Sch.*, No. 18 C 3, 2020 WL 1066248, at *8 (N.D. Ill. Mar. 5, 2020), which relied upon *Waid* for the proposition that Title IX claims for employment discrimination are precluded by Title VII. [ECF 42 at 18.] But again, the plaintiff in *Bergholz* brought no Title IX retaliation claim: instead, he brought Title VII and Title IX discrimination claims. *Bergholz*, 2020 WL 1066248, at **1, 8

While Title IX discrimination claims are preempted by Title VII, Title IX retaliation claims are not. Because Fitzgerald has brought a retaliation claim under Title IX, and not a discrimination claim, her claim is not preempted by Title VII.

### 4. Defendants are not exempt from Fitzgerald's Title IX claim.

Defendants maintain that even if the Title IX retaliation claim is not preempted, it is barred by Title IX's religious-school exemption, found at 20 U.S.C. § 1681(a)(3). [ECF 42 at 19.] This exemption states that the prohibition against discrimination on the basis of sex, codified at 20 U.S.C. § 1681(a), does "not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." U.S.C. § 1681(a)(3). Defendants argue they both should enjoy this exemption, because they believe they are educational institutions, controlled by a

religious organization; and because "applying Title IX would "not be consistent" with the Archdiocese's "religious tenets."" [ECF 42 at 19.]

First, the exemption does not apply to the Archdiocese on its own terms, for the Archdiocese is not an educational institution. But with respect to Roncalli, no portion of any pleading asserts that retaliation – which is the heart of the Title IX claim – is a tenet of the Archdiocese.

Title IX prohibits both discrimination on the basis of sex, and "retaliation against a person because [she] complains of sex discrimination." *Milligan v. Bd. of Trustees of Southern Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012.) To prove Title IX retaliation, as in a retaliation claim under Title VII, "a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two." *Wetzel v. Glen St. Andrew Living Community, LLC*, 901 F.3d 856, 868 (citing, inter alia, *Milligan*, 686 F.3d at 388).

Fitzgerald has alleged she engaged in protected activities. [ECF 1, p. 8-9, ¶¶ 69-74; p. 15, ¶¶ 120, 121.] She filed multiple charges of discrimination against Defendants with the EEOC between January and March 2019. [*Id.*, pp. 2-3, ¶¶ 5-12.] She alleged she suffered adverse actions including "a hostile work environment, constructive discharge, and the non-renewal of her employment contract," the last of which did not take place until May 2, 2019. [*Id.*, pp. 8, 15, ¶¶ 66, 122.] And she alleges a causal connection between the protected activities and the adverse consequences, asserting that Defendants retaliated against her "for engaging in protected activities through her complaints of sex, sexual orientation, and/or marital status discrimination and publicity associated with those complaints." [*Id.*, p. 15 ¶ 123.]

Defendants claim they placed Fitzgerald on administrative leave and declined to renew her contract because she "rejected Church teaching" and entered into a same-sex marriage, and that the Title IX exemption protects them from a retaliation claim. But this response is not

13

satisfactory. First, it ignores the hostile work environment Fitzgerald alleges, and Defendants identify no religious tenets of the Catholic Church that require the imposition of such a hostile work environment. Second, while Defendants claim their tenets require them to discriminate on the basis of sex, they have identified no such tenets that require them to retaliate for engaging in protected activity. *See Goodman v. Archbishop Curley High School, Inc.*, 149 F.Supp.3d 577, 586 (D. Md. 2016) ("The United States Supreme Court has recognized the importance of retaliation claims in Title IX enforcement, *Jackson*, 544 U.S. at 180, 125 S.Ct. 1497, and no court has since held that Title IX's religious organizations exemption precludes a Plaintiff from raising a Title IX retaliation claim simply because the employer has proposed a religious reason for her termination. On the contrary, courts have recognized that simply allowing an employment discrimination or retaliation claim to proceed under the *McDonnell Douglas* scheme does not threaten a Defendant's religious interests or freedoms.")

