**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

|  |  |  |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:19-cv-04291-RLY-DLP |
| | ) | |
| ROMAN CATHOLIC ARCHDIOCESE | ) | |
| OF INDIANAPOLIS, INC., and | ) | |
| RONCALLI HIGH SCHOOL, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 1

I. Fitzgerald's federal claims are barred under Title VII and Title IX. ................. 1

    A. Title VII does not apply to decisions by religious employers
    based on an employee's religious observances and practices ....................... 1

    B. Fitzgerald's breach was a nondiscriminatory reason
    for nonrenewal ...................................................................................... 4

    C. Fitzgerald has failed to allege that the challenged decision was
    motivated by sexual orientation, rather than Church teachings ............... 6

    D. Fitzgerald's retaliation claims fail to allege but-for causation .................... 7

    E. Fitzgerald's Title IX claim is preempted by Title VII ................................. 8

    F. Fitzgerald's Title IX claim is barred by the religious exemption ................ 9

    G. Neither Title VII nor Title IX applies to claims of
    discrimination based on sexual orientation ............................................ 11

II. All of Fitzgerald's claims are barred by the First Amendment ...................... 11

    A. Fitzgerald's claims are barred by religious autonomy .............................. 11

       1. Fitzgerald's federal claims are barred by religious autonomy ............. 11

       2. Fitzgerald's state claims are barred by religious autonomy ................. 13

    B. Fitzgerald's claims are barred because they would
    impermissibly entangle the Court in religious questions ......................... 14

    C. Fitzgerald's claims are barred by freedom of association ......................... 17

    D. Constitutional avoidance requires dismissal of Fitzgerald's claims .......... 20

CONCLUSION ........................................................................................... 20

CERTIFICATE OF SERVICE. ....................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alicea-Hernandez v. Catholic Bishop of Chi.*,
  320 F.3d 698 (7th Cir. 2003) ................................................................ 11

*Atlas IP, LLC v. Exelon Corp.*,
  189 F. Supp. 3d 768 (N.D. Ill. 2016) .................................................... 6

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000) ............................................................... 17, 18, 19

*Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*,
  796 N.E.2d 286 (Ind. 2003) ................................................................ 14

*Brown v. Ill. Dep't of Human Services.*,
  717 F. App'x 623 (7th Cir. 2018) .......................................................... 8

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (10th Cir. 2002) .................................................. 11-12, 13

*Burton v. Bd. of Regents of the Univ. of Wis. Sys.*,
  171 F. Supp. 3d 830 (W.D. Wis. 2016) .................................................. 8

*Burton v. Bd. of Regents of the Univ. of Wis. Sys.*,
  851 F.3d 690 (7th Cir. 2017) ................................................................ 8

*Christian Legal Soc'y v. Martinez*,
  561 U.S. 661 (2010) ............................................................................ 7

*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir. 2006) ....................................................*passim*

*Cline v. Catholic Diocese of Toledo*,
  206 F. 3d 651 (6th Cir. 2000) .............................................................. 6

*Coco v. Elmwood Care, Inc.*,
  128 F.3d 1177 (7th Cir. 1997) .............................................................. 5

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-
  day Saints v. Amos*,
  483 U.S. 327 (1987) .......................................................................... 13

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
  450 F.3d 130 (3d Cir. 2006)........................................................*passim*

*Darbha v. Capgemini Am. Inc.*,
492 F. App'x 644 (7th Cir. 2012) .......................................................................... 7, 8

*Darbha v. Capgemini Am., Inc.*,
No. 10 C 2581, 2012 WL 718826 (N.D. Ill. Mar. 6, 2012) ...................................... 8

*Demkovich v. St. Andrew the Apostle Parish*,
343 F. Supp. 3d 772 (N.D. Ill. 2018) ............................................................... 12, 13

*Doe v. Mercy Catholic Medical Center*,
850 F.3d 545 (3d Cir. 2017)..................................................................................... 9

*EEOC v. Miss. Coll.*,
626 F.2d 477 (5th Cir. 1980) .................................................................................. 3

*Emp't Div. v. Smith*,
494 U.S. 872 (1990) ............................................................................................. 15

*Fitzgerald v. Barnstable Sch. Comm.*,
555 U.S. 246 (2009) ............................................................................................... 8

*Garrick v. Moody Bible Inst.*,
412 F. Supp. 3d 859 (N.D. Ill. 2019) ..................................................... 9, 10, 12, 13

*Geinosky v. City of Chi.*,
675 F.3d 743 (7th Cir. 2012) .................................................................................. 6

*Gonzales v. O Centro*,
546 U.S. 418 (2006) ............................................................................................. 18

*Goodman v. Archbishop Curley High Sch., Inc.*,
149 F. Supp. 3d 577 (D. Md. 2016) ..................................................................... 10

*Grussgott v. Milwaukee Jewish Day Sch.*,
882 F.3d 655 (7th Cir. 2018) ............................................................................... 16

*Hall v. Baptist Memorial Health Care Corp.*,
215 F.3d 618 (6th Cir. 2000) ......................................................................... 15, 17

*Herx v. Diocese of Fort Wayne-South Bend, Inc.*,
48 F. Supp. 3d 1168 (N.D. Ind. 2014) .............................................................. 4, 16

*Herx's v. Diocese of Fort Wayne-South Bend, Inc.*,
772 F.3d 1085 (7th Cir. 2014) .......................................................................... 4, 16

*Hively v. Ivy Tech Community College*,
853 F.3d 339 (7th Cir. 2017) ............................................................................... 13

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*,
   565 U.S. 171 (2012) ............................................................................... 19

*Hung Nguyen v. Regents of Univ. of Cal.*,
   No. 8:17-CV-00423-JVS-KES, 2018 WL 5886018 (C.D. Cal. Sept. 17,
   2018) ...................................................................................................... 9

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
   515 U.S. 557 (1995) ............................................................................... 19

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ................................................................................. 8

*Kennedy v. St. Joseph's Ministries, Inc.*,
   657 F.3d 189 (4th Cir. 2011) .................................................................. 2

*Konkle v. Henson*,
   672 N.E.2d 450 (Ind. Ct. App. 1996) .................................................... 14

*Korte v. Sebelius*,
   735 F.3d 654 (7th Cir. 2013) ................................................................. 11

*Lawrence v. Texas*,
   539 U.S. 558 (2003) ................................................................................. 7

