# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04291-RLY-TAB |
| | ) | |
| RONCALLI HIGH SCHOOL, INC., and | ) | |
| the ROMAN CATHOLIC | ) | |
| ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF MICHELLE FITZGERALD'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS

MARK W. SNIDERMAN
Findling, Park, Conyers, Woody &
Sniderman, P.C.
151 N. Delaware Street, Ste. 1520
Indianapolis, IN 46204

DAVID T. PAGE
1634 W. Smith Valley Road, Suite B
Greenwood, IN 46142

RICHARD B. KATSKEE
BRADLEY GIRARD
ADRIANNE M. SPOTO
Americans United for Separation of
  Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-3234
girard@au.org

*Counsel for Michelle Fitzgerald*

# TABLE OF CONTENTS

Page(s)

Table of Authorities ....................................................................................... iii

Statement of Undisputed Material Facts ............................................... 2

Statement of Disputed Material Facts ................................................... 10

Standards of Review ....................................................................................... 17

Argument .......................................................................................................... 18

I.    Fitzgerald was not a minister. ............................................................ 18

    A.   Fitzgerald did not perform the functions of a minister. ............. 19

    B.   None of the other considerations even minimally support that Fitzgerald was a minister. .......................................................... 27

    C.   Roncalli's framing of Fitzgerald's position is entitled to no deference. ................................................................................... 30

    D.   The Court's decision in *Starkey* does not control. .................... 31

II.   Defendants' additional arguments fail. ........................................... 33

    A.   This Court has already denied Roncalli's additional First Amendment and Title VII defenses. ........................................... 33

    B.   As a matter of law, RFRA does not apply. ................................ 35

Conclusion ......................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................. 17

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) .............................................................. 35

*Davis v. Balt. Hebrew Congregation*,
985 F. Supp. 2d 701 (D. Md. 2013) ........................................... 25

*Demkovich v. St. Andrew the Apostle Par.*,
3 F.4th 968 (7th Cir. 2021) (en banc)................................ 18, 19, 25, 27

*DeWeese-Boyd v. Gordon Coll.*,
163 N.E.3d 1000 (Mass. 2021),
*petition for cert. filed* (U.S. Aug. 2, 2021) (No. 21-145) ................... 22, 23

*Gonzalez v. City of Elgin*,
578 F.3d 526 (7th Cir. 2009) ............................................... 18, 24

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*,
882 F.3d 655 (7th Cir. 2018) ..................................... 20, 28, 29, 30

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) ............................... 18, 19, 20, 25, 27, 28, 29, 30, 31

*Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*,
665 F.3d 930 (7th Cir. 2012) .................................................... 17

*Kirby v. Lexington Theological Seminary*,
426 S.W.3d 597 (Ky. 2014) ..................................................... 23

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) .................................................... 34

*Laouini v. CLM Freight Lines, Inc.*,
586 F.3d 473 (7th Cir. 2009) ............................................... 17, 18

*Listecki v. Off. Comm. of Unsecured Creditors*,
780 F.3d 736 (7th Cir. 2015) .................................................... 35

*Lukaszewski v. Nazareth Hosp.*,
764 F. Supp. 57 (E.D. Pa. 1991) ............................................... 25

*McClure v. Salvation Army*,
460 F.2d 553 (5th Cir. 1972) ............................................. 18, 25, 27

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) ..................................18, 19, 20, 22, 23, 25, 26, 27, 29, 30, 31

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
   No. 19-cv-03153, ___ F. Supp. 3d ___, 2021 WL 3669050
   (S.D. Ind. Aug. 11, 2021), *appeal docketed*, No. 21-2524 (7th Cir.
   2021) ................................................................................. 2, 28, 31, 32, 33

*Sterlinski v. Cath. Bishop of Chi.*,
   934 F.3d 568 (7th Cir. 2019) ................................................................ 30

*Young v. N. Ill. Conf. of United Methodist Church*,
   21 F.3d 184 (7th Cir. 1994) ................................................................ 28

**Constitution and Rules**

U.S. Const. amend. I...................................................................................*passim*

Fed. R. Civ. P. 12(c) ................................................................................ 17

Fed. R. Civ. P. 12(d)................................................................................ 17

**Other Authorities**

Ted Booker, *Notre Dame's Landscaping Chief to Retire, Capping Off
   35-year Journey*, South Bend Tribune (May 22, 2019),
   https://perma.cc/SFN9-KQKF.............................................................. 25

**INTRODUCTION**

Shelly Fitzgerald was a dedicated and cherished guidance counselor at Roncalli High School for fifteen years, eventually becoming co-director of the department. Year after year she was lauded for her job performance. Yet when the Archdiocese learned that she is married to a woman, it fired her, violating her civil rights.

Now Roncalli contends that it can skirt liability because, according to the school, Fitzgerald was a minister. But the ministerial exception protects a religious organization's right to determine its religious messages, so it applies only to those who play important roles in preaching or teaching *religion*. It does not convert every employee who performs any religious task—no matter how small, sporadic, or disconnected from the employee's actual job—into a minister. And it does not give religious employers *carte blanche* to ignore antidiscrimination laws.

The record does not support that Fitzgerald was a minister as a matter of law, which is what Roncalli must show. Quite the contrary. As a guidance counselor—a position for which she received secular education and credentials—Fitzgerald spoke with students about class schedules, college applications, and standardized testing. She was not expected to, nor did she, pray with students, offer them spiritual advice or guidance, or teach them religious doctrine. She never prayed over the loudspeaker, planned mass, or served as a Eucharistic minister. As department co-chair, she evaluated other guidance counselors on purely secular criteria and coordinated and administered many of the same standardized tests given at public schools. On the Administrative Council she discussed school logistics; when issues of religion *did* arise, the Council referred them to the school's religion and ministry teams.

Ignoring these facts, Roncalli relies on affidavits from the principal who fired Fitzgerald and a counselor who started *one week* before she was put on leave, plus some formal documents, several of which Fitzgerald had never seen before this litigation. To the limited extent that any of that might be relevant in determining

1

Fitzgerald's job duties, it is disputed. But Roncalli is not deterred: It combs through Fitzgerald's fifteen years at Roncalli and draws on a bare handful of moments in which she expressed her personal faith. It then points to a few annual religious events hosted at the school but neglects to mention that Fitzgerald was usually excused from them and permitted to focus on her wholly secular workload. Surely that cannot be enough to make one a minister as a matter of law.

Unable to show that Fitzgerald played *any* religious role, let alone an important one, Roncalli insists that this case is a foregone conclusion in light of the Court's decision in *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, No. 19-cv-03153, ___ F. Supp. 3d ___, 2021 WL 3669050, at *7 (S.D. Ind. Aug. 11, 2021), *appeal docketed*, No. 21-2524 (7th Cir. 2021). That is incorrect for two reasons. First, the ministerial exception does not turn on an employee's title. So while Starkey and Fitzgerald may have been co-directors of the Guidance Department, what matters is whether Roncalli can show that *Fitzgerald* played a vital role in forming or communicating religious doctrine. It has not and cannot. Second, to the extent that the Court relied in *Starkey* on similar descriptions of Fitzgerald's position, we show—through evidence that must be viewed in Fitzgerald's favor—why those facts are, at the very least, in dispute.

Roncalli asks this Court to ignore the ministerial exception's purpose, the pertinent considerations outlined by the Supreme Court, and the facts about Fitzgerald's actual job responsibilities. Then, in a scant six pages, it offers a blunderbuss of *nine* affirmative defenses on the merits, developing none sufficiently to make considered rulings possible, while also eliding binding circuit precedent, and reraising defenses that this Court already rejected. The motions should be denied.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Shelly Fitzgerald began working as a guidance counselor at Roncalli in 2004. SA.2 ¶ 3. After three years, she was promoted to co-director of the Guidance Department.

2

SA.2 ¶ 7. Fitzgerald was a dedicated guidance counselor who consistently earned positive reviews. *See, e.g.*, SA.31 ¶ 45; 38 ¶ 36; 47 ¶ 33; 53 ¶ 23; 67-69 ¶¶ 6, 29; 72 ¶ 7; 138; App. 609-17. Her job was to help students with academics, college planning, and career counseling. Her few other responsibilities were overwhelmingly secular; none involved teaching or preaching religion.[1]

**Meeting with students.** Each guidance counselor was assigned a subset of students with whom to meet briefly each year. SA.3-4 ¶¶ 14-16; 27 ¶ 10. In these meetings, Fitzgerald advised students on academics: the sequence for certain classes, appropriate levels of coursework, and how to prepare for college-admissions exams. SA.3-4 ¶ 14; 55 ¶¶ 5-7; 59 ¶¶ 4-6; 62 ¶¶ 4-5; 72 ¶¶ 5-7; *see also* SA.27 ¶ 12.

Fitzgerald's responsibilities shifted throughout each year to meet her students' immediate needs but always focused on academics and college admissions. For example, every August, Fitzgerald met with seniors to discuss college applications and career preparation, and choice of schools. SA.4 ¶ 17. She did not discuss personal or religious issues with them, nor could she—they had only a short time to cover everything relevant to college admissions and post-graduation plans. SA.4 ¶¶ 18-19.

After meeting with her seniors, Fitzgerald turned to the other students. In November and December she prepared the next year's master schedule of classes, gave presentations to students on scheduling, and answered questions from students about their schedules. SA.4-5 ¶¶ 20-23. Between January and April, she met with her assigned freshmen, sophomores, and juniors to schedule their classes for the next year.[2] These scheduling meetings lasted roughly fifteen minutes and focused on academics, class schedules, and study skills. SA.5 ¶¶ 24-27. There was no time to discuss

---

[1] Roncalli's Appendix is cited as "App." and Fitzgerald's Supplemental Appendix is cited as "SA."

