UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHELLE FITZGERALD,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>RONCALLI HIGH SCHOOL, INC. and,  )<br>ROMAN CATHOLIC ARCHDIOCESE OF  )<br>INDIANAPOLIS, INC.,  )<br>)<br>Defendants.  ) | No. 1:19-cv-04291-RLY-TAB |

**ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendant, Roncalli High School, Inc., fired Plaintiff, Michelle (Shelly) Fitzgerald, who had been employed by Roncalli for fifteen years, after learning that she lawfully married another woman. In her role as a guidance counselor at Roncalli, Fitzgerald gave advice to students on matters involving class schedules, college applications, and standardized testing. She sues Roncalli and the church that oversaw it, the Roman Catholic Archdiocese of Indianapolis, Inc., alleging they violated 42 U.S.C. § 2000e by firing her (Counts I, II, and III), that Roncalli retaliated against her for engaging in protected conduct (Count IV),[1] and that the Archdiocese interfered with her contractual and business relationship with the school (Count V and VI). Roncalli and the Archdiocese defend on the ground that the ministerial exception bars all of Fitzgerald's

---

[1] In a previous Entry, the court concluded that Title VII, which forms the basis for Counts I–III, preempts Fitzgerald's Count IV retaliation claim. (*See* Filing No. 98). Therefore, the court granted judgment to Roncalli on the pleadings for Count IV. (*Id.*).

1

claims. For the reasons set forth below, the court agrees with Defendants. Accordingly, the court **GRANTS** Defendants' Motion for Summary Judgment (Filing No. 118).

I.     **Background**

Shelly Fitzgerald began working as a guidance counselor for Roncalli in 2004. (Filing No. 125, Supplemental Appendix ("SA") at 2 ¶ 3). Three years later, Roncalli promoted her to Co-Director of the Guidance Department. (*Id.* at 3 ¶ 7). She primarily assisted students with academics, class scheduling, college planning, and career counseling. (*Id.* at 3–4 ¶¶ 14–15). The parties dispute whether Fitzgerald and other guidance counselors had or performed religious duties. (*Compare* Filing No. 120, Appendix ("App.") at 1–9 (declaration of guidance counselor hired after Fitzgerald was let go) *with* SA at 26–32 (declaration of guidance counselor with whom Fitzgerald worked)).

Roncalli introduces a declaration from guidance counselor Angela Maly, who describes her role as "assist[ing] students with their social, mental, academic, emotional, and spiritual needs." (App. at 2 ¶ 4). Accordingly she instructed students "how to rely on God," prayed regularly with students, and encouraged students to "offer [their] struggle[s] up to Christ through prayer." (*Id.* at 2–3 ¶¶ 7, 9, 13). But she was only hired after Fitzgerald had been placed on leave. (*Id.* at 1 ¶ 2).

Fitzgerald, to the contrary, submits evidence from contemporary guidance counselors who stress guidance counselors played no religious or ministerial role during Fitzgerald's tenure. Counselors never talked with students about religion or faith, and instead focused on SAT/ACT testing, career guidance, and scheduling. (SA at 27, 28 ¶¶

2

11, 25). Fitzgerald also claims she never prayed or discussed religious doctrine as part of work, and that students did not come to her with religious or spiritual issues at all. (*Id.* at 7 ¶¶ 37–40; *id.* at 47 ¶¶ 25–26). When a student needed in-depth answers to religious questions, teachers referred them "to a religion teacher, the campus minister, or the school's priest" instead of guidance counselors. (*Id.* at 47 ¶ 30). Allegedly, Roncalli encouraged students to go to "religious sisters, a priest, the dean, the principal, or the religion teachers" but not guidance counselors when religious questions arose. (*Id.* at 56 ¶ 12). Indeed, the guidance counselors' duties were seemingly so non-religious that a religion teacher proposed creating a new position for a "spiritual guidance counselor." (*Id.* at 8 ¶ 49). That position would talk about God, religion, and spirituality with students during counseling appointments because the current guidance counselors were not. (*Id.*)

As part of her job, Fitzgerald sat on the "Administrative Council." (App. at 18 ¶¶ 4, 7). The council included the Principal, Campus Minister, Chaplain, two Assistant Principals, Dean of Students, Athletic Director, and Co-Directors of Guidance. (*Id.*). There is, however, a genuine issue of fact about what the Council does and whether it has religious responsibilities at Roncalli.