Fitzgerald's Title IX claim does not seek to punish the Defendants for acting on their religious beliefs: it just seeks to hold them accountable for retaliating against her for engaging in protected activity. And there is simply no evidence at this stage of proceedings that such retaliation is a religious tenet of either Defendant. This question can and should be resolved by a trier of fact.

### 5.     Fitzgerald properly alleged her Title VII claims.

Defendants argue that the Title VII claims must fail because Fitzgerald did not allege the actions she challenges were based on her sexual orientation, instead of her conduct. [ECF 42 at 14.] Contrary to Defendants' allegations, however, the parties do *not* "agree that the Archdiocese placed Fitzgerald on paid leave and declined to renew her contract not because of her "sexual *orientation*" but because of her "*conduct*" in entering into a sex-sex union… ." [ECF 42 at 15 (emphasis in the original).] Instead, Fitzgerald alleged the Defendants treated her differently, and

14

to her detriment, as compared to similarly situated male employees [ECF 1, p. 10, ¶ 86]; and that Defendants discriminated against her on the basis of sex by treating her less favorably because of her sex; by taking her sex into account by treating her differently from similarly-situated men who married a woman; taking into account the sex of her spouse; discriminating against her on the basis of gender and sex stereotypes; or taking her sex or sexual orientation into account by treating her differently from men or heterosexuals whose marriages or behavior violate the teachings of the Catholic Church [*Id.* at 10-11; ¶ 87.] The parties thus do not agree that the reasons for Defendants' Title VII violations is Fitzgerald's conduct; and she asserts – just as Defendants concede is sufficient – Title VII claims based upon "animus motivated by certain protected characteristics.

Further, the conduct/status distinction relied upon by Defendants [ECF 42 at 15], has previously been rejected by the Supreme Court, and specifically collapsed with respect to the issue of discrimination on the basis of sexual orientation: "when homosexual conduct is made criminal… that declaration is an invitation to subject homosexual persons to discrimination both in the public and the private spheres." *Lawrence v. Texas*, 539 U.S. 558, 575 (2003). When a student group at a law school made a similar argument to justify discriminating against homosexual students – namely, that it was doing so on the basis of conduct and the belief that the conduct was "not wrong," and not on the basis of sexual orientation itself – the Supreme Court noted that its decisions do not make such a distinction. *Christian Legal Soc. Chapter v. Martinez*, 561 U.S. 661, 689 (2010) (citations omitted).

So it is here: Fitzgerald properly pled the elements of her Title VII claims, alleging Defendants discriminated against her because of sex and sexual orientation.

### 6.    Fitzgerald properly alleged her Title VII and Title IX retaliation claims.

Defendants claim that Fitzgerald's Title VII and Title IX retaliation claims should fail because she failed to allege but-for causation. [ECF 42 at 16-18.] They assert, essentially, that there can be no retaliation if the "allegedly retaliatory decision "precedes the protected activity."" [*Id.* at 17.] Here, however, Fitzgerald plainly pled that Defendants retaliated against her and her father, Pat Fitzgerald, in retaliation for her complaints to the Archbishop, Principal Weisenbach, President Hollowell, and her social activism. [ECF 1 at 12, ¶¶ 94-96.] Defendants told Mr. Fitzgerald he could no longer serve as a volunteer; and did so, inter alia, to punish Fitzgerald for her social activism, and to deter future protected conduct. [*Id.* at 13, ¶¶ 107-109.] And while Fitzgerald alleged that the discrimination and retaliation against Plaintiff included, inter alia, "one or more adverse employment actions impacting the terms and conditions of her employment, a hostile work environment, being placed on administrative leave, being banned from campus, and the non-renewal of her employment contract" [*Id.* at 14, ¶ 110], the chronology buttresses the pleading: while the Plaintiff was placed on leave and banned from campus in August 2018, she was not given notice that her contract would not be renewed until May 2, 2019, well after the events giving rise to the retaliation arose. Even if she were not permitted to plead in the alternative, Fitzgerald properly pled she elements of retaliation claims under Title VII and Title IX, including the fact that her contract was not renewed because the Defendants retaliated against her for engaging in protected activity.