*Leitgen v. Franciscan Skemp Healthcare, Inc.*,
   630 F.3d 668 (7th Cir. 2011) ................................................................... 7

*Little v. Wuerl*,
   929 F.2d 944 (3d Cir. 1991) ............................................................. 4, 18

*Ludlow v. Nw. Univ.*,
   125 F. Supp. 3d 783 (N.D. Ill. 2015) ..................................................... 9

*Maguire v. Marquette Univ.*,
   627 F. Supp. 1499 (E.D. Wis. 1986) ................................................... 3, 4

*Maguire v. Marquette Univ.*,
   814 F.2d 1213 (7th Cir. 1987) ................................................................ 3

*McCarthy v. Fuller*,
   714 F.3d 971 (7th Cir. 2013) ................................................................ 14

*McEnroy v. St. Meinrad Sch. of Theology*,
   713 N.E.2d 334 (Ind. Ct. App. 1999) ................................................... 14

*Mitchell v. Helms,*
    530 U.S. 793 (2000) ........................................................................... 16

*NLRB v. Catholic Bishop of Chi.,*
    440 U.S. 490 (1979) ........................................................................... 20

*Obergefell v. Hodges,*
    135 S. Ct. 2584 (2015) ................................................................... 13, 18

*Olson v. Paine, Webber, Jackson & Curtis, Inc.,*
    806 F.2d 731 (7th Cir. 1986) ............................................................ 7, 9

*Othon v. Wesleyan Univ.,*
    No. 3:18-CV-00958 (KAD), 2020 WL 1492864 (D. Conn. Mar. 27,
    2020) ..................................................................................................... 9

*Our Lady's Inn v. City of St. Louis,*
    349 F. Supp. 3d 805 (E.D. Mo. 2018) ................................................ 19

*Peele v. Country Mut. Ins. Co.,*
    288 F.3d 319 (7th Cir. 2002) ............................................................... 5

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial*
    *Presbyterian Church,*
    393 U.S. 440 (1969) ........................................................................... 15

*Rayburn v. Gen. Conf. of Seventh-day Adventists,*
    772 F.2d 1164 (4th Cir. 1985) ........................................................... 20

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ..................................................................... 17, 18

*RWJ Mgmt. Co. v. BP Products N. Am., Inc.,*
    672 F.3d 476 (7th Cir. 2012) ......................................................... 13-14

*Smith v. Metro. Sch. Dist. Perry Twp.,*
    128 F.3d 1014 (7th Cir. 1997) ....................................................... 10-11

*Sterlinski v. Catholic Bishop of Chi.,*
    934 F.3d 568 (7th Cir. 2019) ......................................................... 6, 20

*Telescope Media Grp. v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) ............................................................. 18

*Waid v. Merrill Area Pub. Schs.,*
    91 F.3d 857 (7th Cir. 1996) ............................................................. 8, 9

*Washington v. Safer Found.*,
  274 F. App'x 484 (7th Cir. 2008) ............................................................................ 4

*Westfield Ins. Co. v. Sheehan Constr. Co.*,
  564 F.3d 817 (7th Cir. 2009) ............................................................................. 12

**Statutes**

20 U.S.C. § 1681 .................................................................................................... 9

42 U.S.C. § 2000e ....................................................................................... 1, 2, 3, 4

42 U.S.C. § 2000e-1 ......................................................................................... 1, 2

42 U.S.C. § 2000e-2 ............................................................................................. 1

**Other Authorities**

Code of Canon Law, Canon 803 ............................................................................. 9

# INTRODUCTION

Fitzgerald does not dispute that she knowingly violated her contract. Nor can she dispute that her lawsuit would punish the Catholic Church for acting on millennia-old teachings about marriage. Indeed, she welcomes that result, requesting that the Defendants, the Roman Catholic Archdiocese of Indianapolis and Roncalli High School (collectively, "the Archdiocese"), "explain … to the Court and jury" whether and why "same-sex marriage is more of an offense against church teaching than other offenses involving heterosexuals and marriages." Dkt. 53 at 23. Such a trial is foreclosed by the text of Title VII and Title IX, by the Constitution, and by Supreme Court precedent—which forbid government entanglement in religious questions and protect the right of religious groups to hire only those who are committed to their mission.

# ARGUMENT

## I. Fitzgerald's federal claims are barred under Title VII and Title IX.

Fitzgerald's federal claims are foreclosed by statutory religious exemptions and by her own complaint, which demonstrates that she was nonrenewed for a legitimate, nondiscriminatory reason. Her arguments to the contrary cannot be reconciled with the statutory text or the weight of precedent.

### A. Title VII does not apply to decisions by religious employers based on an employee's religious observances and practices.

Title VII states that it "shall not apply" to religious employers when they employ individuals based on their particular religious "belief," "observance," or "practice." 42 U.S.C. §§ 2000e-1(a), 2000e-2(e)(2), 2000e(j). Here, the Archdiocese nonrenewed Fitzgerald because she rejects the Church's "belief" and "practice" of marriage between one man and one woman. Dkt. 42 at 11-12. Her Title VII claims are therefore barred.

Fitzgerald doesn't dispute that the Archdiocese is a religious employer covered by the exemptions or that it nonrenewed her contract "because she married a woman," action that was in undisputed violation of Church teaching. Dkt. 53 at 2 (citing

Compl. 1 ¶, Dkt. 1). Instead, she argues that the exemptions don't apply because she does not allege "religious discrimination[] or religious preference." Dkt. 53 at 9. But the exemptions don't turn on how the employee articulates her claims; they turn on the basis for the employer's actions—whether the employer's decision was based on the employee's religious "belief," "observance," or "practice." 42 U.S.C. § 2000e(j). If so, the exemptions apply. This is evident from both text and precedent.

Section 702(a) provides that "*[t]his subchapter* shall not apply" to religious employers "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a) (emphasis added). "[R]eligion" is then defined to include not just "belief," but "all aspects of religious observance and practice." *Id.* § 2000e(j). This exemption has a simple structure: "[law X] shall not apply" to religious employers "with respect to [conduct Y]." The *law* that shall not apply is "[t]his subchapter"—which is *all* of Title VII, not just the ban on religious discrimination. *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192-94 (4th Cir. 2011). And the *conduct* that is protected is the "employment of individuals of a particular" "belief," "observance," or "practice." Thus, the meaning is clear: When a religious employer engages in the relevant conduct—making an employment decision based on an individual's religious "belief," "observance," or "practice"—Title VII does not apply.