[2] According to Roncalli's Course Catalog: "The following items are discussed during these planning appointments: 1. Current academic status[,] 2. Next year's schedule[,] 3. Four-year (graduation) plan[,] 4. Graduation credits/Core 40/Academic Honors Diploma[,] 5. Career plans[, and] 6. Post-secondary goals[.]" SA.100; *see also* SA.88, 110. There is no mention of religion.

nonacademic issues during the meetings. SA.5-6 ¶ 28. It was also very difficult to meet with students about any nonscheduling issues during those months. *Id.*

Because so much of Fitzgerald's time was spent in academic meetings, she "had very little time for any personal or social counseling." SA.7 ¶ 37. Most students never went to her, or any guidance counselor, with personal issues. SA.7 ¶ 38; *see also* SA.59 ¶ 7; 73 ¶ 18; 77 ¶ 14. The ostensibly personal counseling that Fitzgerald did provide was largely related to academics. For example, when one student felt stressed by her heavy course load and extracurriculars, Fitzgerald talked with her "about what [they] could do to make [her] schedule more manageable." SA.63 ¶ 13. That was the only time this student approached Fitzgerald with a personal issue. *Id.* Another student, who was "struggling with depression mostly related to school stress," went to Fitzgerald to "work on coping skills" and to talk about things like how her classes were going. SA.67 ¶¶ 9-10. They never talked about religion or prayed. SA.67 ¶¶ 11-12. And a third student "almost never spoke with Ms. Fitzgerald about personal, nonacademic issues." SA.57 ¶ 17. That student also explained that the school had a "different" person—social worker Kelley Fisher—"whose role it was to discuss personal issues, especially mental health," and whom the student understood to be the school's go-to person "if the school thought a student was struggling with mental health issues." SA.57 ¶ 18; *see also* SA.7 ¶ 39; 40 ¶¶ 4, 7; 53 ¶ 21; 63 ¶ 14; 77 ¶ 14.

Simply put, Fitzgerald did not pray or discuss religious doctrine with students. SA.4 ¶ 18; 6 ¶¶ 29-33; 7 ¶¶ 40-42; *see also* SA.56 ¶¶10-13; 60 ¶¶ 11-14; 62-63 ¶¶ 5, 7-12; 67 ¶¶ 7-8, 11-12; 73 ¶¶ 8-11. And students did not come to her with religious or spiritual issues or expect her to discuss them. SA.6 ¶ 34; 56 ¶¶ 11-12; 60 ¶¶ 11-13; 63 ¶¶ 9-11; 68-69 ¶¶ 19-21; 73 ¶¶ 12-15. One of Fitzgerald's students, for example, explained that she "wouldn't have thought it made sense to go to Ms. Fitzgerald with religious questions because [the student] understood [Fitzgerald's] role to be providing academic guidance, not religious guidance." SA.63 ¶ 9.

4

Other counselors likewise did not view Fitzgerald's or their own role as involving religious doctrine or formation. They did not understand their duties to include incorporating religion in their meetings with students, advising students on religious or spiritual matters, or praying with students during counseling sessions. SA.27-29 ¶¶ 8, 13-14, 24-27; 35-37 ¶¶ 5-6, 19-21, 26-27. And Roncalli never told them that they should incorporate religion into their work. SA.27-29 ¶¶ 8, 28; 35-36 ¶¶ 5-6, 19-21.

Roncalli teachers likewise did not understand the Guidance Department as a source of religious counseling: They would not send students with religious questions to the guidance counselors, nor were they directed by the school to do so. *See* SA.47 ¶¶ 30-31; 52-53 ¶¶ 17-20, 22; *see also* SA.42 ¶ 18. Religious counseling "wasn't the purpose of the guidance department." SA.47 ¶ 31.

And Roncalli "did not present or advertise guidance counselors as playing a religious or spiritual role or being there to discuss religion"; instead, Roncalli presented their role, as another student explained, as working "to get the college acceptance rate as high as possible." SA.56 ¶ 10; *see also* SA.35 ¶¶ 8-9; 60 ¶¶ 10-13; 63 ¶¶ 8, 11. The school's website likewise did not (and does not) mention religious counseling in the list of services offered by the Guidance Department. SA.118-22; 124-25; 127-28; 136. Instead, Roncalli conveyed to students that religious issues were best addressed by the school's chaplain, campus minister, and religion teachers. SA.56 ¶ 12; 73 ¶ 12; 77 ¶ 10. As a result, students did not understand the Guidance Department as a source of religious instruction or spiritual support. SA.56 ¶¶ 10-13; 59-60 ¶¶ 6, 9-13; 62-63 ¶¶ 5, 7-11; 68-69 ¶¶ 19-21; 73 ¶¶ 13-16; 76-77 ¶¶ 7-10.

Nor did Roncalli tell Fitzgerald that she was expected to play any religious role with or for students—and she didn't. Roncalli never criticized her for not praying with students, for not incorporating the Catholic faith into her counseling sessions, or for not spending time on students' religious issues. SA.6-8 ¶¶ 29-32, 36, 41, 49. Fitzgerald's performance appraisals did not mention any religious duties or any need to

5

incorporate religious doctrine or prayer in her counseling work. App. 609-17; SA.138. Other counselors at Roncalli had similar experiences. They, too, were never told to incorporate religion into their counseling. SA.29 ¶ 28; 35 ¶¶ 5-6. At one point, a religion teacher proposed to Principal Chuck Weisenbach that the school create a new position of "spiritual guidance counselor" precisely because the guidance counselors did not pray with students or incorporate religion in their work. SA.8 ¶ 49. That plan was never implemented. *Id.* And yet, the guidance counselors were still never asked to perform any religious duties. *Id.*

**Test Administration.** From August through October, much of Fitzgerald's time was spent coordinating PSAT testing. SA.14 ¶ 99. This work included ordering tests, training proctors, and setting schedules for test days. *Id.* She oversaw the test days and told students and teachers what to do with the test results. *Id.* And throughout the year, Fitzgerald oversaw the school's AP exam process. SA.13-14 ¶ 100. From March through May, her AP responsibilities were "nearly a full-time job." *Id.*

**Administrative Council.** In her role as co-director of guidance, Fitzgerald served on the school's Administrative Council. SA.8 ¶ 50. The Council was "a group of people from around the school" who met approximately once a week to discuss "the overall day-to-day logistics of the school." App. 198:7-14. Sometimes decisions would be made during Council meetings, but the meetings were often used just to share school updates. App. 198:19-199:6; SA.10 ¶¶ 61, 64. "Ultimately the principal had the last say" on all decisions. App. 199:4-19. Fitzgerald's role on the Council focused on day-to-day school operations. SA.8 ¶ 51. For example, she discussed e-learning days, academic-scholarship nominations and awards, the PSAT and AP exams, and administration of the high-school-placement test. *Id.*

**Department Chair.** As co-director of the Guidance Department, Fitzgerald attended some Department Chair meetings (with co-director Starkey attending others).

These meetings focused largely on academics. SA.12 ¶¶ 76-77. The guidance co-directors offered little input during these meetings and attended primarily in case academic-department chairs "had questions about standardized testing or guidance [counselors] coming into classrooms . . . to talk about the standardized testing[]." App. 165:6-19; SA.12 ¶¶ 78-82. Issues of religion did not come up, nor did the chairs discuss the religion curriculum. SA.12 ¶ 79.

As a department chair, Fitzgerald also facilitated weekly guidance-department meetings. SA.13 ¶ 84. These meetings addressed topics and updates "relevant to [the guidance counselors'] work," *id.*, including scheduling appointments, standardized tests, graduation requirements, and college applications. *See* SA. 37 ¶¶ 28-29; 42 ¶¶ 20-21; 80-84 (sample meeting agendas). They did not address religious topics. SA.13 ¶ 85; 37 ¶ 29; 42 ¶ 21; 80-84. One of the other counselors, Kathy Heath, generally choose to lead a prayer at the start of the meetings. App. 323:9-16; SA.37 ¶ 30. Fitzgerald does not remember ever leading a prayer. App. 323:12-13; *see also* SA.13 ¶ 86; 37 ¶ 30.

**Student Assistance Program.** Guidance counselors also participated in the school's Student Assistance Program. "SAP met to discuss at-risk students[,] . . . connect them with resources and support," and help them succeed in school. SA.13 ¶¶ 88-89. SAP was primarily geared toward drug testing students caught using drugs or alcohol, App. 184:13-15; SA.13 ¶ 89; 56 ¶ 14-16; 63 ¶ 15; 77 ¶ 16, though it sometimes also addressed academic or personal struggles, SA.13 ¶ 90; 41 ¶ 8. Roncalli counselors interacted with students in SAP by giving and sometimes discussing drug tests, not personal or spiritual counseling. SA.13 ¶¶ 91-92; 56 ¶¶ 14-16; 67-68 ¶¶ 13-18.