Roncalli contends this was "[t]he main leadership body in the school" and was "the lifeblood of decision-making at the school" such that it was "responsible for 95% of Roncalli's daily ministry, education, and operations." (App. at 18–19 ¶¶ 4–7). They explain that the council planned "all-school liturg[ies]," evaluated who should serve "as

3

Eucharistic ministers," and brainstormed "[h]ow to get [students] more involved in" Mass. (App. at 208, 220–21, 224–25, 447, 487–88).

Yet, Fitzgerald submits considerable evidence suggesting this is not true. On that evidence, the "Administrative Council and the Department Chairs were not responsible for 95% of Roncalli's daily ministry." (SA at 46 ¶ 23 (declaration of Charisse Phillips); *see also id.* at 9 ¶ 57 (declaration of Michelle Fitzgerald)). Nor was the Administrative Council the main leadership and decision-making body of the school; that would be the President's Council (i.e. the President, Principal, Dean, and Assistant Principles among others). (*Compare id.* at 9 ¶ 55 (identifying members) *with* App. 19 ¶ 6 (describing body as the "President's Council" and explaining it "focuses on mission, financial planning . . . and strategic planning for the school")). The Administrative Council only "dealt with the everyday questions related to running a school." (SA at 46 ¶ 22). Ministry issues were "handled" by "the campus pastor, religion department, and priest." (*Id.* at 46 ¶ 23; *accord id.* at 9 ¶ 59). To emphasize, the "Administrative Council did not decide who could serve as Eucharistic ministers" at all, that was decided "by the Campus Ministry team" who might bring an update about their decision to the principal during an Administrative Council meeting. (*Id.* at 10 ¶ 62). To the extent that a ministry issue was discussed at an Administrative Council meeting, the Campus Minister raised the issue solely to inform the principle; "[o]ther members of the Council were not expected to contribute anything when these sorts of side conversations would come up." (*Id.* at 10 ¶ 61–64).

As Co-Director, Fitzgerald attended department chair meetings and supervised other guidance counsellors. (SA at 12 ¶ 76). Common topics of discussion at chair and

supervisory meetings were updates on "core academic subject areas," "standardized testing," and "classroom presentations on testing and scheduling." (*Id.* at ¶ 78). However, there is an issue of fact about whether the department meetings and her supervisory duties required religious action by Fitzgerald. The parties also dispute whether Fitzgerald helped develop religious standards for evaluating guidance counselors or whether those standards were developed by others and merely applied to guidance counselors to secure better pay. (*See* App. at 37; *see also id.* at 273).

Whether Fitzgerald's supervisory role was religious is also in dispute. For its part, Roncalli contends that these supervisory duties required Fitzgerald to address student crises "in light of [the school's] Catholic faith." (App. at 19 ¶ 8). Fitzgerald and other guidance counselors indicate the opposite. The Department Chair meetings "did not involve making decisions about or shaping the school's religious mission." (SA at 12 ¶ 82). Instead, they revolved around "core academic subject areas," "standardized testing," and "classroom presentations on testing and scheduling." (*Id.* at 12 ¶ 78). In other words, according to Fitzgerald, the guidance counsellors never discussed "anything related to religion, including the religion curriculum," which was left to other positions like the Vice President of Mission and Ministry. (SA at 9, 12 ¶ 59, 79).

Further, like all faculty, Fitzgerald attended the "Days of Reflection," a school gathering at the beginning of the year. (App. at 21 ¶ 19). That gathering included both "nuts-and-bolts" and ministerial sessions. (*Id.* at 355–56; SA at 45 ¶ 9; *id.* at 22 ¶¶ 154–156). The nuts-and-bolts sessions covered new rule changes and other information relevant to the day-to-day running of a school, (SA at 45 ¶ 9), while the ministerial

5

sessions involved activities like commissioning participants to "faithfully and joyfully serve as ministers of the faith," (App. at 36). Some staff at the school, like cafeteria and janitorial staff, were exempt from the ministerial sessions. (*Id.* at 359).