Causation is pled throughout the Complaint, and is also done so specifically:  Fitzgerald claims there is a causal connection between her sex and marital status, and sexual orientation and marital status, and Defendants' adverse employment actions towards her. [ECF 1, p. 11, ¶ 88-89.] Fitzgerald properly alleged her Title VII and Title IX claims, including but-for causation.

**7. The pleadings do not establish that there was a legitimate, non-discriminatory reason for Fitzgerald's non-renewal.**

Defendants argue that Fitzgerald's Title VII claims fail because, in their view, she breached the "ministry contract's" "morals clause[]." [ECF 13.] They claim such a breach would constitute a "legitimate, nondiscriminatory reason" for the Archdiocese's nonrenewal decision. [*Id.*, quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 666 (6th Cir. 2000).] At the outset, this argument ignores the fact that Fitzgerald has alleged more than one adverse employment action: in addition to the nonrenewal of her contract, she has also pled that the Defendants took other adverse employment actions against her, in violation of Title VII, by: placing her on administrative leave; banning her from the Roncalli campus; blocking her from using her work email; accompanying and supervising her while she cleaned out her office; and having her co-workers, supporters and students subjected to threats and intimidation. [ECF 1, p. 10, ¶ 84.] Fitzgerald also pled that the Defendants violated Title VII when they retaliated against her father and her by removing him from his volunteer position, and by subjecting her to a hostile work environment. [*Id.* at 12-14.] Defendants' claim they had a "legitimate, non-discriminatory reason" for her non-renewal, and that thus her Title VII claims should be denied, ignores all the other adverse employment actions she pled, and the scope of the three Title VII claims. The Title VII claims should survive.

Even assuming arguendo that Fitzgerald only pled the nonrenewal decision as the only adverse employment action, the pleadings still do not establish there was legitimate, non-discriminatory reason for the nonrenewal. To be sure, the question is not yet resolved, but should be decided by the trier of fact. Despite Defendants' claim otherwise [ECF 42 at 13], the parties do *not* agree that the purported breach formed the basis of the Archdiocese's action. In fact, Fitzgerald pled precisely the opposite: that Defendants violated Title VII by "taking her sexual

orientation into account by treating her differently from heterosexuals who are in legally valid, opposite sex marriages that allegedly violate the teaching of the Catholic Church; and/or [ ] taking her sex and/or sexual orientation into account by treating her differently from men and/or heterosexuals whose behavior allegedly violates the teaching of the Catholic Church." [ECF 1 at 11, ¶ 87(6)-(7).] While a material breach of a contract may constitute a legitimate, nondiscriminatory reason for nonrenewal, using an alleged breach can certainly be a pretext, in which case it would be neither legitimate, nor nondiscriminatory. This is precisely what is alleged here. Fitzgerald has not pled or accepted Defendants' suggested reason for her nonrenewal. Instead, she is entitled to engage in discovery and present evidence of pretext to a finder of fact. She may show a discriminatory reason more likely motivated the Defendants; or she may show pretext, by demonstrating the Defendants' proffered explanation lacks credibility; or she may show Defendants enforced their policies in a discriminatory manner. *Cline*, 206 F.3d at 667.

**B.** **The First Amendment does not bar Fitzgerald's claims.**

Defendants ask this Court to dismiss all of Plaintiff's claims, because they are barred by a variety of doctrines emanating from the First Amendment. Defendants believe Fitzgerald's claims "invite the Court to engage in religious line-drawing" that would "impermissibly entangle[ ]" the Court in religious questions, and thus violate the First Amendment. [ECF 42 at 28 (quoting *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 660 (7th Cir. 2018).] Additionally, they argue her claims are barred by their freedom of association rights [*Id.* at 30-34]; and that the doctrine of constitutional avoidance requires the dismissal of the federal claims [*Id.* at 34-35.] But religious institutions and schools are not immune from all civil suits: courts "can apply neutral principles of law to churches without violating the First Amendment." *Konkle v. Henson*, 672 N.E.2d 450, 455 (Ind. Ct. App. 1996) (citing *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969)).