If Congress wanted to limit this exemption to religious-discrimination *claims*, it easily could have done so. It could have changed the *law* that shall not apply—from "[t]his subchapter" to "[t]his subchapter's *prohibition on religious discrimination*." Alternatively, it could have framed the exemption in terms of the plaintiff's *claim* instead of the employer's *conduct*—stating that this subchapter shall not apply to a religious employer "with respect to *claims of religious discrimination*." It did neither. Instead, it barred application of *all* Title VII claims when a religious employer makes a decision based on an individual's religious beliefs, observances, or practices.

Fitzgerald ignores the text, skipping to caselaw. But caselaw only reinforces the

text. As Fitzgerald concedes (at 9), multiple courts have said Title VII's religious exemptions can bar sex-discrimination claims. *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130 (3d Cir. 2006); *EEOC v. Miss. Coll.*, 626 F.2d 477 (5th Cir. 1980); *Maguire v. Marquette Univ.*, 627 F. Supp. 1499 (E.D. Wis. 1986), *aff'd and vacated in part*, 814 F.2d 1213 (7th Cir. 1987). Fitzgerald's attempts to distinguish these cases fail.

First, Fitzgerald argues that *Curay-Cramer* applied the exemption "on the grounds of constitutional avoidance." Dkt. 53 at 9. But constitutional avoidance equally applies here, and also underscores the difficulty of Fitzgerald's position: she must not only rebut the Archdiocese's plain-language interpretation of the text but also show that Congress manifested a "clear legislative intent" in favor of hers. *Curay-Cramer*, 450 F.3d at 138; *see* Dkt. 42 at 34-35; *infra* II.D. She cannot do so. *Curay-Cramer* squarely rejects Fitzgerald's interpretation, holding that Title VII's religious exemptions can bar "a plaintiff's claim of gender discrimination." 450 F.3d at 141.

Next, Fitzgerald says (at 10) that unlike the *Mississippi College* defendant, the Archdiocese doesn't claim to have acted "on the basis of" Fitzgerald's "religion." But that's exactly what the Archdiocese claims (and the pleadings show)—it nonrenewed Fitzgerald's contract because she rejected the religious "belief" and "practice" of abstaining from same-sex unions. 42 U.S.C. § 2000e(j).

Finally, Fitzgerald concedes that *Maguire* applied the exemption to bar a claim of sex discrimination. Dkt. 53 at 10; 627 F. Supp. at 1502-03, 1506-07. She simply observes that the Seventh Circuit affirmed the district court on narrower grounds: plaintiff failed to make out a prima facie case of sex discrimination. Dkt. 53 at 10. But this in no way calls into question the district court's interpretation of the religious exemption, as reflected in the Seventh Circuit's praise for the district court's "conscientious[]" treatment of the issue. 814 F.2d at 1216.

Unable to distinguish the relevant caselaw, Fitzgerald instead relies on a single

district-court decision: *Herx v. Diocese of Fort Wayne-South Bend, Inc.*, 48 F. Supp. 3d 1168 (N.D. Ind. 2014). But *Herx*'s interpretation of the religious exemption does not rely on Circuit authority—as the Seventh Circuit later pointedly noted. 772 F.3d 1085, 1087 (7th Cir. 2014). And the Court shouldn't defer to it here. It conflicts with better-reasoned decisions of *Curay-Cramer*, *Mississippi College*, and *Maguire*—none of which *Herx* cites, much less distinguishes. It fails to grapple with the statutory text. *See* 48 F. Supp. 3d at 1174-76. And it never addresses the distinction between "discriminatory decisions on the basis of race, sex, or national origin," *id.*, and decisions based on religious "belief," "observance," or "practice," 42 U.S.C. § 2000e(j)—likely because it never even cites Title VII's definition of "religion."

*Contra Herx*, the governing rule here has been recognized by multiple courts: "[I]t does not violate Title VII … for a parochial school to discharge [an educator] who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991).

## B. Fitzgerald's breach was a nondiscriminatory reason for nonrenewal.

Fitzgerald's claims also fail because her complaint shows the Archdiocese nonrenewed her contract for a legitimate, nondiscriminatory reason: her violation of the Archdiocese's legitimate expectations—as reflected in its well-known religious beliefs and "morals clause" policy (the defaults clause)[1]—by entering a same-sex union. Dkt. 42 at 13-14. Fitzgerald "does not dispute that [s]he was aware of [this] policy and violated it. That is enough to doom" her case. *Washington v. Safer Found.*, 274 F. App'x 484, 485 (7th Cir. 2008).[2]

Fitzgerald says dismissal under the morals clause is inappropriate at this stage

---

[1] These obligations appeared in Fitzgerald's uncontested contract. Dkt. 42-2 ¶ 6(i), (j).

[2] This argument does not 'ignore[]' the other relevant actions alleged in Fitzgerald's Title VII claims. Dkt. 53 at 17. The relevant allegations relate to terms of administrative leave, and Fitzgerald agrees that she was "placed on administrative leave, banned from campus, and fired from her job *because she married a woman*." Dkt. 53 at 2 (emphasis added).

of the case. Dkt. 53 at 17-18. But courts dismiss Title VII claims on the pleadings when the complaint shows the employer acted for unprohibited reasons. Dkt. 42 at 14 (collecting cases). Indeed, before the defendant assumes "the burden of stating the reasons for" its action, the plaintiff must show, as part of her *prima facie* case, that she "was meeting h[er] employer's legitimate expectations." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1178-80 (7th Cir. 1997). Fitzgerald's complaint shows she wasn't: the Archdiocese expected her to model Church teachings on marriage by not entering "[r]elationships … contrary to a valid marriage as seen through the eyes of the" Church, Dkt. 42-2 ¶ 6(i), (j); she violated those expectations, Compl. ¶ 51.[3]

Fitzgerald says she can overcome these failings by showing she was treated worse than employees who entered opposite-sex relationships or committed other "behavior [that] violates the teaching of the Catholic Church." Dkt. 53 at 17-18 (referring to this as a "pretext" argument despite conceding that the adverse employment actions were "because she married a woman," *id.* at 2, Compl. ¶ 1). But the First Amendment forecloses that path here. The differential treatment Fitzgerald alleges would suggest pretext only if entering a same-sex union and entering other improper relationships are equally "sever[e] … violations of Church doctrine"—itself a religious question. *Curay-Cramer*, 450 F.3d at 137. Even for equal violations, the court would have to weigh "differentiating or mitigating circumstances" under Church teaching, *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (emphasis omitted)—such as an individual's contrition, intention to avoid future sin, and ability to continue as a witness in ministry. Adjudicating such questions "would violate the First Amendment." *Curay-Cramer*, 450 F.3d at 139.