**Fitzgerald's Performance Reviews.** Right up until it placed her on leave in 2018, Roncalli praised Fitzgerald for her job performance. *See, e.g.,* App. 609-17; SA.138. In her 2014 performance appraisal, Principal Weisenbach applauded her for her "'action-oriented' approach," her positive energy, and her role in the Guidance

7

Department. App. 613. And in her 2017 performance appraisal, he observed that he did "not believe [he] ha[d] ever received more positive comments about an employee when seeking feedback than [he] did when getting feedback from folks about their working with [Fitzgerald]." App. 609. He praised her professionalism, energy, organization, and problem-solving skills. App. 610. He also listed her participation in the Administrative Council as a strength. App. 610-11. He did not say anything about her playing a religious role, on the Administrative Council or otherwise. App. 609-11.

Counselors could also choose to undergo the Catholic Educator Advancement Program, which helped them obtain raises. *See* SA.16 ¶¶ 111-12.[3] CEAP included a variety of observations assessing how the counselor handled classroom presentations, scheduling appointments, and senior appointments, along with survey feedback from students. SA.16 ¶ 116; App. 546-71 (survey responses). Individual counseling sessions were not observed. SA.16 ¶ 117. The CEAP counseling-appointment-observation and student-feedback forms did not ask or address whether counselors prayed with students, incorporated Catholic doctrine in their counseling, or otherwise fostered students' spiritual growth. App. 529-32, 538-71. Fitzgerald's assessments included no criticism of her for not doing so. *Id.* And the CEAP completion letter she received when she was promoted to Distinguished School Counselor did not mention her performing any religion-related tasks or even hint that she should incorporate religion into her work. SA.140; *see also* SA.16-17 ¶¶ 118-20.

**Fitzgerald's Nonreligious Role.** Fitzgerald was not viewed by students, faculty, or staff as a religious leader. SA.31-32 ¶¶ 44, 46-47, 50; 38 ¶ 33; 41 ¶¶ 15-16; 47

---

[3] Initially, only teachers could seek pay raises through CEAP. SA.16 ¶ 111. And the school had no intention of including counselors. SA.16 ¶ 114. Because counselors had no way to rise on the pay scale, however, Fitzgerald and Starkey asked Weisenbach to open the CEAP process to counselors. SA.16 ¶ 112. They obtained permission to adapt the teachers' CEAP for counselors but were told that they could not change the substance of the criteria under "Spirit of Roncalli Formation" because that "would not be fair to the teachers." SA.16 ¶ 113. When Weisenbach expressed concern that the adapted CEAP was not workable for counselors, Fitzgerald offered to go through it herself as a test run. SA.16 ¶ 115.

¶¶ 26-27; 56 ¶¶ 9-10; 60 ¶¶ 8-10; 62-63 ¶¶ 6-8; 69 ¶¶ 27-29; 73 ¶¶ 16-17; 78 ¶¶ 22-23. Nor did she view herself that way. SA.19-20 ¶ 134-35. She never planned religious services, delivered readings at religious services, or distributed communion. SA.20 ¶¶ 138-41. She was not a member of the Campus Ministry team, so she never coordinated all-school liturgies or other religious services. SA.20 ¶ 144. Likewise, she *never* led prayer at the school—not during counseling sessions, not in department or department-chair meetings, not in Administrative Council meetings, and not at any other time. SA.10 ¶ 60; 13 ¶¶ 83, 86; 20 ¶¶ 142-43.

Fitzgerald had no religious training when she applied to Roncalli. She did not attend a religious college, pursue a theology degree, or hold any prior religious posts. App. 429-31. While at Roncalli, she was required to seek out professional-development opportunities related to her counseling work, but not to undertake religious training. SA.2-3 ¶¶ 6, 9; 19 ¶ 133; 38 ¶ 34; App. 573-75 ("Evidence of Professional Development"). By contrast, Roncalli *did* require those responsible for religious education to receive religious training: According to the student handbook, Roncalli students "receive instruction in the essential teachings of the Catholic faith from certified catechists." App. 762. Fitzgerald was never a certified catechist. SA.2 ¶ 5.

Though she did attend one senior retreat—in her almost fifteen years working at Roncalli—she was there merely as an observer. SA.21 ¶¶ 145-46. She did not lead student discussions. SA.21 ¶ 147; *see also* SA.63 ¶ 16 (explaining that teachers "generally did not sit in on the small group discussions" at retreats). She gave a single half-hour talk about how her religion affected her personally during a difficult time in her life, but did not recall leading any prayers. SA.21 ¶¶ 148-49; App. 298:10-15, 317:5-9. Several students who attended senior retreats stated that they did not see the adult volunteers as religious leaders afterwards. *See* SA.64 ¶ 18; 73-74 ¶¶ 19-20.

**Ministry Contract.** For the 2018-19 school year, Roncalli introduced "ministry contracts" and "ministry descriptions" for guidance counselors. Fitzgerald signed her

contract in late May 2018, a mere two months before she was placed on leave. App. 507-08. She did not receive a copy of the ministry description until after she had signed the contract. SA.18 ¶ 128. The school did not give her any explanation for the new contract or ministry description. SA.18 ¶ 129. And it did not give her or the other counselors any opportunity to share input or negotiate before signing. *See* SA.18 ¶¶ 128; 30-31 ¶¶ 37-38, 42; 37 ¶ 23.

**Fitzgerald's Termination**. In August 2018, Fitzgerald was called into a meeting with Weisenbach and Roncalli President Joe Hollowell. SA.23 ¶ 167. There, she was told that the Archdiocese had learned that she was married to a woman. *Id*. Roncalli presented her with four "options": She could dissolve her "civil union," resign her position, "keep quiet" about why she was being fired until her yearly contract was up and then be let go, or be fired immediately. *Id*. At no point did Roncalli tell Fitzgerald that she was not performing the functions of her job. *Id*. Fitzgerald made no public statements about the meeting. SA.23 ¶ 169. Nevertheless, Roncalli issued a press release days later announcing that Fitzgerald had been put on administrative leave. SA.23 ¶ 170. She was later told that her contract would not be renewed. SA.23 ¶ 171.

## STATEMENT OF DISPUTED MATERIAL FACTS

Almost every fact or inference in Roncalli's Statement of Undisputed Facts is in dispute—*some by Roncalli's own evidence*.

**Contracts and Ministry Descriptions.** Roncalli contends (at 6-7, 20-21) that the duties listed in its ministry contracts and ministry descriptions reflected Fitzgerald's actual job duties. But those formal documents do not reflect what the counselors actually did or what Roncalli expected them to do. SA.18-19 ¶¶ 130-32; 30-31 ¶¶ 37-43; 36 ¶¶ 19-21. Fitzgerald and another counselor both confirmed that they were never expected—either before or after the ministry contracts and job descriptions were introduced—to pray with students or incorporate Catholic doctrine or beliefs into their work. SA.6-7 ¶¶ 29-36; 30-31 ¶¶ 39-40.

10

The form contracts state that the counselor has been provided with the faculty handbook—which Roncalli asserts assigns counselors and co-directors the duty to assist students "in strengthening and developing their social, emotional, intellectual and Christian development." Br. 5, 21, 28. But Fitzgerald did not receive a copy of the handbook then or at any other time. SA.3 ¶ 10. And in all events, the single reference to "Christian development" in job descriptions that identify no specific religious duties, *see* App. 435-38, does not reflect the school's actual expectations for counselors or the counselors' actual duties. *See* SA.6-7 ¶¶ 29-36; 28 ¶ 24.

Roncalli also relies on statements by Angela Maly—who joined the counseling department the same month Fitzgerald was placed on leave—to somehow show what *Fitzgerald* did before Maly was hired. Br. 7-9. But Maly's statements bear no resemblance to Fitzgerald's role. *Compare, e.g.*, App. 2-3 ¶¶ 10-13, *with* SA.6-8 ¶¶ 29-33; 44-47. For example, Maly stated that the ministry description accurately described her work, that she prayed with and for students, that she modeled and taught students the Catholic faith, that she discussed students' questions and doubts about the Catholic faith, and that she discussed issues of sexual orientation and gender identity with students. Br. 7-9. There is reason to doubt the veracity of those statements: One of Maly's students, for example, declared that Maly never discussed religion or prayed with him, gave him any religious memorabilia, or discussed any personal issues with him. SA.77 ¶¶ 8-15. But even if Maly were accurately stating what *she* did, Fitzgerald did not do any of those things—and Roncalli didn't expect her to. SA.4 ¶ 18; 6-8 ¶¶ 29-35, 40-47; 13-14 ¶¶ 92-94; 27-28 ¶¶ 8, 12-13, 15, 24; 30 ¶ 36; 32 ¶ 50; 37 ¶ 24.

Roncalli emphasizes that guidance counselors met one-on-one with students each year, implying that these were unique opportunities to engage students spiritually. Br. 8. But these brief academics-and-college-focused appointments left no time to discuss anything else, such as spiritual or other personal issues. SA.4-6 ¶¶ 17-18, 28-29. And the counselors met one-on-one with just their assigned subset of students—not

each student. SA.3-4 ¶ 14; 27 ¶ 10. Roncalli also asserts that counselors were "often the first to identify when students are grappling with difficult social, mental, academic, emotional, family, or spiritual issues." Br. 22 (internal citation omitted). But in reality, teachers or administrators were often the first to learn that a student was struggling. SA.7 ¶ 38. And they did not necessarily alert the guidance counselors. *Id.*

**CEAP Self-Evaluation.** Roncalli uses statements from Fitzgerald's CEAP self-assessment to suggest that she incorporated religion and spiritual life in her counseling and "shar[ed] her own spiritual experiences." Br. 12. But Fitzgerald testified that she used the phrase "spiritual experiences" to refer to things like being "kind" and "humble." App. 282:18-283:2. And while her self-assessment suggested that she would have been "willing" to share more of her faith and beliefs "where appropriate," those things "just never were a part of [her] job." App. 284:12-17. Finally, Fitzgerald explained that the parts of her CEAP self-evaluation addressing religion were not accurate: She had said that she "plan[ned] to help more with St. Vincent de Paul," a food pantry, but she had not volunteered there before (and did not do so after) the self-evaluation. App. 277:11-278:9. The report said that she consistently attended "all masses at Roncalli," but that, too, was "exaggerated." App. 281:11-282:8. And though the report said that she "consistently use[d] spiritual life and resources in [her] counseling conversations" she did not "remember any specific instances where [she] did this." App. 282:12-283:13. And she confirmed that she *never* incorporated religious doctrine or teachings in her work. SA.6 ¶ 29-30.