The parties dispute whether guidance counsellors were also exempt from the ministerial sessions. Roncalli argues that Fitzgerald attended these gatherings, where she and the rest of the faculty "promise[d] to willingly share my faith with others" and were "commission[ed] . . . as ministers of the faith." (*Id.* at 22 ¶¶ 21–22; *id.* at 36). Yet, Fitzgerald states she—like cafeteria staff and janitors—only attended nuts-and-bolts sessions which solely covered "procedural . . . and major rules changes" and other information relevant to running the school. (SA at 45 ¶ 9; App. at 355–56 (explaining how Principal Weisenbach excused guidance counselors from the religious components of Days of Reflection to "meet with . . . seniors" about academics); *id.* at 359 (noting cafeteria and janitorial staff were exempted from religious parts of Days of Reflection but not the nuts-and-bolts session)). She states she was not required or expected to attend the religious aspects such as Mass. (SA at 22 ¶¶ 155–56). Her testimony also claims Roncalli exempted her from religious activities on the Days of Reflection specifically due to her role as a guidance counselor. (SA at 22–23 ¶¶ 156, 163 (noting Fitzgerald was "never 'Commissioned' as a 'Minister of the Faith'" like other teachers)).

Fitzgerald attended only one of many senior retreats during her 15-year tenure at Roncalli. (SA at 21 ¶ 145). These retreats focused on "help[ing] students understand how Christ is present in their daily life," (App. at 6 ¶ 35), and featured talks about spirituality and prayer, (App at 600). For her part, Fitzgerald gave a speech about how

6

her "relationship with God shifted throughout [her] life." (App. at 311). It is unclear, however, whether Fitzgerald attended in her personal capacity, speaking about her personal beliefs, or if she attended pursuant to her formal duties.

During her tenure at Roncalli, Fitzgerald received overwhelmingly positive performance reviews. (App. at 609–17). Indeed, Principal Weisenbach did not believe he had "ever received more positive comments about an employee when seeking feedback than [he] did when getting feedback from folks about their work[] with Fitzgerald." (*Id.* at 609). Not one positive comment or performance evaluation references religious or ministry work with students or as part of her official duties. (*Id.* at 609–17). Nor did any comments reflect the need to incorporate religious teachings into her work. (*Id.*). Fitzgerald, in a self-evaluation, referred to "hav[ing] no problems sharing my beliefs and my love of God," (*id.* at 47), but the exact meaning and truthfulness of this self-evaluation is genuinely at issue.

Other disputes abound. Roncalli claims the Student Assistance Program helped students spiritually, (App. at 3–4, 23 ¶¶ 14–18, 29), while Fitzgerald marshals evidence demonstrating that the program only addressed drug use, (SA at 41 ¶ 9 ("SAP did not address students' religious issues or struggles."); *accord* App. at 184). In the same vein, the parties dispute whether Fitzgerald's speech given to a seniors at a religious retreat was a private reflection on her personal spiritual journey not required by Roncalli, (SA at 21 ¶¶ 145, 146, 148), or a part of her official duties.

In May 2018, Fitzgerald signed a "School Guidance Counselor Ministry Contract." (App. at 507–08; *Id.* at 261). That contract incorporated a faculty handbook which stated

7

that guidance counselors were expected to "assist[] the students in strengthening and developing their social, emotional, intellectual and Christian development." (*Id.* at 435, 437). The ministry description—incorporated into the contract—also required Fitzgerald to communicate the Catholic faith to students, pray with students, and teach and celebrate Catholic traditions. (*Id.* at 29). The contract also charged her with "foster[ing] the spiritual . . . growth of the children entrusted in his/her care." (*Id.* at 509). In other words, the school described her as "a minister of the faith." (*Id.*). The contract also contained a "default" clause that provided Fitzgerald would forfeit her position if she engaged in "personal conduct . . . at variance with . . . the moral or religious teachings of the Roman Catholic Church." (*Id.* at 508).