### 1.    Religious autonomy does not bar Fitzgeralds' claims.

The doctrine of religious autonomy bars neither the federal nor state claims. Defendants claim this doctrine gives religious employers "special solicitude" to "generally govern themselves." [ECF 42 at 21, quoting *Korte v. Sebelius*, 735 F.3d 654, 677-79 (7th Cir. 2013).] But this doctrine has not been recognized to bar either Title VII or Title IX claims.  Defendants cite to a Tenth Circuit case, *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648 (10th Cir. 2002), in support of the proposition that religious autonomy protects "personnel decision[s]" beyond those concerning ministers, when such decisions are based on "religious doctrine." One female plaintiff was employed as youth minister at a church, and subsequently entered into a civil commitment ceremony with her female partner, and co-plaintiff. *Bryce*, 289 F.3d at 651. In response, the defendants informed her that her contract would not be renewed, for they thought she violated Episcopal doctrine. *Id*. at 652. Beyond the nonrenewal, the defendants wrote and called church members, and held parish meetings about plaintiff and her actions. *Id*. at 652-53. After Bryce's contract was not renewed, she filed suit. But her Title VII claim was not based upon the nonrenewal: instead, it was based upon the sexual harassment she experienced as a result of the defendants' communications. *Id.* at 651, 653. The Tenth Circuit held that these communications addressed religious topics, within the context of an internal church dialogue, and thus "plaintiffs' claims were barred by the church autonomy doctrine." *Id.* at 658-59.

But *Bryce* is unavailing. Beyond the fact that it is non-binding on this Court, the Title VII claim in that case was brought only for sexual harassment, which would be apropos only to Fitzgerald's hostile workplace claim here (Count III [ECF 1 at 14]). It was decided fifteen years before *Hively* established that Title VII banned employment discrimination on the basis of sexual orientation in this circuit; twelve years before same-sex marriage was legalized in this circuit; and thirteen years before same-sex marriage was extended nationally. *Hively*, 853 F.3d at 341-42,

19

351-52; *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014); and *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). And *Bryce* itself even anticipates and distinguishes the instant case: noting that churches are not, and should not be, above the law, it acknowledged the autonomy doctrine was limited, and did not apply to purely secular decisions. *Bryce*, 289 F.3d at 657 (quoting *Rayburn*, 772 F.2d at 1171. Fitzgerald alleges that she suffered discrimination, retaliation and a hostile work environment. While Defendants may claim they apply religious teachings to Plaintiff and others equally, she alleges the opposite: that they take her sex or sexual orientation into account by treating her differently from men or heterosexuals who allegedly violated church teaching. [ECF 1 at 11, ¶ 87(5)-(7).] If she is correct and adduces evidence for this claim, a trier of fact can determine the Defendants' proffered explanation is merely pretextual, and that their actions were secular decisions. *Herx*, 48 F.Supp.3d at 1178.

Religious autonomy does not bar Fitzgerald's state law claims either. She has brought two such claims against the Archdiocese: for tortious interference with a contractual relationship, and for tortious interference with a business relationship. [ECF 1 at 15-17.] The elements of the former are: the "(i) existence of a valid and enforceable contract; (ii) defendant's knowledge of the existence of the contract; (iii) defendant's intentional inducement of breach of the contract; (iv) the absence of justification; and (v) damages resulting from defendant's wrongful inducement of the breach." *Winkler v. VG Reed and Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994). The latter's elements are similar: "the existence of a valid business relationship; the defendant's knowledge of the existence of the relationship; the defendant's intentional interference in the relationship; the absence of any justification; and, damages resulting from the defendant's interference." *Comfax v. North American Van Lines, Inc.*, 587 N.E.2d 118, 124 (Ind. Ct. App. 1992) (internal citations omitted). The only difference between the two is the latter does not require the existence of a contract. *Id.* Both require breach to be induced by a third party (*id.*), and Fitzgerald has pled (in

the alternative) that the Archdiocese was a party that did so. [ECF 1 at 15-16, ¶¶ 126, 128, 133, 134.]