---

[3] The incorporated ministry description, which Fitzgerald acknowledged receipt of by signature in the uncontested contract, further explains her obligation to "convey and be supportive" of the Church's teaching on the "Sacrament of Marriage." Dkt. 42-3 ¶ V.A, *see* Dkt. 42-2 ¶ 4 ("School Guidance Counselor also acknowledges receipt of the ministry description that is attached to this contract").

*Cline* doesn't require otherwise. *See* Dkt. 53 at 18. There, the court held that although the plaintiff violated a contractual morals clause through premarital sex, a jury could find sex discrimination if male employees who participated in premarital sex would have been treated more favorably. *Cline v. Catholic Diocese of Toledo*, 206 F. 3d 651, 666-67 (6th Cir. 2000). So there, the plaintiff and the comparator would have "committed essentially the same offense." *Curay-Cramer*, 450 F.3d at 141. Here, Fitzgerald proposes to compare her entering a same-sex union with (for example) an opposite-sex marriage that (in an unspecified way) "violates the teaching of the Catholic Church." Dkt. 53 at 18. That is different conduct giving rise to a different "offense" under different Catholic teachings—and holding otherwise would impermissibly "reject a church's characterization of its own theology." *Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568, 570 (7th Cir. 2019); *see infra* II.B. Because Fitzgerald's complaint shows she wasn't meeting the Archdiocese's legitimate expectations and was nonrenewed for a legitimate, nondiscriminatory reason, her claims must be dismissed.

## C. Fitzgerald has failed to allege that the challenged decision was motivated by sexual orientation, rather than Church teachings.

A nonrenewal based on conduct and views—here, entering a same-sex union and rejecting Church teaching—is "based on belief and behavior rather than status." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 860 (7th Cir. 2006). It therefore doesn't violate Title VII. Dkt. 42 at 14-16.

Fitzgerald first claims she does "not agree that" she was nonrenewed "because of her '*conduct*' in entering into a same-sex union." Dkt. 53 at 14-15. But her complaint says the opposite: "Fitzgerald was … fired from her job because she married a woman." Compl. ¶ 1. Fitzgerald "cannot contradict" her complaint "in opposing a motion to dismiss." *Atlas IP, LLC v. Exelon Corp.*, 189 F. Supp. 3d 768, 779 (N.D. Ill. 2016) (citing *Geinosky v. City of Chi.*, 675 F.3d 743, 745-46 n.1 (7th Cir. 2012)).

Fitzgerald thus pivots, saying the status–conduct distinction has been "collapsed"

for "discrimination on the basis of sexual orientation." Dkt. 53 at 15. But *Walker* fore-closes this argument: It held that a religious group's policy requiring members to support and follow the group's beliefs about marriage was permissibly "based on be-lief and behavior rather than status." 453 F.3d at 860.

*Martinez* and *Lawrence* don't change the result. *Cf.* Dkt. 53 at 15. *Lawrence* was decided *before Walker* and addressed the due-process analysis "[w]hen homosexual conduct is *made criminal* by" state law, *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (emphasis added)—a context far removed from that of *Walker* and this case. And as explained in the opening brief and not addressed by Fitzgerald, *Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010), doesn't displace *Walker* on the relevant point. *See* Dkt. 42 at 16 n.2. Thus, this Court remains bound by it. *See Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734, 741 (7th Cir. 1986) ("high standard" for district court "to reject a doctrine developed by" the Seventh Circuit).

### D. Fitzgerald's retaliation claims fail to allege but-for causation.

Fitzgerald's Title VII and IX retaliation claims fail because the retaliatory deci-sions alleged in her complaint—which the Archdiocese announced an "intent" to un-dertake on August 10, 2018, Compl. ¶ 67—preceded her alleged protected activity, all of which occurred "[s]ince August 10, 2018," *id.* ¶¶ 69-76. It's "impossible" for pro-tected activity to be the but-for cause of a previously made adverse employment deci-sion. *Darbha v. Capgemini Am. Inc.*, 492 F. App'x 644, 647-48 (7th Cir. 2012); *see Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011).

Resisting this conclusion, Fitzgerald argues that "chronology buttresses [her] pleading" by showing two distinct adverse actions against her: in August 2018, she was placed on paid administrative leave and conditions were placed on her return to campus, and "she was not given notice that her contract would not be renewed until May 2, 2019." Dkt. 53 at 16. But this chronology is belied by Fitzgerald's controlling

pleadings: both the August 2018 and May 2019 actions simply carried out the Arch-diocese's "statement of intent in the meeting with Fitzgerald on August 10, 2018." Compl. ¶ 67. Indeed, Fitzgerald alleges that by October 2018 she had cleaned out her office, and the Archdiocese had already "placed a classified advertisement for [her] permanent replacement." Compl. ¶¶ 61-62. Thus, because the only allegedly pro-tected opposition activities engaged in by "Fitzgerald and her family" have occurred "[*s*]*ince* August 10, 2018," *id.* ¶¶ 69-76 (emphasis added), Fitzgerald cannot establish the required causal link between these activities and the decision the Archdiocese had—according to the complaint itself—"previously reached." *Curay-Cramer*, 450 F.3d at 137 (no causal connection where complaint "ma[de] clear that [the deci-sionmaker] contemplated firing" the plaintiff before the allegedly protected activity); *see Darbha v. Capgemini Am., Inc.*, No. 10 C 2581, 2012 WL 718826, at *3, *9 (N.D. Ill. Mar. 6, 2012), *aff'd*, 492 F. App'x 644 (7th Cir. 2012) (no causal connection even though pre-protected-activity "decision to terminate" was conditional and nonfinal).

**E. Fitzgerald's Title IX claim is preempted by Title VII.**

It is settled Circuit law that "*all* employment-discrimination claims must be brought under Title VII," including "claim[s] under Title IX." *Brown v. Ill. Dep't of Human Services.*, 717 F. App'x 623, 625-26 (7th Cir. 2018) (emphasis added) (citing *Waid v. Merrill Area Pub. Schs.*, 91 F.3d 857 (7th Cir. 1996), *abrogated in part by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009)); *see* Dkt. 42 at 18-19 (col-lecting cases). That principle requires dismissal of the Title IX claim.