**FLSA Letter.** Roncalli repeatedly attributes to Fitzgerald a letter asserting that guidance counselors fulfilled most of the responsibilities in the school's teacher ministry description. Br. 10-11, 29. But that letter was not about whether counselors played a religious role—it was about whether they would be moved to a pay and contract structure with less job security. App. 249:1-14. In any event, Fitzgerald testified that Lynn Starkey sent the letter and added Fitzgerald's name without obtaining her

permission or discussing the specific content with her. App. 247:3-248:7. Fitzgerald "didn't author" the letter, didn't sign it, didn't remember reviewing it before it was sent, and "did not send" it. App. 247:9-20, 248:5-15; *see also* SA.17 ¶ 124. She testified that she couldn't "say that [counselors] did all 67 of th[e] items" in the teacher ministry description. App. 254:1-3. And she noted that counselors "were not evaluated on all 67 of those." App. 257:14-22; *see also* SA.17 ¶¶ 121, 123.

Roncalli also asserts (at 10) that a later email to Weisenbach thanking him for taking the counselor's "side" shows that Fitzgerald agreed that she was a minister. But again, Fitzgerald was referring to Weisenbach's support in helping ensure that counselors did not lose summer pay and benefits; she was not agreeing with a description of counselors' responsibilities. *See* SA.17-18 ¶ 125.

**Student Assistance Program.** Roncalli also mischaracterizes SAP and Fitzgerald's role in it. It implies that, through SAP, Roncalli's guidance counselors brought a religious lens to students' religious concern and personal struggles. Br. 8-9. But, as the school's social worker confirmed, "SAP did not address students' religious issues or struggles," and to her knowledge, "no student was ever referred to SAP for religious struggles." SA.41 ¶ 9; *see also* SA.28 ¶¶ 19-21. Instead, SAP addressed drug, alcohol, and academic problems, not religious ones. App. 184:13-15. It was the "kind of program [that] definitely exists in public schools." SA.41 ¶ 12. During Fitzgerald's many years at Roncalli, she could not recall a single time when students' spiritual issues came up in SAP; students' religious struggles would generally go to the campus minister, chaplain, or religion teachers. App. 183:11-22; *see also* SA.14 ¶¶ 93-96.

Indeed, "[a]lthough the school would sometimes describe the SAP program as something more," a Roncalli student who had been in SAP described it as "exclusively a program for drug testing students," explaining that Fitzgerald and he "didn't talk about religion or spirituality." SA.56 ¶¶ 15-16; *see also* SA.63 ¶ 15; 77 ¶ 16. Aside

from drug testing, students in SAP were not required to meet with guidance counselors: SAP mostly referred students to outside therapists or trusted adults to talk to. SA.13 ¶¶ 91-92; 41 ¶ 10; 67-68 ¶¶ 14-18.

Roncalli describes Fitzgerald as the recipient of anonymous referrals of students to SAP. Br. 8. But this just meant that students could leave anonymous paper referral forms in Fitzgerald's mailbox, and she would pass them along to the Assistant Principal for Student Activities, who was in charge of SAP. App. 191:19-192:15; *see also* SA.14 ¶ 97. She did not interact with referring students, exercise discretion, or make judgments about the referrals. *See* SA.14 ¶ 97.

**Administrative Council.** Roncalli asserts that the Administrative Council dealt with "issues core to Roncalli's religious mission" and that Fitzgerald gave "input on issues of faith" and "mission." Br. 14. It says that the Council (along with department chairs) was responsible for 95% of Roncalli's daily ministry and that faculty and staff saw the Council as the "lifeblood" of the school. Br. 13, 23, 25. Those characterizations are all disputed: Several teachers disagreed, as did Fitzgerald. SA.9 ¶¶ 55-57; 46 ¶¶ 22-24; 52 ¶¶ 14-15.

First of all, items on the Council's agenda did not necessarily involve input from the full council. For example, the campus minister, dean of students, and athletic director sometimes used the meetings to confer on logistics for school masses, without input from other members. SA.10 ¶ 63. And sometimes agenda items were included solely to ensure that everyone knew about them, without any opportunity for input. SA.10 ¶¶ 64-65. Fitzgerald was not expected to share input on topics unrelated to academics or the guidance department. SA.9 ¶¶ 52-53; 11 ¶¶ 68-71.

Beyond that, Roncalli points to Fitzgerald's input on a draft Archdiocese policy on transgender students. Br. 14. But her feedback was limited to whether counselors could adhere to the policy's requirement of notifying parents, given their professional duty of confidentiality. App. 230:8-231:17; *see* SA.146.

14

Roncalli also implies that Fitzgerald planned religious events, based on her suggestion, after the Parkland school shooting, that there be a prayer service. Br. 14. But her suggestion wasn't "necessarily about a prayer service." App. 205:21-208:8. Rather, Roncalli students were planning a walkout in the wake of the Parkland tragedy, and Fitzgerald, worried about the risk of liability, merely brainstormed possible alternatives. App. 205:21-207:8; *see also* SA.11 ¶ 67.

Nor, contrary to Roncalli's assertions, *see* Br. 14, did the Administrative Council vote on or choose Eucharistic ministers or music for school masses. App. 368:17-369:2; *see also* SA.10 ¶ 62. Fitzgerald testified that the Council would at most ask the principal or campus minister to convey student feedback about music to the music director, who was responsible for music selection. App. 209:3-10, 368:17-369:2.

Roncalli also states that Council members participated in "book studies" as a form of "required" "continued religious education." Br. 15, 28. But during Fitzgerald's time on the Council, the members read and discussed just one book: *Living as Missionary Disciples*. SA.11-12 ¶¶ 73-75. Roncalli states that it was "designed to assist 'pastoral leaders' as they 'develop, enhance, and review their own local strategies' to pursue evangelization." Br. 15. But discussions about the book were brief, and Fitzgerald does not recall substantively taking part. SA.11-12 ¶ 73. Nor did she consider it a form of religious training or education. SA.11-12 ¶ 73. And the Council did not take any action based on the book. *Id*.

**Senior Retreat.** Pointing to the ministry description for guidance counselors, Roncalli asserts that counselors were required to participate in student retreats. Br. 3-4, 6, 11. But Fitzgerald confirmed that attending or leading retreats was not required for her job, which is why she attended only *one* during her fifteen-year tenure. SA.21 ¶ 145. Roncalli contends that Fitzgerald was a team leader at that retreat. Br. 2, 13, 22. She wasn't: Because it was her first (and only) retreat, she was an "observer" and did not lead a group of students. SA.21 ¶ 146; App. 278:19-279:9; *see also* S.A 28

15

¶ 23. And the bulk of the retreat was led by youth leaders, with even the adult leaders playing a more "peripheral" role. App. 294:8-12; SA.21 ¶ 147.

**Personal Religious Expression and Activities.** Roncalli cites Weisenbach's note in one of Fitzgerald's performance appraisals about her goal of "find[ing] more ways to celebrate Christ, specifically through reading, journaling, praying, etc." Br. 12. Fitzgerald doubted that she phrased her goal that way. App. 326:21-22. But regardless, it was one of Fitzgerald's *personal* goals, not a professional goal connected in any way with her work or job duties. App. 326:21-327:4; SA.15-16 ¶¶ 108-10. Roncalli also points to Fitzgerald and Weisenbach's exchange of "books on religious and theological topics." Br. 15. But again, to the extent that the two shared book recommendations, those were personal exchanges based on years of familiarity and friendship, not professional recommendations, duties, or job functions. SA.23 ¶¶ 164-65; *see also* App. 342:21-343:17.

Roncalli also states that it sent "Fitzgerald and one other employee to a 'workshop about bringing LGBTQ people into the church,'" Br. 15, implying that she attended in her professional capacity. But she was invited to attend for personal reasons, not professional. SA.21 ¶ 151. Fitzgerald had no conversations with Weisenbach about the conference and did not incorporate anything from it into her work. SA.21 ¶ 151.

**Days of Reflection.** Roncalli states that Fitzgerald attended "Days of Reflection," an annual faculty meeting at the start of the school year. Br. 7. But because guidance counselors needed time for senior appointments, Weisenbach excused them from everything except "nuts-and-bolts" sessions. App. 355:9-356:15; 357:1-16; SA.22 ¶¶ 154-156; 29 ¶ 31; *see also* App. 359:8-21 (noting that cafeteria staff and janitors likewise attended the nuts-and-bolts sessions but not the rest of the Days of Reflection). During those sessions, Weisenbach would go over important procedure and rule changes, give updates from the summer, and provide other, practical information "relevant to running any school." SA.22 ¶154; 45 ¶ 9; 51 ¶ 6. It "was very similar to

16

what it would be at a public school." SA.51 ¶ 6. Fitzgerald was not required to attend faculty mass or any other parts of the day. SA.22 ¶¶ 155-56; 29 ¶ 31.