Three months after Fitzgerald signed the ministry contract, Roncalli's leaders learned Fitzgerald was married[2] to another woman. Defendants stipulate for the purposes of this summary judgment motion that because Fitzgerald had married another woman, Roncalli placed her on "paid administrative leave" for the remainder of her contract, which Roncalli decided not to renew. (Filing No. 29, Defs.' Answer ¶¶ 56, 66). In Defendants' view, Fitzgerald, because she is a woman, could not "form with [her wife] an intimate communion of life and love," which Catholic doctrine limits to "a man and a

---

[2] Roncalli repeatedly refers to Fitzgerald's relationship as a civil union. The evidence and Roncalli's own admission, however, demonstrates that Fitzgerald's relationship is a marriage, not a civil union. (App. at 157; SA at 23 ¶ 166; Filing No. 29, Defs.' Answer ¶ 52 (noting "Defendants admit" that "Roncalli President . . . and Principal . . . knew of [Fitzgerald's] marriage to a female spouse")). As this court previously explained, this distinction is important. "[M]arriage is more than a routine classification for purposes of certain statutory benefits;" it uniquely provides "hundreds of rights and responsibilities under Indiana and federal law," *Baskin v. Bogan*, 12 F. Supp. 3d 1144, 1161 (S.D. Ind. 2014), and provides "equal dignity" to same-sex couples, *Obergefell v. Hodges*, 576 U.S. 644, 681 (2015).

woman." (Catechism of the Catholic Church § 1660). Therefore, as Fitzgerald engaged in conduct at odds with "the moral or religious teachings of" Roncalli and the Archdiocese, Fitzgerald was in default under the contract and Roncalli let her go. (App. at 508).

## II.   Legal Standard

Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal quotation marks omitted). This process requires reviewing the record in the "light most favorable to the nonmoving party and draw[ing] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

## III.  Discussion

The ministerial exception is "an affirmative defense to . . . otherwise cognizable claim[s]." *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 195 n.4 (2012). The exception binds courts "to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). Where it applies, it bars both federal and state law claims. *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th at 945 (7th Cir. 2022). Naturally, while the exception unambiguously applies to "the head of a religious congregation," *Hosanna-*

9

*Tabor*, 565 U.S. at 190, it also applies more broadly to all religious employees that "perform[] vital religious duties," *Morrissey-Berru*, 140 S. Ct. at 2066.

Determining whether an employee qualifies as a minister is a fact-intensive inquiry that requires "tak[ing] all relevant circumstances into account" to determine whether an employee is a "teacher[] of religion." *Morrissey-Berru*, 140 S. Ct. at 2066–67. "What matters" to that analysis "is what an employee does." *Id.* at 2064. Under Seventh Circuit precedent that "involves what an employee is entrusted to do, not simply what acts an employee" did. *Starkey*, 41 F.4th at 941. One way of determining what duties the organization entrusts to the employee is to examine the employment agreement and employee's expected duties. *See id.* (relying on employment agreement and faculty handbook).

Fitzgerald argues that Roncalli never entrusted her with religious teaching duties by raising numerous genuine factual disputes over what exactly she did at the school.[3] She contends the record demonstrates that Roncalli entrusted her in description alone. She never engaged in religious teaching, nor did Roncalli expect her to.

---

[3] The parties spend considerable time discussing whether Fitzgerald believed she was a minister. Roncalli points to some e-mails allegedly co-signed by Fitzgerald that argued she was a minister and should receive extra pay. (*See* App. at 498). Fitzgerald contends that her signature was added without her knowledge and consent. (*See id.* at 247). Roncalli also submits that Fitzgerald represented she engaged in religious teaching during her annual evaluation to get a raise. (*See id.* at 40–48; *see also id.* at 37 (describing Fitzgerald's goal of "find[ing] more ways to celebrate Christ")). Fitzgerald argues Roncalli's description of her evaluation is inaccurate and that her representations were puffery to try and get a raise. (*See id.* at 282–284; *see also* SA at 15–16 (describing goal of celebrating Christ as a personal not professional goal)). Regardless, Fitzgerald's subjective understanding of her role is not dispositive. *See Morrissey-Beru*, 140 S. Ct. at 2066 (explaining "the school['s] definition and explanation of the[] role[] is important"). Instead, "it is the school's expectation . . . that matters." *Grussgott*, 882 F.3d at 661.