Defendants claim the same doctrine of religious autonomy bars these two claims, because they would require this Court to determine whether the Archdiocese had a "legitimate reason" for interfering with the contract or relationship, which is ultimately a "religious question." [ECF 42 at 27.] While the First Amendment "requires civil courts to refrain from interfering in matters of church discipline, faith, practice, and religious law," such abstention should only take place if resolving disputes "cannot be made without extensive inquiry… … into religious law and polity... ." *Stewart v. Kingsley Terrace Church of Christ, Inc.*, 767 N.E.2d 542, 546 (Ind. Ct. App. 2002). Courts are restrained by the First Amendment from "determining underlying questions of religious doctrine and practice." *Brazauskas v. Fort Wayne-South Bend Diocese, In*c., 714 N.E.2d 253, 262 (Ind. Ct. App. 1999), *trans. denied* (internal citations omitted). The Indiana Supreme Court has also held that a court with general authority to hear matters like employment disputes is not deprived of subject matter jurisdiction because the defendant pleads a religious defense. *Brazauskas v. Fort Wayne-South Bend Diocese, In*c., 796 N.E.2d 286 (Ind. 2003). Courts "can apply neutral principles of law to churches without violating the First Amendment." *Konkle*, 672 N.E.2d at 455. "The First Amendment only prohibits the court from determining underlying questions of religious doctrine and practice." *Id.*

Here, no extensive inquiry will have to be made into religious law or polity to resolve this dispute. A trier of fact can determine whether the Archdiocese's proffered reasons for interfering with Fitzgerald's contractual or business relationship with Roncalli stem from the Defendant's desire to enforce its view of Church teachings, or if it was motivated by her sex or sexual orientation. The foregoing elements of the state law claims are based upon neutral principles of law, which are broadly and generally applicable to all third parties. Discovery should reveal

which, if any, other employees of Roncalli (or other Archdiocesan) schools, have been interfered with by the Archdiocese. This Court may evaluate the reasons proffered by the Defendants, without taking them at face value, and without determining questions of religious doctrine. *See Herx*, 48 F.Supp.3d at 1182, ("The Diocese is understandably concerned about the possibility of a judge or jury conducting its own secular analysis of Roman Catholic doctrine… That shouldn't happen.") Here, just as in *Herx*, a Court and jury can determine whether the Plaintiff has proved whether Defendants' took actions against her because of her sex/sexual orientation, and there is no reason why a jury cannot do so "where a religious employer claims to have acted for religious reasons." *Id.*

For the foregoing reasons, the doctrine of religious autonomy bars none of Fitzgerald's claims.

### 2. Fitzgerald's claims do not impermissibly entangle the court in religious questions.

Defendants believe Fitzgerald's claims "invite the Court to engage in religious line-drawing" that would "impermissibly entangle[ ]" the Court in religious questions, and thus violate the First Amendment. [ECF 42 at 28 (quoting *Grussgott*, 82 F.3d at 660.] They state the claims, on their face, would require "impermissible judicial decisions on quintessentially theological disputes." [*Id.* at 29.] Again, however, these claims require neither the Court nor jury to resolve any religious questions, or engage in any religious line-drawing. Instead, this matter can be resolved through the use of neutral principles that are generally and commonly employed in Title VII, Title IX and state law claims.

Herx establishes that such entanglement is not necessary:

> The Diocese is understandably concerned about the possibility of a judge or jury conducting its own secular analysis of Roman Catholic doctrine on in vitro fertilization. That shouldn't happen. In the ordinary Title VII case, the employer points to a non-discriminatory reason as the reason for the adverse employment

> action, and the plaintiff tries to prove that she suffered the adverse action because of her sex, race, national origin, and so on. In the ordinary Title VII trial, the judge instructs the jury along these lines: "In deciding Plaintiff's claim, you should not concern yourselves with whether Defendant's actions were wise, reasonable, or fair. Rather, your concern is only whether Plaintiff has proved the Defendant [adverse employment action] him [because of race/sex]...." [citation omitted.] The Diocese has given the court no reason to think a jury is likely to disobey that instruction in a case in which a religious employer claims to have acted for religious reasons.