The sole in-Circuit case Fitzgerald musters in response—*Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 171 F. Supp. 3d 830 (W.D. Wis. 2016) (summary judgment for employer), *aff'd on other grounds*, 851 F.3d 690, 695 (7th Cir. 2017)—doesn't re-quire otherwise. *Burton* concluded that *Waid* doesn't apply to Title IX "retaliation" claims against employers, 171 F. Supp. 3d at 839-40, because the Supreme Court entertained such a claim in *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005).

But there is no conflict between *Jackson* and *Waid*. The *Jackson* plaintiff had "no actionable claim under Title VII," because the underlying sex discrimination wasn't in employment. *Othon v. Wesleyan Univ.*, No. 3:18-CV-00958 (KAD), 2020 WL 1492864, at \*10 (D. Conn. Mar. 27, 2020). Thus, "*Jackson* does not shed light on the [preemptive] impact of Title VII on … Title IX" retaliation claims in cases like this one. *Id.*; *see* Compl. ¶¶ 120-21, 123. Rather, *Waid*'s reasoning—that where Title VII and Title IX "overlap," Title VII trumps—fully applies. 91 F.3d at 861-62; *see Othon*, 2020 WL 1492864, at \*9-11; *Hung Nguyen v. Regents of Univ. of Cal.*, No. 8:17-CV-00423-JVS-KES, 2018 WL 5886018, at \*7 (C.D. Cal. Sept. 17, 2018).

Fitzgerald relies on *Doe v. Mercy Catholic Medical Center*, but *Doe* expressly disagrees with the law of this Circuit. *See* 850 F.3d 545, 563 (3d Cir. 2017). Absent any "basis to go beyond" this Circuit's "uniform findings that employment discrimination claims under Title IX are preempted by Title VII under *Waid*," *Ludlow v. Nw. Univ.*, 125 F. Supp. 3d 783, 790 (N.D. Ill. 2015), Fitzgerald's Title IX claim fails.

**F. Fitzgerald's Title IX claim is barred by the religious exemption.**

Title IX also does not apply to "educational institution[s] … controlled by a religious organization" if application would "not be consistent" with the organization's "religious tenets." 20 U.S.C. § 1681(a)(3). Here, accepting Fitzgerald's allegations, she was nonrenewed because she "oppos[ed]" both the Archdiocese's religious tenets on marriage and its canon-law application of those tenets to Catholic school educators. Compl. ¶¶ 80, 95; Code of Canon Law, Canon 803 § 2 (requiring teachers to be "outstanding in correct doctrine and integrity of life"), *available at* https://perma.cc/J6B7-4ENY. So the Archdiocese's action "was rooted in the Catholic church's doctrinal opposition to same-sex marriage," *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871 & n.5 (N.D. Ill. 2019), requiring dismissal of Fitzgerald's Title IX claim.

Fitzgerald doesn't dispute that Roncalli is an educational institution controlled by a religious organization, the Archdiocese. She states only that "no portion of any

pleading asserts that retaliation" or "imposi[ng] … a hostile work environment" is a "tenet of the Archdiocese." Dkt. 53 at 13-14. But the question isn't whether these legal terms were themselves part of the Archdiocese's religious tenets; it's whether the *actions* that Fitzgerald alleges *constitute* retaliation and the imposition of a hostile work environment "were firmly rooted in … religious beliefs." *Moody Bible*, 412 F. Supp. 3d at 872. The pleadings show that is the case here. Fitzgerald's contract required her to model Church teaching to students, including by refraining from "[r]elationships … contrary to a valid marriage as seen through the eyes of the" Church. Dkt. 42-2 ¶ 6(i), (j).[4] Fitzgerald violated that requirement when she opposed the Archdiocese's already-expressed intent to apply its doctrinal standards to her—and it would be inconsistent with the Archdiocese's tenets to require it to retain her nonetheless.

Fitzgerald cites *Goodman v. Archbishop Curley High Sch., Inc.*, 149 F. Supp. 3d 577 (D. Md. 2016), but that case proposes a rule for when the reasons for the plaintiff's termination are disputed. *Id.* at 581, 586 (complaint alleged termination for reporting sex abuse; defendant alleged it was due to breach of Canon Law in delaying reporting). Again, there is no dispute about the nonrenewal reason: "Fitzgerald was … fired from her job because she married a woman." Compl. ¶ 1. This case thus tracks *Moody Bible*, where both the termination and the relevant "doctrinal views" were undisputed. 412 F. Supp. 3d at 871-72.

Falling back, Fitzgerald asserts (at 13) that her Title IX claim should proceed at least against the *Archdiocese* because the Archdiocese (unlike Roncalli) isn't an "educational institution." But this is a non sequitur; "only a [Title IX] grant recipient"—*i.e.*, an educational institution—"can violate Title IX" in the first place. *Smith v.*

---

[4] The ministry description that the contract incorporates further explains that the Archdiocese believes teachers must "convey *and be supportive of*" Church teaching on "sexuality" and "the Sacrament of Marriage." Dkt. 42-3 ¶ V.A (emphasis added).

*Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1018-20 (7th Cir. 1997). So if the Archdiocese *isn't* interchangeable with Roncalli for purposes of Title IX, it isn't an "appropriate defendant" for Fitzgerald's Title IX claim, *id.* at 1034; if it *is*, it can invoke the exemption. Fitzgerald's claim fails either way.

### G. Neither Title VII nor Title IX applies to claims of discrimination based on sexual orientation.

The Archdiocese's opening brief preserves the argument that Titles VII and IX do not reach sexual orientation claims; the issue should be further briefed when the Supreme Court resolves *Zarda*, *Bostock*, and if relevant, *Harris Funeral*. Dkt. 53 at 7-8.

## II. All of Fitzgerald's claims are barred by the First Amendment.

Fitzgerald's claims are also foreclosed by the First Amendment doctrines of religious autonomy, non-entanglement, and expressive association. Applying these doctrines would not, as Fitzgerald claims, immunize "religious institutions and schools … from all civil suits[.]" Dkt. 53 at 18. Rather, it would uphold established law that religious schools have a right to ensure their staff shares their faith and courts have a duty to avoid entanglement in such internal religious affairs. Dkt. 42 at 21-29.