By her last four years at Roncalli, Fitzgerald stopped attending the Day of Reflection events altogether because of her increased number of senior appointments. App. 357:7-16. Faculty and staff who attended mainly remember icebreaker and team-building activities. SA.35 ¶ 12; 45 ¶ 10; 51 ¶ 7. At one that Fitzgerald attended in earlier years, the teachers and staff members "went and took pictures of different things," including bushes and parks. App. 357:1-11, 358:3-9; SA.22 ¶ 157. At another "a long time ago,"—not "recent" as Roncalli asserts, *see* Br. 7—Fitzgerald heard a talk given by the President of Marian University, App. 358:15-22. She does not remember the talk being about spirituality. SA.22 ¶ 158. She doesn't remember attending *any* Day of Reflection sessions relating to religious training or students' spiritual formation. SA.22 ¶ 159. Nor was she commissioned as a minister "during a Day of Reflection or others." SA.23 ¶ 163; *see also* SA.29 ¶ 33; 45 ¶¶ 12-13; 51 ¶¶ 8-12.

## STANDARDS OF REVIEW

A motion for judgment on the pleadings must be denied unless—accepting all allegations in the complaint as true—the complaint fails to state a plausible claim for relief. Fed. R. Civ. P. 12(c); *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934-35 (7th Cir. 2012). If the defendant relies on facts outside the complaint, the motion must be denied and the plaintiff must be given an opportunity to engage in discovery. *See* Fed. R. Civ. P. 12(d).

Summary judgment is inappropriate unless the moving party shows that there are no genuine disputes of material fact and that it prevails as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A factual dispute exists if a reasonable factfinder could decide it in favor of either party. *See id.* at 248. When the issue is an affirmative defense, "the burden of proof" to show the absence of genuine factual disputes "rests on the defendant." *Laouini v. CLM Freight Lines, Inc.*,

586 F.3d 473, 475 (7th Cir. 2009). Critically, the Court cannot "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). Nor may inferences be drawn in favor of the moving party. *Id.*

## ARGUMENT

### I. Fitzgerald was not a minister.

The ministerial exception is a rare departure from the constitutional rule that religious organizations are bound by laws that are neutral with respect to religion and apply generally. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012). For employees who play key religious roles, the exception strips them of the protections of antidiscrimination laws.

Because it is so potent, the exception applies only to "personnel who are essential to the performance" of religious functions, *id.* at 199 (Alito, J., concurring)—in other words, those who play "vital" roles in teaching or preaching the faith. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2066 (2020). After all, the ministerial exception is meant to protect religious institutions from governmental intrusion into their development and transmission of religious doctrine, not to shield employers from liability whenever they engage in unlawful discrimination.

Any application of the exception must therefore be "tailored to this purpose." *Hosanna-Tabor*, 165 U.S. at 199 (Alito, J., concurring). Thus, courts should apply the exception only when an employee actually "is the 'chief instrument' for a religious organization 'to fulfill its purpose.'" *See Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 978 (7th Cir. 2021) (en banc) (quoting *McClure v. Salvation Army*, 460 F.2d 553, 559 (5th Cir. 1972)). Put another way, ministerial employees "lie[] at the heart of a religious organization's work and workplace," *id.* at 981, and "imbue a religious organization with spirituality," *id.* at 979. Other employees do not—even if they share the organization's religious aims and ends.

18

With that specific purpose in mind, in *Hosanna-Tabor* the Supreme Court mandated a fact-intensive, case-by-case approach to determining whether an individual is a minister. 565 U.S. at 190. There, four considerations justified applying the exception to a "called" teacher: (1) she had substantial religious functions "in conveying the Church's message and carrying out its mission," including teaching religion four times a week and leading students in prayer throughout the day; (2) the school held her out as a minister, with the formal title "Minister of Religion, Commissioned"; (3) she had, and was required to have, considerable religious training and commissioning; and (4) she held *herself* out as a minister. *Id.* at 191-92.

In *Morrissey-Berru*, the Supreme Court reaffirmed this case-by-case, fact-driven approach while underscoring that though all the factors remain pertinent, the most important consideration is what an employee actually does. 140 S. Ct. at 2063-64. The Supreme Court has thus directed courts to scrutinize an employee's specific functions to determine whether she is genuinely responsible for teaching or preaching the faith. *See id.* at 2056-59, 2066-69. Through this fact-bound analysis, courts determine who "speak[s] in [the organization's] own voice and spread[s] its own message." *See Demkovich*, 3 F.4th at 978.

### A.   Fitzgerald did not perform the functions of a minister.

**1.** Viewing disputed facts in Fitzgerald's favor and starting with the most important consideration—what she did—Fitzgerald did not preach or teach the faith.

The ministerial exception is limited to employees who have an "important responsibility in elucidating or teaching the tenets of the faith." *Morrissey-Berru*, 140 S. Ct. at 2064. In schools, that has meant teachers who teach religious doctrine, pray with the students, and lead religious rituals. The teacher in *Hosanna-Tabor*, for example, taught religion four days a week. 565 U.S. at 192. Both teachers in *Morrissey-Berru* were their students' "primary teachers of religion." 140 S. Ct. at 2067; *see also*

19

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 656 (7th Cir. 2018) (Hebrew teacher who taught students Torah deemed minister). The teacher in *Hosanna-Tabor* led her students in prayer three times each day and also led other daily devotional exercises, 565 U.S. at 192; *see also Grussgott*, 882 F.3d at 656 (teacher taught students prayers). The teachers in *Morrissey-Berru* each opened or closed every school day with prayer, and they both taught prayers and other religious practices. 140 S. Ct. at 2057, 2059. And one produced the school's passion play. *Id.* at 2057.

Unlike those teachers, Fitzgerald did not play any role, let alone a "key" one, in conveying Catholic doctrine to Roncalli students. *See Morrissey-Berru*, 140 S. Ct. at 2055. Her responsibility was, first and foremost, to help students achieve academic success and prepare for college. She scheduled students for classes, helped with the college-admissions process, supplied test-preparation materials, and coordinated standardized testing. SA.3 ¶ 13; 4-5 ¶¶ 17, 20-27; 14-15 ¶¶ 98-103; *see also* SA.27 ¶ 11. She didn't incorporate Catholic doctrine or teachings in her discussions with students. SA.5-6 ¶¶ 28-31, 33-34; 7 ¶ 40; 56 ¶¶ 11-13; 60 ¶¶ 11-14; 62-63 ¶¶ 5-12; 67 ¶¶ 7-8, 11-12; 73 ¶¶ 8-11; *see also* SA.41-42 ¶¶ 17, 19, 22; 47 ¶ 28; 77 ¶¶ 8, 11. Nor did Roncalli expect guidance counselors to play a religious role, much less a vital one; the school designated other staff to serve as spiritual leaders for the students. For example, it explicitly told classroom teachers to pray with students weekly and offered at least one teacher a prayerbook to help her fulfill this duty. SA.52 ¶ 13. And it directed students with spiritual needs to seek help from the campus minister, chaplain, and religion teachers. App. 183:11-22; *see also* SA.56 ¶ 12; 63 ¶¶ 10-11; 73 ¶¶ 12, 15; 77 ¶ 10. By contrast, Roncalli never offered Fitzgerald a prayerbook for praying with students, never asked her to pray with students, and never told her—in performance evaluations or otherwise—that she should incorporate religion or prayer into her duties. SA.7 ¶¶ 36, 41; 15 ¶ 107; *see also* App. 609:17; SA.138.

20

Nor did Fitzgerald perform a religious role at school events. She never prayed over the public-address system. SA.20 ¶ 142. When she attended all-school mass (which was dependent on her workload), she was an attendee, like anyone else in the school or outside community. SA.20 ¶¶ 138, 141; 69 ¶¶ 23-25; 74 ¶ 21; 77-78 ¶¶ 18, 20. She never served as a Eucharistic minister or in any other leadership role in mass. SA.20 ¶ 138; 64 ¶¶ 20-22; 69 ¶ 26; 78 ¶ 19.

Fitzgerald's other duties likewise did not entail any important religious functions.

As a member of the Administrative Council, she represented the Guidance Department's interests. SA.8-9 ¶¶ 51-52. The meetings mostly involved the same secular, logistical issues that arise in the running of any school. SA.8 ¶ 51; 46 ¶ 23. Because the Guidance Department was decidedly *not* religious, when religion issues arose during meetings, they were addressed by the departments that *were* religious— the ministry team or religion teachers. SA.10 ¶¶ 61-63. And when Fitzgerald did weigh in on issues that involved religious events, it was solely to discuss logistics, such as parking for an all-school mass. App. 219:15-22.

As co-director of the Guidance Department, Fitzgerald oversaw the other guidance counselors, who also did not have religious responsibilities. App. 162:7-163:20; SA.27 ¶¶ 9, 11-12; SA.37-38 ¶¶ 31-32. She organized and edited the school's master course schedule. SA.5 ¶ 21. She coordinated test administration for standardized tests that public schools also administer. SA.14-15 ¶ 100-02. That responsibility— like much of what she did at Roncalli—was logistical: She coordinated test dates, spaces, delivery, and proctors. She also helped facilitate weekly departmental meetings on matters relevant to the department's work, which did not include discussions of religious or spiritual topics. SA.13 ¶¶ 84-87.