For example, taking the record in the light most favorable to Fitzgerald would indicate that the Administrative Council only ran day-to-day operations, while other departments engaged in spiritual teaching. (SA at 9–10 ¶¶ 57, 62; *id* at 46 ¶ 23). Moreover, the Co-Director of Guidance may not have had any religious duties in their supervisory or guidance counsellor role. (SA at 27, 28, 29 ¶¶ 11, 25, 30). Indeed, guidance counsellors may have been treated like cafeteria and janitorial staff with regard to being exempted from religious discussions. (SA at 22 ¶ 155, 163; App. at 355–56). And it may be the reason there were suggestions to employ spiritual guidance counsellors is because the current guidance counsellors could not and were not expected to provide spiritual counseling. Thus, as far as Fitzgerald attempts to create genuine disputes as to these issues, she is correct that a reasonable jury could make each of those findings on this record.

Yet these disputes are not material under *Starkey*. 41 F.4th at 941. *Starkey* teaches it is not "simply what acts an employee chooses to perform," but "what an employee is entrusted to do." *Id.* In making that determination, the Seventh Circuit principally relied on (1) the employment ministry contracts, (2) the faculty code of conduct, and (3) being called a minister of the faith. *Id.* at 940. Reliance on those documents is not unusual in determining what duties a religious organization entrusts to an employee. *See Sterlinksi v. Cath. Bishop of Chi.*, 934 F.3d 568, 569 (7th Cir. 2019) (utilizing church document to determine whether organ player duties were religious); *see also Grussgott*, 882 F.3d at 660–61 (using schools' description of its curriculum to determine minister status); *Skryzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238,

11

1243 (10th Cir. 2010) (finding ministerial status based on "job description" and description of religious duties among other church documents).

All three grounds for the decision in *Starkey* are present here. Fitzgerald's employment agreement and Roncalli's description of Fitzgerald's expected duties are, alone, sufficient to resolve this case because those documents make clear that Roncalli entrusted Fitzgerald to teach the Catholic faith and carry out Roncalli's religious mission. Fitzgerald's employment agreement was a "teaching ministry contract" and Fitzgerald agreed to "[f]aithfully perform all duties of a [t]eacher in the school." (App. at 513). The faculty code of conduct indicated these expected duties included "assist[ing] the students in strengthening . . . their . . . Christian development," and "foster[ing] the spiritual . . . growth of the children entrusted in his/her care." (*Id.* at 86, 509). Counsellors were also charged with being "role models" by "leading students toward Christian maturity and with teaching the Word of God." (*Id.* at 13). Indeed, the school describes guidance counselors as "minister[s] of the faith" with the responsibilities of communicating the Catholic faith to students, praying with students, and teaching and celebrating Catholic traditions. (*Id.* at 29).

All this indicates Roncalli entrusted guidance counselors like Fitzgerald to convey the Church's message in addition to their secular duties. And under Seventh Circuit precedent, Fitzgerald's non-performance of these entrusted duties makes her "an underperforming minister" who may be removed pursuant to the ministerial exception. *Id.* at 941; *see also Sterlinksi*, 934 F.3d at 571 ("[A] church may decide that any organist who plays like a robot *ought* to be fired.") (emphasis in original).

12

To be sure, "[i]t is a stretch to call a high school guidance counsellor a minister," as "the job is predominantly secular." *Starkey*, 41 F.4th at 945 (Easterbrook, J., concurring). But because Roncalli, through the employment agreement and faculty handbooks, expressly entrusted Fitzgerald with shaping the school's religious policy, Fitzgerald's position as Co-Director of Guidance qualifies for the ministerial exception under *Starkey*. Since the application of the ministerial exception bars all of Fitzgerald's claims, summary judgment is appropriate for Roncalli and the Archdiocese. *Id.* at 942–45.

### IV. Conclusion

For the reasons discussed above, the court **GRANTS** the Defendants' Motion for Summary Judgment (Filing No. 118).

**IT IS SO ORDERED** this 30th day of September 2022.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Council of Record.