*Herx*, 48 F.Supp.3d at 1182-83.

Defendants worry that Fitzgerald aims to show that she was treated differently when compared to other employees who allegedly violated Church teachings. [ECF 42 at 38.] They claim that such a "comparison is probative only if being in an opposite sex-marriage is, as a moral and theological matter, an equally weighty violation as being in a same-sex union," and that courts may not engage in such a comparison. [*Id.*] This claim is too broad, for a trier of fact can still determine the honesty of their proffered reasons for adverse actions while not resolving any religious questions. If same-sex marriage is more of an offense against church teaching than other offenses involving heterosexuals and marriages, or men and marriages, then Defendants can explain that and the morals clause to the Court and jury.

The cases upon which Defendants rely do not dictate otherwise. In *Curay-Cramer*, a Catholic school teacher who was fired for publicly supporting abortion rights claimed she was discriminated against on the basis of sex, for men whose behavior was more egregious were not treated as harshly as she. *Curay-Cramer*, 450 F.3d at 132. Her discrimination claim was dismissed because the males she identified allegedly violated different Church teachings (either by being Jewish, or opposing the Iraq War), which were unrelated to abortion rights. *Id.* at 139, n.7. The *Curay-Cramer* court noted, however, that her case was different from one where "a plaintiff avers that truly comparable employees were treated differently following substantially similar conduct."

*Id.* at 141. In that type of case, "neither the concerns of *Little*[2] nor the interests of the exemption

for religious employers from religious discrimination claims are raised. Requiring a religious

employer to explain why it has treated two employees who have committed essentially the same

offense differently poses no threat to the employer's ability to create and maintain communities of

the faithful." *Id.* Fitzgerald's claim follows in this vein: she has averred that comparable male

and/or heterosexual employees were treated differently following substantially similar conduct.

[ECF 1 at 1, 9, 10-11, ¶¶ 1, 78 85-87.] Here, requiring the Defendants to explain why they have

treated her differently from such employees poses no threat to their ability to create and maintain

their faith communities.

In *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618 (6th Cir. 2000), the plaintiff sued

her employer, a Baptist college, after she was fired for becoming a lay minister in a Christian

church which accepted homosexuals. *Hall*, 215 F.3d at 621-22. Hall sued for discrimination on

the basis of her religion, and the court dismissed the case upon summary judgment. *Id.* at 623.

The Sixth Circuit affirmed, finding the college was entitled to Title VII's religious exemption at §

2000e-2(e)(2). *Id.* at 624. It also found that Hall had "failed to establish that a similarly-situated

co-worker received more favorable treatment than she did," for she identified other employees

who had allegedly violated other teachings of the college unrelated to homosexuality. *Id.* at 627.

Here, Fitzgerald has not brought a religious discrimination claim, and this Court thus

does not have to determine what constitutes "true" Christian doctrine, between competing

versions. Here, neither Defendant is entitled to invoke Title VII's religious exemption, as

discussed in Sec. IV(A)(2). And Fitzgerald has alleged that comparable male and/or heterosexual

---

[2] *Little v. Wuerl*, 929 F.2d 944, 950 (3d Cir. 1991) (where court was concerned that applying Title VII to a claim of religious discrimination by an employee of a Catholic school in violation of canon law would raise serious constitutional questions).

employees were treated differently following substantially similar conduct [ECF 1 at 1, 9, 10-11, ¶¶ 1, 78 85-87.]

For the foregoing reasons, Fitzgerald's claims do not impermissibly entangle the court in religious questions. She should be permitted to discover and offer evidence that that comparable male and/or heterosexual employees were treated differently following substantially similar conduct.