### A. Fitzgerald's claims are barred by religious autonomy.

#### 1. Fitzgerald's federal claims are barred by religious autonomy.

Fitzgerald's Title VII and IX claims are barred by religious autonomy—*i.e.*, religious organizations' First Amendment right to "shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines." *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013). Religious autonomy includes the right to make employment decisions respecting "ministers" for any reason—"secular or religious." *Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 703 (7th Cir. 2003). As relevant to this motion, it also includes a right to make employment decisions "based on religious doctrine," even when the affected employee is not a "minister." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657-

60, 658 n.2 (10th Cir. 2002). Because the Archdiocese's decision was based on religious doctrine—Fitzgerald's rejection of the Church's teaching on marriage, Compl. ¶ 54—her claims are barred.

Fitzgerald first asserts that religious autonomy "has not been recognized to bar either Title VII or Title IX claims." Dkt. 53 at 19. But she simply ignores the two recent in-Circuit decisions that have done just that—applied "the overarching principle of religious autonomy" (*Moody Bible*, 412 F. Supp. 3d at 871) to bar Title VII and Title IX claims. *Id.* at 871-72 (Title VII and Title IX claims); *Demkovich v. St. Andrew the Apostle Parish*, 343 F. Supp. 3d 772 (N.D. Ill. 2018) (Title VII claims). As explained in our motion (at 24-25), *Moody Bible* and *Demkovich* are squarely on point—they explain that religious autonomy requires dismissing Title VII and Title IX claims over a religious institution's personnel decisions reflecting its "religious views," *Moody Bible*, 412 F. Supp. 3d at 872, including (as here) the Catholic Church's "opposition to same-sex marriage." *Demkovich*, 343 F. Supp. 3d at 786. Fitzgerald's refusal to acknowledge these cases demonstrates her inability to distinguish them.

As for *Bryce*, Fitzgerald concedes that the Tenth Circuit likewise applied religious autonomy doctrine to dismiss Title VII claims, like hers, that challenged a religious organization's application of religious doctrine in employment. *Bryce*, 289 F.3d 648. She simply says that *Bryce* is "unavailing" and "non-binding on this Court." Dkt. 53 at 19. But *Moody Bible* and *Demkovich* (both in-Circuit) found *Bryce* persuasive. *Moody Bible*, 412 F. Supp. 3d at 871; *Demkovich*, 343 F. Supp. 3d at 782. Fitzgerald's disagreement with it doesn't make it any less good law.

Fitzgerald's attempt to distinguish *Bryce* is meritless. She first notes that *Bryce*—which barred a claim by a church employee fired for entering a same-sex union—was decided "fifteen years before *Hively*," and "thirteen years before" *Obergefell*. Dkt. 53 at 19-20. But "judicial decisions" don't have "expiration dates," *Westfield Ins. Co. v. Sheehan Constr. Co.*, 564 F.3d 817, 819 (7th Cir. 2009), and *Bryce* was central to

12

*Demkovich* and *Moody Bible*—decided in 2018 and 2019 respectively. *Demkovich*, 343 F. Supp. 3d at 782; *Moody Bible*, 412 F. Supp. 3d at 871. In any event, *Hively v. Ivy Tech Community College* "saved for another day" the "[a]dditional complications" in cases involving "religious institution[s]"—explaining that "a religious employer may be exempted from Title VII liability because they have a bona fide need to discriminate on the basis of a protected characteristic." 853 F.3d 339, 351 & n.7 (7th Cir. 2017). And *Obergefell v. Hodges* said "[t]he First Amendment ensures that religious organizations" are granted "proper protection as they seek to teach" that "by divine precepts, same-sex marriage should not be condoned." 135 S. Ct. 2584, 2607 (2015). That's the same protection *Bryce* affords and the Archdiocese seeks.

Turning to *Bryce*'s substance, Fitzgerald argues that because the *Bryce* plaintiff's claim was "only for sexual harassment" based on the church's "communications" about the implications of its teachings for the plaintiff's employment, its relevance is limited to "Fitzgerald's hostile workplace claim." Dkt. 53 at 19 (conceding the comparison is "apropos" for that claim). But limiting *Bryce* to strike only Count III ignores its holding: "When a church *makes a personnel decision* based on religious doctrine, and holds meetings to discuss that decision and the ecclesiastical doctrine underlying it, the courts will not intervene." 289 F.3d at 660 (emphasis added). *Bryce* doesn't pit "personnel decision[s]" against "communications." It protects both, which makes sense. Religious autonomy protects religious groups' ability to employ "only those committed to" their shared "religious mission," *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring); thus, they must be able not just to "discuss" doctrinal qualifications for employment but to act on them.

## 2. Fitzgerald's state claims are barred by religious autonomy.

Because Fitzgerald's federal claims fail, the Court should relinquish jurisdiction over the state claims. *RWJ Mgmt. Co. v. BP Products N. Am., Inc.*, 672 F.3d 476, 482

(7th Cir. 2012). Or it can dismiss them, as Indiana courts have invoked religious autonomy to bar tortious interference claims like Fitzgerald's. *McEnroy v. St. Meinrad Sch. of Theology*, 713 N.E.2d 334, 336 (Ind. Ct. App. 1999); *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286, 294 (Ind. 2003); *see* Dkt. 42 at 26-28.

Fitzgerald makes no effort to distinguish *McEnroy* or *Brazauskas*, instead arguing that courts may resolve claims where they "can apply neutral principles of law to churches without violating the First Amendment." *Konkle v. Henson*, 672 N.E.2d 450, 455 (Ind. Ct. App. 1996). Even if relevant here, that would not help her, since it points up precisely the problem with the state claims. The elements of those claims require this Court to determine whether the Archdiocese had a "legitimate reason" for requiring Roncalli to implement a "morals clause" in Fitzgerald's contract and then to enforce it in light of her violation. Dkt. 42 at 26-28. And that is ultimately a religious question, *id.*, requiring this Court to overrule the Archdiocese's resolution of "questions of religious doctrine and practice," *Konkle*, 672 N.E.2d at 455.

## B. Fitzgerald's claims are barred because they would impermissibly entangle the Court in religious questions.

Fitzgerald's claims are also barred because they would impermissibly entangle the court in "religious questions." *McCarthy v. Fuller*, 714 F.3d 971, 980 (7th Cir. 2013). Fitzgerald proposes to show sexual-orientation discrimination by showing she has been treated worse than "comparable male and/or heterosexual employees" who committed other "offense[s] against church teaching." Dkt. 53 at 23-24. But that would be probative only if her conduct and the other "offense[s]" of the alleged comparators are equally "sever[e] … violations of Church doctrine"—an inquiry that would "violate the First Amendment." *Curay-Cramer*, 450 F.3d at 137, 139.