**2.** Bereft of evidence that Fitzgerald played any religious role, never mind a vital one, Roncalli improperly resolves factual disputes and draws inferences in its own

favor and points to a handful of isolated, out-of-context details that simply do not represent Fitzgerald's job.

***Job Description.*** Roncalli depends overwhelmingly on its contracts, ministry descriptions, and faculty handbook as evidence of Fitzgerald's responsibilities, Br. 6-7, 19-21, asserting that these documents "expressly charged [Fitzgerald] with leading students toward Christian maturity and with teaching the Word of God," Br. 6. Roncalli's view of Fitzgerald's status is pertinent here only insofar as it shows what Roncalli actually required and what Fitzgerald actually did, *see Morrissey-Berru*, 140 S. Ct. at 2064—not what Roncalli *now* says. And the evidence of what Fitzgerald did and was expected to do tells a different story.

As an initial matter, Fitzgerald received and signed the guidance-counselor-ministry contract a mere two months before being put on administrative leave. App. 507-08. She was not given a copy of the guidance-counselor-ministry description until after she had already signed the contract. SA.18 ¶128. She and the other counselors had not been notified that a new contract or description was coming. *Id*. They did not receive any training connected to the new description, and no one from the school verified that they had received, read, or understood it. SA.18 ¶ 129; 30 ¶ 38; 37 ¶ 23. And multiple counselors confirmed that their duties did not change after the ministry contract and new description were introduced: Both before and after, they were not expected to play a religious role in students' lives. Nor did they. SA.19 ¶ 132; 30 ¶ 39; 36 ¶ 20.

In all events, it is not enough for an employer to adopt a job description that purports to give employees ministerial duties; the description must reflect the employee's *actual* duties. *See DeWeese-Boyd v. Gordon Coll.*, 163 N.E.3d 1000, 1013 (Mass. 2021) (rejecting religious college's argument that professor is a minister just because formal

22

documents say so), *petition for cert. filed* (U.S. Aug. 2, 2021) (No. 21-145).[4] Instead, what matters is the "totality of the circumstances," including the "important functions performed for the religious institution," whether those functions "were essentially liturgical, closely related to the doctrine of the religious institution, . . . performed in the presence of the faith community," and whether they "resulted in a personification of the religious institution's beliefs." *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 614 (Ky. 2014).

Nonetheless, Roncalli presses this Court to accept without question that the religious duties listed in its formal documents and Weisenbach's declaration reflect its actual expectations for Fitzgerald and what her job actually entailed. It asks the Court to ignore Fitzgerald's evidence that she did not perform any religious functions, and that Roncalli never expected her to. That turns the summary-judgment standard on its head.[5]

***FLSA Letter.*** Roncalli also looks to a letter by Starkey and emails by Weisenbach that discussed counselors' pay under the Fair Labor Standards Act, pointing to statements about the extent to which counselors performed duties in the teachers' ministry description. Br. 8-9. But Fitzgerald did not author or sign onto those emails or the attached letter from Starkey. She has instead stated that counselors did not actually perform all of the religious duties that Starkey and Weisenbach identified. App. 254:1-3; 257:14-22; *see also* SA.17 ¶¶ 121, 123.

---

[4] To conclude otherwise would encourage religious employers to shield themselves from liability by adopting across-the-board ministry contracts, no matter what an employee's job actually requires. Indeed, the reasonable inference drawn in Fitzgerald's favor is that Roncalli did precisely that.

[5] Roncalli also relies on Angela Maly's declaration to argue that the ministry description accurately reflects the counselors' jobs. But even if those facts weren't disputed—they are—the declaration would be of little relevance: Maly started working at Roncalli the month Fitzgerald was placed on leave. What matters is what was expected of *Fitzgerald* while *she* was at Roncalli, and what *she* actually did, *see Morrissey-Berru*, 140 S. Ct. at 2064, not what Maly did or was expected to do after Fitzgerald left.

***Counseling.*** Roncalli cites statements from Fitzgerald's CEAP self-evaluation, Br. 21-22, and from counselor Autumn Currens about "encouraging faith with [Currens' students]," Br. 11-12, and asks this Court to infer that those brief mentions accurately reflect staff members' understanding of their job duties. But both Fitzgerald and Currens confirmed that they did not encourage students' Catholic faith and were not expected to. SA.6 ¶¶ 29-35; 28 ¶ 24-25; 29 ¶ 28-29.[6]

Roncalli also points to a letter from former board member Daniel Parker after Fitzgerald was put on leave, defending Fitzgerald by purporting that Fitzgerald "always preached the message of the Gospel in the meetings with my family." App. 606. But Parker's daughter, who is best positioned to know what she herself experienced, stated that Fitzgerald "never preached the message of the Gospel in any of [their] meetings." SA.73 ¶ 10. Fitzgerald did not discuss "religion" or "spirituality" with her, did not pray with her, "did not help shape [her] spiritual life," and "did not inspire or guide [her] in [her] spiritual life." SA.73 ¶¶ 8-11. And the same was true of Fitzgerald's work with all the students. SA.4 ¶ 18.

***Administrative Council.*** Roncalli selects a handful of out-of-context items from Administrative Council agendas to suggest that the Council in general—and Fitzgerald as a member—played an important role in shaping the school's religious mission. Br. 13-15, 23-26. But as explained above, Fitzgerald did not play a religious role on the Council. And the Council itself dealt with the day-to-day business of running any school. App. 198:7-14; SA.8 ¶ 51. It was not responsible for the school's religious mission—that duty resided with the Campus Ministry team, the Religion Department, the Vice President for Mission and Ministry, and the chaplain. SA.9 ¶¶ 57-59.

---

[6] The court cannot weigh Fitzgerald's and Currens's declarations against their self-evaluations and infer that the declarations—admissible evidence, no matter how Roncalli describes them—are inaccurate. *See Gonzalez*, 578 F.3d at 529. Any conflicts must be resolved in Fitzgerald's favor. *See id.*

That Fitzgerald was in the school's "leadership" does not make her a minister. Indeed, the Supreme Court has rejected reliance on general descriptors of that ilk. *See Morrissey-Berru*, 140 S. Ct. at 2063-64, 2067 n.26. And for good reason: Plenty of leadership roles have nothing to do with determining and transmitting the faith. The IT Director at a religious nonprofit could be in a leadership position. But in no way would that person, in the mine run of cases, play a "key role[]" in developing and transmitting religious teachings. *See id.* at 2060. The examples are legion: Head of Groundskeeping, Director of Facilities, and Director of Plant Operations, to name a few.[7] The Head of Surgery at a religious hospital might sit on an administrative board and make important decisions for the hospital, but to consider her a minister based solely on that would divorce the ministerial exception from its grounding in the First Amendment's prohibition against government's making *religious* decisions.

To be sure, leadership positions might ultimately help further a religious organization's mission; and a religious employer might require that all such employees (and the entire staff) conduct themselves at work according to principles of the faith. But if that were enough to make employees *ministers* for legal purposes, every administrative assistant, bus driver, custodian, and gift-shop clerk would be one. For they each help further their employer's mission in their own way. A rule that would make them all ministers has no relation either to the purpose of the ministerial exception as explained in *Hosanna-Tabor* and *Morrissey-Berru*, or to the holdings in those cases. Ministerial employees are the "chief instrument[s]" for a religious organization "to fulfill its purpose"—its *religious* purpose. *Demkovich*, 3 F.4th at 978 (quoting *McClure*, 460 F.2d at 559). Not everyone who contributes to a religious organization's day-to-day operations qualifies—not even all who hold "leadership" positions.

---

[7] *See Davis v. Balt. Hebrew Congregation*, 985 F. Supp. 2d 701, 711 (D. Md. 2013) (facilities manager); *Lukaszewski v. Nazareth Hosp.*, 764 F. Supp. 57, 58-61 (E.D. Pa. 1991) (director of plant operations); *see also* Ted Booker, *Notre Dame's Landscaping Chief to Retire, Capping Off 35-year Journey*, South Bend Tribune (May 22, 2019), https://perma.cc/SFN9-KQKF (landscaping chief).

***Student Assistance Program.*** Roncalli uses a page from the 2016-17 student handbook and Maly's declaration to characterize SAP as addressing students' spiritual needs and, through a faith-based lens, their other personal needs. Br. 8-9, 22-23. But members of the SAP team and students confirmed that SAP focused primarily on drug and alcohol use, along with academic struggles. SA.41 ¶ 8; 56 ¶ 15; 63 ¶ 15; 77 ¶ 16. The SAP team "did not address students' religious issues or struggles." SA.41 ¶ 9. Nor did it receive referrals related to students' spiritual struggles. *Id.*; *see also* SA.14 ¶¶ 93-94. Indeed, even Weisenbach's declaration did not list spiritual issues as something that SAP addressed. App. 23 ¶ 29. And being in SAP did not require *any* counseling appointments other than for drug tests, let alone ones for spiritual instruction. SA.13 ¶ 92; 67-68 ¶¶ 14-18. While it is certainly possible to address substance use, academic struggles, and other personal issues from a religious perspective, that was not SAP's approach. *See* SA.27 ¶¶ 19-22; 41 ¶¶ 10-12; 56 ¶¶ 14-16; 67-68 ¶¶ 14-18. That Roncalli *now* says that it wants the SAP team to approach students' personal issues from a religious perspective or that it wants counselors to "show[] the face of Christ," Br. 8-9, does not change what Fitzgerald's evidence shows—that Roncalli had no such expectation when she worked there.