### 3.      Fitzgerald's claims are not barred by freedom of association.

Defendants next assert that all of the claims are barred by the First Amendment's freedom of association. [ECF 42 at 30.] They argue that this freedom to associate with whom they wish includes the right to disassociate with whomever they deem might undermine their message, even if doing so would violate antidiscrimination laws. [*Id*.] Defendants have identified no cases standing for the proposition that, or identifying the parameters when, Title VII, Title IX, or state common law should be trumped by the freedom of association. And courts "have repeatedly acknowledged that Title VII serves a compelling interest in eradicating all forms of invidious employment discrimination proscribed by the statute." *EEOC v. R.G. and G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 591, n. 12 (6th Cir. 2018) (citing, inter alia, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984) (the "stigmatizing injury" of discrimination, "and the denial of equal opportunities that accompanies it, is surely felt as strongly by persons suffering discrimination on the basis of their sex as by those treated differently because of their race"); and *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1280 (9th Cir. 1982) ("By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a `highest priority.' Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions"), abrogated on other grounds).

The right of association, like all rights, is not absolute, and may be regulated when the government has identified a compelling interest. The Supreme Court has held that there may be a compelling interest in eliminating discrimination against women, even if doing so may infringe upon the freedom of association. *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (California's Unruh Civil Rights Act requiring Rotary Club to admit women as members did not violate First Amendment (citing *Buckley v. Valeo*, 424 U.S. 1 (1976) (right of association may be limited by state regulations necessary to serve a compelling interest unrelated to the suppression of ideas)). Defendants cite to no case holding Title VII and Title IX unconstitutional for violating associational rights. But if their theory is extended to its logical conclusion, no religious employer – or any non-governmental employer at all – could be constrained by Title VII or Title IX, if they simply maintain they have a First Amendment right to dissociate with whomever they please, and that forced association would significantly affect their ability to express their viewpoints. This position would render Title VII and Title IX essentially meaningless and unenforceable in the private sector, and cannot be right.

Defendants cite to *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), where an adult's membership was revoked when the defendant learned he was a homosexual and gay rights activist. *Dale*, 530 U.S. at 644. Dale sued under a New Jersey law which prohibited discrimination on the basis of sexual orientation in places of public accommodation. *Id.* at 645. Accordingly, *Dale* is inapposite here, for it did not involve Title VII, Title IX, or state common laws restricting employment discrimination based on sex or sexual orientation. Further, the broad definition of a "place of public accommodation," which was part of *Dale's* reasoning in identifying potential conflict between the state law and the First Amendment right of organizations, plays no role here. *Id.* at 657.

26

Defendants also rely upon *Christian Legal Society v. Walker*, 453 F.3d 853 (7th Cir. 2006), but it too is distinguishable. [ECF 42 at 31-32.] There, the Seventh Circuit enjoined a public university from revoking a Christian student group's status because the group discriminated against people "who engage[d] in or affirm[ed] homosexual conduct," in violation of the university's nondiscrimination policies. *Walker*, 453 F.3d at 857. Again, this case did not involve employment discrimination, Title IX, Title VII, or state common law. Further, the Supreme Court took a decidedly different turn four years after *Walker* in a case involving similar facts, holding that another public university's requirement that student groups not discriminate on the basis of religion and sexual orientation, inter alia, did not violate the First Amendment's rights to free speech, expressive association or free exercise. *Martinez*, 561 U.S. at 668-69.

Under the Defendants' proffered analysis of their associational rights claim, the "key questions" in are whether they engage in in some form of expression, and whether the "forced association" would "significantly affect" their ability to express or advocate their viewpoints. [ECF 42 at 32]. Assuming arguendo that analysis should be employed, it cannot be done so now. The answers to these questions turn on material facts, and they are not established on the pleadings for the purposes of the instant motion. Neither do the pleadings establish why or how the Defendants are significantly affected by Fitzgerald's father holding up a sign asking that his daughter be treated kindly. [ECF 1 at 13, ¶ 105; ECF 42 at 33.] Though the Archdiocese claims that including a father who asks others to be kind to his daughter would "alter the expressive content" of their event [ECF 42 at 34], they have adduced no evidence of this claim, and the pleadings do not establish it. Nor, for that matter, do the pleadings establish that Fitzgerald's employment or activism would force Defendants to send any message, and particularly not one that it "accepts homosexual conduct." [*See* ECF 42 at 33.]