Fitzgerald doesn't dispute the blackletter prohibition on judicial resolution of religious questions. *See* Dkt. 53 at 22-25. Instead, she argues her claims avoid this obstacle because they ask the Court to compare only "same-sex marriage" and "other

offenses involving heterosexuals and marriages[] or men and marriages" if those offenses are "similar"—though she doesn't identify any such offenses that would qualify. *Id.* at 23. But no neutral "principle of law or logic" "can be brought to bear" to determine whether any two "offenses against church teaching" are "similar" as a matter of federal law. *Emp't Div. v. Smith*, 494 U.S. 872, 887 (1990). To do so would require this Court "to determine matters at the very core of" the Catholic faith—"the interpretation of particular church doctrines" and the relative "importance of those doctrines[.] Plainly, the First Amendment forbids civil courts from playing such a role." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 450 (1969).

And indeed, the Catechism and Canon Law reject Fitzgerald's amorphous category of "offenses involving heterosexuals and marriages[] or men and marriage," instead distinguishing among a variety of different ways that intimate relationships can violate Church teaching and describing the distinct moral issues raised by each. For example, the Catechism chapter on matrimony addresses a variety of offenses related to marriage, including "divorce and remarr[iage]", "polygamy," and "refusal of fertility." Catechism ¶¶ 1625-66. Meanwhile, "homosexual acts" are dealt with in the separate chapter on the Sixth Commandment, *id.* ¶¶ 2357-59, along with (but in a subchapter distinct from) other "offenses against chastity," *id.* ¶¶ 2351-56 (also listing, *e.g.*, "lust," "pornography," and "prostitution"). Fitzgerald offers no neutral principle allowing this Court to adopt her grouping of these teachings over the Catechism's. Rather, Fitzgerald *acknowledges* that courts have recognized that a religious school may consider violations of "teachings … unrelated to homosexuality" distinctly from other conduct—the precise distinction her claims depend on erasing. Dkt. 53 at 24 (citing *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618 (6th Cir. 2000)).

Moreover, it's easy to see *why* a religious body might treat different relationships

that violate Catholic teaching differently. Fitzgerald tellingly offers *no specific example* of a violation of Church teaching she would have the Court identify as "substantially similar" to a same-sex marriage—perhaps realizing each would be subject to obvious criticism. Dkt. 53 at 25. Further, even for identical relationships, the Church considers other religious factors like an individual's contrition, intention to avoid future sin, and ability to continue as a witness in ministry. To compile a list of suitable comparators for Fitzgerald, then, the Court would have to "troll[] through [the Archdiocese's] religious beliefs," *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality), picking and choosing which conduct contrary to Catholic teaching it views as sufficiently similar to Fitzgerald's conduct, guided by its (or Fitzgerald's) own moral sensibilities. That "religious line-drawing" is both "incredibly difficult" and "impermissibl[e]." *Grussgott v. Milwaukee Jewish Day Sch.*, 882 F.3d 655, 660 (7th Cir. 2018).

*Herx* is not to the contrary. There, the district court considered a plaintiff and comparator engaged in the *same* conduct—in vitro fertilization (IVF)—and held that a jury could find sex discrimination if male employees who participate in IVF would have been treated more favorably. *Herx*, 48 F. Supp. 3d at 1179. And on appeal, the Seventh Circuit emphasized that the district court should be "explicit" in "instruct[ing] the jury *not* to weigh or evaluate" Church doctrine. 772 F.3d at 1091. *Herx* thus doesn't support Fitzgerald's theory that judges or juries can apply their own theological judgment to determine whether or not "same-sex marriage is more of an offense against church teaching than other offenses involving heterosexuals and marriages." Dkt. 53 at 23 (arguing that Defendants must "explain" any such distinction "to the Court and jury"). To the contrary, Fitzgerald's concession that the other offenses to which she seeks to compare conduct are just that—"*other offenses*"—is a concession that this case is governed not by the district court's opinion in *Herx* but by the rule recognized in *Curay-Cramer* and *Hall. See Curay-Cramer*, 450 F.3d at 139,

16

141 (explaining that courts cannot "assess[] the relative severity of offenses" and "distinguish[ing] this case" from cases in which the plaintiff seeks to compare "two employees who have committed *essentially the same offense*" (emphasis added)); *Hall*, 215 F.3d at 626-27 (no comparing "two tenets of … faith" (quotation marks omitted)).

### C. Fitzgerald's claims are barred by freedom of association.

Freedom of association allows an expressive association to disassociate from those whose presence would "significantly affect" its "ability to advocate [its] viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, 650 (2000). The Archdiocese is an expressive association, and punishing it for nonrenewing Fitzgerald—despite her defiance of Church teaching—would undermine its ability to express that teaching. Dkt. 42 at 26-34. So Fitzgerald's claims are barred.

Fitzgerald doesn't dispute that the Archdiocese is an expressive association. *See* Dkt. 53 at 25-28. Rather, she disputes that neither her "employment or activism[,]" nor her father's public opposition to Church teaching, "would force" the Archdiocese to send the message that it "accepts homosexual conduct." *Id.* at 27. But courts must "give deference to an association's view of what would impair its expression." *Dale*, 530 U.S. at 653. And no deference is even necessary to find impairment, given the Seventh Circuit's recognition that forcing a religious group to accept members "who engage in or affirm homosexual conduct" would "significantly affect … [its] ability to express its disapproval of homosexual activity." *Walker*, 453 F.3d at 862; *see also* Compl. ¶¶ 70-76, 105 (recounting Fitzgerald's "frequent" opposition to Defendants' beliefs, as well as her father's public opposition and her "activism" to change them).

Because the Archdiocese is an expressive association and Fitzgerald's claims would harm its message, Fitzgerald's claims must pass strict scrutiny. This means she bears the burden to show that her claims serve "compelling state interests" "that cannot be achieved through" less-restrictive means. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). This showing isn't evaluated in the abstract but as applied to the

17

"particular … claimant[]" asserting the right. *Gonzales v. O Centro*, 546 U.S. 418, 430-32 (2006); *Walker*, 453 F.3d at 863. But instead of making this case-specific showing, Fitzgerald broadly asserts her impairment on the Archdiocese's rights is justified by the "compelling interest in eliminating discrimination against women." Dkt. 53 at 26. That is not enough: "[e]ven antidiscrimination laws, as critically important as they are, must yield to the Constitution." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019); *Dale*, 530 U.S. at 653 (overriding antidiscrimination laws).