As a counselor who worked with Fitzgerald said, "a public-school program would be able to approach students' issues in the same way [Roncalli's SAP] did." SA.28 ¶ 22. The school's social worker likewise noted that "this kind of program definitely exists in public schools." SA.41 ¶ 12. So even if SAP played an important role in getting students back on track, the fact that it was just like what might be in a public school, where religious programming is constitutionally forbidden, means that it cannot be weighty in the ministerial-exception analysis, which turns on teaching and preaching *religion*. *See Morrissey-Berru*, 140 S. Ct. at 2063.

*Senior Retreat.* Roncalli also seeks to make hay of Fitzgerald's involvement in a senior retreat. Br. 13, 22. But Fitzgerald attended just one during her roughly fifteen years at Roncalli, and she was an observer, not a leader. SA.21 ¶¶ 145-46. She gave a single, thirty-minute talk about the ups and downs of her life and her personal faith. App. 317:6-9; SA.21 ¶¶ 148-49; *see also* SA.73-74 ¶¶ 19-20.[8]

*         *         *

When factual disputes are resolved in Fitzgerald's favor, as they must be, the only *undisputed* facts about anything religious that Fitzgerald actually did during her *15 years* at Roncalli are that she: (1) suggested that students be allowed to hold their own prayer circle after the Parkland school tragedy so that they wouldn't stage a walkout, (2) read and discussed as a member of the Administrative Council—but did nothing to implement—one religious book, and (3) talked about her personal experiences and faith for 30 minutes at a single Senior Retreat. That cannot be enough to show that she had "vital" and "important responsibilit[ies] in elucidating or teaching the tenets of the faith," *Morrissey-Berru*, 140 S. Ct. at 2064, and was a "'chief instrument' for [Roncalli] 'to fulfill its [religious] purpose,'" *See Demkovich*, 3 F.4th at 978 (quoting *McClure*, 460 F.2d at 559). The ministerial exception does not apply.

**B.    None of the other considerations even minimally support that Fitzgerald was a minister.**

*Hosanna-Tabor* and *Morrissey-Berru* outlined secondary considerations to determine whether an employee is a minister. All three weigh in Fitzgerald's favor.

*First,* Roncalli did not hold Fitzgerald out as a minister. In *Hosanna-Tabor*, the teacher's official title included "[m]inister," and "[c]ommissioned." 565 U.S. at 191;

---

[8] Fitzgerald's personal faith and personal religious expression cannot make her a minister, despite Roncalli's insistence to the contrary. That would be akin to deeming a physician a minister simply because she was drawn to the medical field by a faith-based call to heal. Instead, what is important is the extent to which religion is part of one's job—and Fitzgerald's evidence demonstrates that religion was not part of hers.

27

*see also Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 184 (7th Cir. 1994) ("probationary minister" seeking promotion to "Clergy Member" or "Elder"). Fitzgerald by contrast, had the titles of Guidance Counselor and Co-Director of the department, both of which "[o]ne might have . . . at a public school and perform a completely secular job." *See Grussgott*, 882 F.3d at 659. Roncalli argues that "Co-Director" designates her as a leader and "Guidance" implies "guiding students as they mature and grow," Br. 27 (quoting *Starkey*, 2021 WL 3669050, at *7). But as described above, leadership does not necessarily mean *religious* leadership. More fundamentally, a title does not support applying the ministerial exception if it "does not show that [the employee] served a religious role." *Grussgott*, 882 F.3d at 659. Titles like "grade school teacher" or "Hebrew teacher"—or indeed, Co-Director of Guidance— could be (and were) held by secular employees. *See id.* They do not establish that an employee is a minister.

Nor did Roncalli hold out guidance counselors as playing religious roles. Roncalli's Guidance Department website did not mention any religious role for counselors at all: the *only* mention of anything religious is that the department has a social worker (not a guidance counselor) from Catholic Charities. SA.118-28; *see also* SA.136 (2019 handout). Unsurprisingly, then, a student explained that the Guidance Department's job is merely to "get the college acceptance rate as high as possible." SA.56 ¶ 10. Another stated that "the school presented" counselors "as playing an academic role," not a "religious" one. SA.63 ¶ 8. Multiple students, teachers, and staff all understood that the guidance counselors were not religious leaders or resources. *See* SA.41 ¶ 15; 47 ¶¶ 25-31; 52 ¶¶ 17-20; 60 ¶¶ 9-13; 69 ¶¶ 27-29; 73 ¶¶ 13-17; 77-78 ¶¶ 13, 22-23.

Yet Roncalli argues that it held Fitzgerald out as a minister through its ministry contract and description. Br. 27. But it could not hold her out as a minister—or anything else—with private employment documents that would not been seen by the public or the school community broadly. *Cf. Hosanna-Tabor*, 565 U.S. at 191 (teacher

underwent "formal process of commissioning" by congregation, which "pray[ed] that God bless her ministrations" (cleaned up)).

*Second*, Fitzgerald did not hold herself out as a minister. She never referred to herself as a minister or faith leader and "did not think it would be appropriate" to do so. SA.19 ¶ 134. She didn't offer religious leadership, guidance, or prayer when meeting with students or colleagues. SA.6-7 ¶¶ 29-31, 37, 40, 45; 47 ¶ 28; 56 ¶¶10-13; 60 ¶¶ 11, 14; 62-63 ¶¶ 5-12; 67 ¶¶ 7-8, 11-12; 73 ¶ 8. Roncalli's only argument to the contrary rests on generalizations, unmoored from what Fitzgerald did or how she acted: It relies exclusively on a letter that Fitzgerald did not author, sign, or send, and an annual event that Fitzgerald—with her supervisor's approval—often did not attend. These two nonactions are different in kind from "accept[ing] the formal call to religious service," claiming religious tax benefits, and other proactive means to hold oneself out as a minister. *See Hosanna-Tabor*, 565 U.S. at 191-92.

*Third*, Fitzgerald had no special religious training or certifications. SA.2 ¶ 5. After finishing Catholic high school (at Roncalli), she went to a secular college and did not study anything related to religion. App. 155. She then completed her master's degree in school counseling at a public university. App. 156. And because guidance counselors at Roncalli were not entrusted with religious responsibilities, the only additional formal education or training that she could obtain was from secular groups like the Indiana School Counseling Association. *See* SA.2-3 ¶ 5-6; 38 ¶ 34. The "education" that Roncalli asserts—Fitzgerald's upbringing in a Catholic family, her high-school education at Roncalli, and her participation in a single book discussion, Br. 28—is simply insufficient to qualify as "significant" for purposes of the ministerial exception. *See Grussgott*, 882 F.3d at 659. It is a far cry from the teacher in *Hosanna-Tabor*, who underwent six *years* of formal training and commissioning, 565 U.S. at 191, or the teachers in *Morrissey-Berru*, who were catechists, 140 S. Ct. at 2067. And the teachers at Roncalli, who genuinely were entrusted with "instructi[ng]" students

29

"in the essential teachings of the Catholic faith," were required to be certified cate-chists. App. 762.

**C.   Roncalli's framing of Fitzgerald's position is entitled to no defer-ence.**

Roncalli argues that it, not the Court, gets to determine whether Fitzgerald's role had religious importance. Br. 24 (citing *Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568, 570 (7th Cir 2019)). But in both *Sterlinski* and *Grussgott*, the Seventh Circuit held that it is the *courts'* duty to "determine whether the . . . employee . . . was serving a religious function." *Sterlinski*, 934 F.3d at 570 (citing *Grussgott*, 882 F.3d 655). And again, *Morrissey-Berru* clarified that the primary consideration in that analysis is what the employee did. 140 S. Ct. at 2064.

In *Sterlinski*, it was undisputed that the organist performed religious music. 934 F.3d at 569. And in *Grussgott*, the teacher acknowledged that she "taught her stu-dents about Jewish holidays, prayer, and the weekly Torah readings" and "practiced the religion alongside her students by praying with them and performing certain rit-uals." 882 F.3d at 660.

Here, not only are there factual disputes about what Fitzgerald did, but those disputes are about whether she had *any* religious duties *at all*, not whether they made her "vital" and "essential to the performance" of religious functions. *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). In other words, Fitzgerald is not saying she had religious duties that on balance should be considered unimportant. Rather, she has shown that what Roncalli says now about its expectations was not what it actu-ally asked, expected, or required of her. At the very least, Roncalli cannot establish as a matter of law that she was something so grossly at odds with the evidence.

And even if *Sterlinski* and *Grussgott* could be read to suggest that courts should give unfettered deference to religious employers when deciding whether to apply the

ministerial exception—which they can't—the cases would then be abrogated by *Morrissey-Berru*. For the Supreme Court made explicit that the ministerial exception is a legal test under which courts must "take all relevant circumstances into account and . . . determine whether each particular position implicate[s] the fundamental purpose of the exception." 140 S. Ct. at 2067. And again, "[w]hat matters, at bottom, is what an employee does." *Id.* at 2064. Adopting Roncalli's preferred approach of deferring to the "*employer's* understanding of the religious importance of the plaintiff's job duties," Br. 24, flies in the face of the Supreme Court's command. Here, the predicate factual questions for applying the legal test are at least in dispute. On summary judgment, those disputes must be decided in Fitzgerald's favor, not Roncalli's.

### D.    The Court's decision in *Starkey* does not control.

Roncalli contends that the decision in *Starkey* preordains the outcome here. It is not controlling for at least two reasons.