Finally, with respect to the state law claims, which are brought against the Archdiocese, both require breach to be induced by a third party. Fitzgerald has pled (in the alternative) that the Archdiocese was a party that did so. [ECF 1 at 15-16, ¶¶ 126, 128, 133, 134.] For the purposes of these claims, then, the Archdiocese was neither Fitzgerald's employer, nor was it a group of which she was a member. Accordingly, the Archdiocese's rights of association or disassociation have no applicability, and do not bar Fitzgerald's state law claims against it.

For the foregoing reasons, Fitzgerald's claims are not barred by Defendants' freedom of association. Defendants' rationale would allow for the possibility of Title VII and Title IX to be swallowed whole, and no case permits this. Fitzgerald should be permitted to discover the evidence underlying Defendants' claim that her employment, or her father's support, would or did significantly affect their ability to express their viewpoints.

### 4. Constitutional avoidance does not require dismissal of Fitzgerald's federal claims.

Defendants' final claim is that Fitzgerald's federal claims should be interpreted narrowly, so as to avoid reaching serious constitutional questions. [ECF 42 at 34.] *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979) is unavailing for the Defendants, however. In that case, the Supreme Court decided the National Labor Relations Board lacked jurisdiction over teachers in parochial schools. *Catholic Bishop*, 440 U.S. at 507. If the NLRB's exercise of jurisdiction "would give rise to serious constitutional questions," then Congress must have affirmatively and clearly expressed that the statute at issue (in that case the National Labor Relations Act ("NLRA")", grants jurisdiction. *Id.* at 501. Because the Court found there was no clear expression of Congress to bring teachers within the jurisdiction of the NLRB, it declined to construe the NLRA "in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses." *Id.* at 507.

Here, however, even if the application of Title VII to this case would give rise to serious constitutional questions, constitutional avoidance is improper. *See Rayburn*, 772 F.2d at 1166. In *Rayburn*, the female plaintiff was denied a pastoral position by the defendant church, and brought claims under Title VII alleging sexual and racial discrimination. *Rayburn*, 772 F.2d at 1165. Before considering the merits, the *Rayburn* court undertook the question of constitutional avoidance, to "determine whether Title VII and the First Amendment necessarily collide in" that case. *Id.* at 1165-66. It found that "Title VII exempts religious institutions only to a narrow extent," citing the "particular religion" language of § 702, and held that if a "religious institution were to present "convincing evidence" that an employment practice favored members of one faith or denomination over another, "§ 702 deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination."" *Id.* at 1166 (citing *Mississippi College*, 626 F.2d at 485).

So while § 702 allows religious institutions to hire on the basis of religious preferences, "Title VII does *not* confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin… ." *Id.* (emphasis added) (internal citations omitted). Congress allowed a religious preference exemption for "one particular reason for employment decision[s]"; and while Congress could have exempted religious employers, it "plainly did not." *Id.* at 1166-67. Accordingly, and consistently with the legislative history of Title VII, the *Rayburn* court concluded that "the affirmative intention of the Congress, clearly expressed," applied, and it thus considered the constitutional questions. *Id.* at 1167. S*ee also Goodman v* 149 F.Supp.3d at 584-86 (allowing Plaintiff to challenge Defendants' religiously-motivated explanation for her termination under the *McDonnell Douglas* burden-shifting analysis is not inconsistent with Defendants' religious tenets; noting the Supreme Court has recognized the importance of retaliation claims in Title IX enforcement; and that Title IX's religious organizations exemption

does not preclude a plaintiff "from raising a Title IX retaliation claim simply because the employer has proposed a religious reason for her termination"). Respectfully, and for the same reasons, this Court should not avoid the constitutional questions here, or hold that the First Amendment bars any of Fitzgerald's claims.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff, by counsel, respectfully requests that the Court deny Defendants' Motion for Judgment on the Pleadings, and grant Plaintiff all appropriate relief.

Respectfully submitted,

*s/ Mark W. Sniderman*
Mark W. Sniderman
FINDLING, PARK, CONYERS, WOODY &
 SNIDERMAN, P.C.
151 N. Delaware Street, Ste. 1520
Indianapolis, IN  46204
Tel: (317) 231-1100
msniderman@findlingpark.com