Moreover, even assuming Title VII and Title IX apply to sexual orientation discrimination and that this application would serve compelling interests generally, Fitzgerald hasn't shown it would do so *here*, as applied to a religious institution organizing around shared beliefs. Nor could she. Congress has recognized that such institutions must be able "to create and maintain communities composed solely of individuals faithful to their doctrinal practices," *Little*, 929 F.2d at 951, providing exemptions in both Title VII and Title IX aimed at protecting just that. *Supra* I.A, I.F. And with respect to the particular belief at issue here—that "same-sex marriage should not be condoned"—the Supreme Court has "emphasized" that religious institutions must have "proper protection as they seek to teach" it, *Obergefell*, 135 S. Ct. at 2607, not that the government has a compelling interest in undermining that message by forcing them to accept leaders who disagree.

Having failed strict scrutiny, Fitzgerald takes another tack, arguing—without authority—that Title VII and Title IX claims are immune from freedom-of-association defenses. But state public-accommodations laws like *Dale*'s are no less important than federal antidiscrimination law; they "provided the primary means for protecting the civil rights of historically disadvantaged groups until the Federal Government reentered the field." *Roberts*, 468 U.S. at 624. And the fact that Title VII involves "employment," *cf.* Dkt. 53 at 26, doesn't distinguish this case from *Dale*, since the *Dale* law, too, protected efforts to "obtain employment." 530 U.S. at 661-62; *id.* at 698

18

(Stevens, J., dissenting). More recently, *Our Lady's Inn v. City of St. Louis*—cited in our motion, with no response—held that freedom of association required that Catholic schools be free not to hire staff who rejected Church teaching on abortion, despite a city employment-discrimination law. 349 F. Supp. 3d 805, 821-22 (E.D. Mo. 2018).

Fitzgerald also worries (at 26) that any "religious" or "non-governmental employer" could invoke freedom-of-association to "disassociate with whomever they please," which she argues "would render Title VII and Title IX essentially meaningless and unenforceable in the private sector." But the limits of the Archdiocese's position derive from freedom-of-association precedent itself. The defendant must be expressive and the plaintiff's presence must "affect[] in a significant way the group's ability to advocate public or private viewpoints"—a harder test for "clearly commercial entities." *Dale*, 530 U.S. at 648, 657. Here, the defendant is a nonprofit religious school, the "archetype" of expressive associations, *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., joined by Kagan, J., concurring), exercising the kind of expressive-association rights already protected by the Seventh Circuit, *Walker*, 453 F.3d at 863.

Finally, Fitzgerald suggests freedom of association can't bar her state-law claims (which are asserted solely against the Archdiocese) because "the Archdiocese was neither [her] employer, nor was it a group of which she was a member." Dkt. 53 at 28. But freedom of association doesn't turn on payroll or membership lists; it turns on *association*—whether the person from whom the claimant seeks to disaffiliate is associated with it in the public eye, such that continued association would affect the claimant's "message … to the world." *Dale*, 530 U.S. at 653; *see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995) (parade had associational right to exclude marchers who were neither members nor employees). That is this case: Roncalli was organized exclusively to "support[] and ... further[]" the Archdiocese's "mission," Dkt. 42-4 ¶ 2.1; Fitzgerald's contract acknowledged that her

personal "conduct" could "reflect" on Roncalli, which is "affiliated with the" Archdiocese, Dkt. 42-2 ¶¶ 6(j), 7; and Fitzgerald's claims against the Archdiocese *depend* on the Archdiocese's "control[]" over Roncalli. Compl. ¶¶ 17-21.

### D. Constitutional avoidance requires dismissal of Fitzgerald's claims.

Even if the First Amendment didn't bar Fitzgerald's claims, those claims present "serious constitutional questions" requiring the Court to construe Title VII and Title IX narrowly to avoid that result absent a clearly expressed, affirmative intention of Congress to the contrary. *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 501 (1979).

Fitzgerald does not dispute that applying Title VII and Title IX to require a Catholic school to retain a guidance counselor who rejects Catholic doctrine on human sexuality would give rise to "serious constitutional questions" under the foregoing First Amendment doctrines. Dkt. 53 at 29. Rather, she relies on *Rayburn* for the proposition that the "affirmative intention of Congress, clearly expressed" was to subject religious organizations to potential Title VII liability for claims of discrimination premised on "race, sex, or national origin." *Id.* (citing *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1166-67 (4th Cir. 1985)). But this is nonresponsive. The Archdiocese doesn't claim wholesale exemption from Title VII for religious institutions; it claims they are exempt *when* they make employment decisions based on an individual's religious "belief," "observance," or "practice," regardless how the employee might later characterize the claim. *Supra* I.A. As explained above, that conclusion flows from the plain language of the Title VII exemption and from decisions of the Third and Fifth Circuits; at minimum, "Congress has not demonstrated a clear expression of an affirmative intention" to the contrary. *Curay-Cramer*, 450 F.3d at 141. *Cf. Rayburn*, 772 F.2d at 1169 (no inquiry into whether challenged decision was grounded in theological belief).

### CONCLUSION

Judgment should be rendered for the Archdiocese.

Respectfully submitted,


By: /s/  Luke W. Goodrich
Luke W. Goodrich (DC # 977736)
Daniel H. Blomberg (DC # 1032624)
Christopher C. Pagliarella (DC # 273493)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave NW
Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090 fax

John S. (Jay) Mercer, #11260-49
Paul J. Carroll, #26296-49
MERCER BELANGER
One Indiana Square, Suite 1500
Indianapolis, IN 46204
(317) 636-3551
(317) 636-6680 fax

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing has been served upon the following on June

3, 2020 by this Court's electronic filing system:

David T. Page
1634 W. Smith Valley Road, Suite B
Greenwood, IN 46142
Tel: (317) 885-0041

Mark W. Sniderman
Findling Park Conyers Woody & Sniderman, P.C.
151 N. Delaware St., Suite 1520
Indianapolis, IN 46204
Tel: (317) 231-1100

By: /s/  Luke W. Goodrich
Luke W. Goodrich (DC # 977736)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave NW
Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090 fax