First, the ministerial exception is a fact-dependent, employee-by-employee determination that looks to a particular employee's duties and asks whether she plays the critical religious role of a minister. *See, e.g., Hosanna-Tabor*, 565 U.S. at 190-92. Starkey and Fitzgerald were two different employees, with different job duties, histories, and activities. For example, Starkey led multiple prayers over the Roncalli P.A. system. *Starkey*, 2021 WL 3669050, at *3. Fitzgerald never did. SA.20 ¶ 142; *see also* Br. 15. Starkey gave "guidance to other staff . . . regarding how to prepare students of different faiths for the school's Catholic liturgy." *Starkey*, 2021 WL 3669050, at *2. Fitzgerald didn't. SA.20 ¶ 139. Starkey regularly attended the Day of Reflection. *Starkey*, 2021 WL 3669050, at *2. When Fitzgerald was put on leave, she had not attended any part of it in four years, had not attended faculty mass in six years, and had been excused from both by Weisenbach. SA.22 ¶¶ 155-56. It is *Fitzgerald's* job, not Starkey's, that matters here.

Second, many of the facts critical to the *Starkey* decision are disputed here. *Starkey* relied on Maly's view that the ministry description reflected the day-to-day expectations for guidance counselors, along with statements from Fitzgerald's CEAP self-evaluation that she discussed "faith formation" with students, "consistently use[d] spiritual life and resources" in her work, and had a "willingness to share her beliefs." 2021 WL 3669050, at *5. But here, multiple counselors have explicitly denied that the ministry description accurately reflected Roncalli's expectations or their job duties. SA.18-19 ¶¶ 130-31; 30 ¶ 40; 36-37 ¶¶ 19-22. Likewise, students and teachers observed that Roncalli counselors—including Maly herself—did not in fact play any religious role, address students' religious questions, or pray with students in counseling sessions. SA.47 ¶¶ 26-31; 52-53 ¶¶ 17-20, 22; 56 ¶¶ 10-13; 60 ¶¶ 8-14; 62-63 ¶¶ 5-12; 68-69 ¶¶ 19-21; 73 ¶¶ 8-15; 77 ¶¶ 8-12. As for the CEAP statements, Fitzgerald's evidence shows that they were exaggerations or about things that she would have been *willing* to do but "never were a part of [her] job." *See* App. 277:11-278:9, 281:11-283:13, 284:12-17.

*Starkey*'s understanding of Roncalli's SAP rested on Maly's statement that students were encouraged to reach out to the SAP when struggling with something that may affect their "spiritual health," and an inference that Roncalli "anticipated that matters of faith and doctrine would inform a guidance counselor's approach" to addressing students' personal issues. 2021 WL 3669050, at *5. But Fitzgerald's evidence shows that the SAP did not address students' spiritual issues, that it was not supposed to and did not address students' other personal issues from a religious perspective, and that public schools could have identical programs. SA.14 ¶¶ 93-94; 28 ¶ 22; 41 ¶¶ 9-12; 67-68 ¶¶ 14. The Court concluded in *Starkey* that "others perceived [Starkey's] position as having a religious component." 2021 WL 3669050, at *5. But numerous counselors, students, and teachers did not understand Fitzgerald

to play a religious role or act as a religious leader. SA.47 ¶¶ 26-27; 52 ¶¶ 18-19; 56 ¶¶ 9-13; 60 ¶¶ 8-10; 62-63 ¶¶ 5-12; 69 ¶¶ 27-29; 73 ¶ 16; 77-78 ¶¶ 8, 13, 22.

As for the Administrative Council, Fitzgerald's evidence, unlike that in *Starkey*, disputes that the Council was "[g]enerally seen by the faculty as the 'lifeblood of decision-making' at Roncalli" and that it and the Department Chairs "handled 95% of Roncalli's daily ministry, education, and operations." *Compare* 2021 WL 3669050, at *5, *with* SA.9-11 ¶¶ 56-57; 46 ¶¶ 23-24; 52 ¶¶ 14-15. In *Starkey*, the Court relied on evidence that the Council and Starkey "continually worked to strengthen the spiritual . . . elements of the Catholic educational environment," "discussed how to infuse faith formation into the athletic program," "planned all-school liturgies," "determined the qualifications for . . . Eucharistic ministers," and considered "how to address the personal and spiritual struggles of faculty members." 2021 WL 3669050, at *6. Fitzgerald's evidence disputes all that. SA.9-11 ¶¶ 53-58, 62-70; App. 368:17-369:2. Ultimately, the Court ruled that Starkey "help[ed] shape Roncalli's educational *and spiritual* environment." 2021 WL 3669050, at *6 (emphasis added). Given Fitzgerald's evidence, the Court simply cannot reach that conclusion as a matter of law here.

## II. Defendants' additional arguments fail.

In a last-ditch effort, Roncalli asserts nine merits defenses. To the extent that any are more than repeats of what this Court has already rejected, they are either premature or foreclosed by circuit precedent.

### A. This Court has already denied Roncalli's additional First Amendment and Title VII defenses.

The Court has already considered and rejected Roncalli's other First Amendment and Title VII defenses. And Roncalli offers no good reason for the Court to revisit those decisions. So just as it did before, this Court should reject them.

First, as this Court has already held, "Title VII's religious exemption does not bar Fitzgerald's Title VII claim." Dkt. 98, at 5. Roncalli does not explain why the Court

should change its earlier ruling. Instead, it reasserts that religious employers must be permitted to discriminate based on an employee's "particular religious belief, observance, or practice." Br. 32. But the Court has already explained that Roncalli's preferred approach "would allow a religious employer to convert any claim of discrimination on the basis of one protected class under Title VII to a case of religious discrimination, so long as there was a religious reason behind the employment decision." *Starkey*, dkt. 93, at 11. The Court's ruling was correct and should stand.

Nor does Roncalli put forth any new reasons why the Court should reverse its ruling that "Fitzgerald has carried her burden of pleading sufficient facts to support a plausible claim of a Title VII violation." Dkt. 98, at 5. Instead, Roncalli rehashes arguments blaming Fitzgerald for "violat[ing] her employment contract" when she got married, Br. 33, and arguing that this "breach" constitutes a "legitimate, nondiscriminatory reason" for her termination, *id.*; dkt. 42, at 13. It continues to insist that Fitzgerald's conduct—"entering into a same-sex union and rejecting Church teachings"—and not her status, led to her termination. Br. 33; *see also* dkt. 42, at 14. And it selectively presents the timeline of events to question whether Fitzgerald has pleaded "but-for" causation. Br. 33; *see also* dkt. 42, at 16-18. The Court has heard and properly rejected those arguments before. *See* dkt. 98, at 5.

Next, Roncalli argues that the religious-autonomy doctrine protects religious groups' "right to 'govern themselves in accordance with their own doctrines.'" Br. 34 (quoting *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013)). But this Court already rejected the argument as premature, dkt. 98, at 5, which it still is. And the Court expressed the manifestly correct concern that adopting Roncalli's interpretation "would render the ministerial exception superfluous." *Starkey*, dkt. 93, at 18.

Finally, Roncalli argues again that Fitzgerald's claims would impermissibly entangle the Court in religious questions, that Roncalli is protected by the freedom of association, and that the Court should avoid reaching Fitzgerald's claims under the

doctrine of constitutional avoidance. Br. 35. But this Court has already held that entanglement arguments are premature, dkt. 98, at 5, and that the freedom-of-association argument is inapplicable in the employment context, *id.* And constitutional avoidance is appropriate where there is a plausible statutory reading allowing the court to avoid a constitutional issue. But here, Roncalli's suggested statutory alternative is based on a reading of Title VII that this Court has already rejected. *Id.* Roncalli's squib arguments on the final page of its brief do not overcome the Court's reasoned decision rejecting them.[9]

### B.   As a matter of law, RFRA does not apply.

Roncalli does raise one new argument—that the Religious Freedom Restoration Act forecloses Fitzgerald's claims. But as Roncalli acknowledges, the Seventh Circuit has expressly held that RFRA "does not apply when the 'government,' as defined in RFRA, is not a party to the action." Br. 30 n.6 (quoting *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 736, 737 (7th Cir. 2015)). Roncalli asserts in a footnote that this precedent is "now questionable in light of *Bostock* and contrary decisions of other circuits." Br. 30 n.6. But Roncalli does not explain what in *Bostock* supposedly makes the holding in *Listecki* "questionable." Nor can it: After all, *Bostock* explicitly declined to consider RFRA at all. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020). Roncalli may wish that RFRA applied here, but that does not make it so.

### CONCLUSION

The Court should deny the motions for summary judgment and judgment on the pleadings.

---

[9] To the extent that Roncalli's arguments do raise anything new based on evidence submitted with its motion, those arguments are premature. At Roncalli's request, and over Fitzgerald's opposition, the Court bifurcated discovery and directed the parties to "proceed only on the applicability of the ministerial exception." Dkt. 117, at 5. Before the Court may consider Roncalli's merits defenses, Fitzgerald must have the opportunity to conduct merits discovery. If Fitzgerald must wait, so too must Roncalli. What's sauce for the goose is sauce for the gander.

Respectfully submitted,

/s/ *Bradley Girard*

MARK W. SNIDERMAN
Findling, Park, Conyers, Woody &
Sniderman, P.C.
151 N. Delaware Street, Ste. 1520
Indianapolis, IN 46204

DAVID T. PAGE
1634 W. Smith Valley Road, Suite B
Greenwood, IN 46142

RICHARD B. KATSKEE
BRADLEY GIRARD
ADRIANNE M. SPOTO
Americans United for Separation of
   Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-3234
girard@au.org

*Counsel for Michelle Fitzgerald*

January 24, 2022